2016-1930, -1931

I N   T H E

# United States Court of Appeals for the Federal Circuit

CROSSROADS SYSTEMS, INC.,

Appellant,

v.

ORACLE CORPORATION, NETAPP INC.,

Appellees.

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2014-01207 and IPR2014-01209.

**SECOND CORRECTED OPENING BRIEF OF APPELLANT CROSSROADS SYSTEMS, INC.**

John A. Dragseth
Robert Courtney
Conrad Gosen
FISH & RICHARDSON P.C.
3200 RBC Plaza, 60 South 6th St.
Minneapolis, MN 55402
Telephone: 612-335-5070

June 30, 2016                              *Attorneys for Appellant*

## CERTIFICATE OF INTEREST

Counsel for the Appellant Crossroads Systems, Inc. certifies the following:

- The full name of every party or amicus represented by me is:

Crossroads Systems, Inc.

- The name of the real party in interest represented by me is:

N/A

- All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Crossroads Systems, Inc. has no parent company and no other publicly held company owns 10% or more of Crossroads Systems, Inc.'s stock.

- The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Fish & Richardson P.C.: John A. Dragseth, Robert Courtney, Conrad Gosen

Blank Rome LLP: Russell Wong, James Hall, Keith A. Rutherford, Steve Edwards, Domingo Manuel Llagostera

Sprinkle IP Law Group: Steven R. Sprinkle, John L. Adair, Scott S. Crocker, Elizabeth Brown Fore

Floyd Walker Law Firm: R. Floyd Walker

Date: June 30, 2016                 _/s/ John A. Dragseth_____
                                    Signature of counsel

                                    _John A. Dragseth_____
                                    Printed name of counsel

## TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................... 1

STATEMENT OF JURISDICTION .................................................................. 1

STATEMENT OF THE ISSUES ...................................................................... 2

INTRODUCTION ....................................................................................... 2

STATEMENT OF THE FACTS AND THE CASE ................................................. 4

    A.    Crossroads' Invention—Device-to-Device "Maps"
           That Control Access of Computer Devices to
           Storage Devices. ................................................................. 5

    B.    Reducing the Storage Router to Practice ............................... 12

    C.    The Parties' Dispute and the Present IPRs ........................... 16

          1.    Kikuchi .................................................................... 16

          2.    *CRD-5500 User's Manual* ................................... 18

          3.    The Board Proceedings ...................................... 21

SUMMARY OF THE ARGUMENT .................................................................. 23

STANDARD OF REVIEW ........................................................................... 25

ARGUMENT ........................................................................................... 26

I.    THE BOARD MISAPPLIED § 102(E) IN ANALYZING
    CROSSROADS' CLAIM TO PRIORITY OVER KIKUCHI ................... 26

# **TABLE OF CONTENTS (cont'd)**

**Page**

A.    The Board Erred by Preferring Some Limitations
Over Others in Applying the Diligence Analysis..................28

B.    The "Reasonable Diligence" Inquiry Does Not
Preclude Reliance on Development Activities
Concerning Subsidiary Limitations of the Later-
Issued Claims.....................................................................32

C.    The Board Misapplied This Court's Cases
Concerning Non-Diligence Due to Commercial
Considerations...................................................................36

D.    The Board's Focus on Attorney Diligence Was
Misdirected ......................................................................39

E.    Properly Considered, the Record Establishes
Crossroads' Diligence and Defeats Kikuchi's Prior
Art Status .........................................................................41

II.    THE BOARD'S INTERPRETATION OF THE "CONTROL
ACCESS" LIMITATIONS WAS ERRONEOUS.......................................43

A.    The Claims Under Review All Require Ensuring
That Devices Have No Access to Storage Not
Expressly Authorized For Them ...............................................46

B.    No Reasonable Interpretation of the "Control
Access" Limitations Could Cover Kikuchi's
Simplistic "Offsetting" Approach to Dividing Up
Storage ............................................................................48

III.    THE BOARD'S INTERPRETATION OF THE "MAPS
BETWEEN DEVICES" LIMITATION WAS ERRONEOUS.................51

**TABLE OF CONTENTS (cont'd)**

**Page**

A.  The Board's Conclusion that the Device-to-Device Mapping Limitation Covered the *CRD-5500 User's Manual* Was Wrong as a Matter of Law ..................................51

B.  No Reasonable Interpretation of the '147 Claims Could Cover the *CRD-5500 User Manual*'s Channel-Oriented Mapping ...........................................................55

　　1.  The '147 Claims, Specification and File History Establish that the Claims Require Device-to-Device Mapping.................................................55

　　2.  The Reference to "Representations" in the Board's Construction Cannot Expand the Claim to Cover Channel-Oriented Mapping..............62

　　3.  The Legal Error in the Board's Approach Was its Vitiation of the Device-to-Device Mapping Requirement, Not its Citation to "Intermediate Identifiers" .................................................66

　　4.  Under the Proper Construction, the Independent Claims are Nonobvious Over the *CRD-5500 User's Manual*............................................67

IV.  THE BOARD COMMITTED FURTHER LEGAL AND FACTUAL ERRORS IN ITS ANALYSIS OF THE "HOST DEVICE ID" DEPENDENT CLAIMS .........................................................68

CONCLUSION...........................................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Network Servs. v. Covad Commc'ns Grp.*,
  262 F.3d 1258 (Fed. Cir. 2001) ................................................................ 65

*Brown v. Barbacid*,
  436 F.3d 1376 (Fed. Cir. 2006) ......................................................... 33, 35

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) .................................................................. 59

*CAE Screenplates Inc. v. Heinrich Fielder GmbH & Co. KG*,
  224 F.3d 1308 (Fed. Cir. 2000) ................................................................ 64

*Cooper v. Goldfarb*,
  154 F.3d 1321 (Fed. Cir. 1998) ................................................................ 33

*Crossroads Sys., (Tex.), Inc. v. Chaparral Network Storage, Inc.*,
  No. 1:00-cv-217, slip op. (W.D. Tex. Nov. 15, 2001) (No. 179),
  *aff'd without op.*, 56 F. App'x 502 (Fed. Cir. 2003) ........................... 5

*Crossroads Systems, Inc. v. Cisco Systems, Inc.*,
  Nos. 2016-2017, -2026, -2027 (Fed. Cir. consolidated May 17,
  2016) ................................................................................................................ 1

*Cuozzo Speed Techs., LLC v. Lee*,
  __ U.S. __, 2016 WL 3369425 (June 2, 2016) ..................................... 45

*Cutsforth, Inc. v. MotivePower, Inc.*,
  No. 2015-1314, 2016 WL 1358628 (Fed. Cir.  Apr. 6, 2016) ...... 45

*Dell Inc. v. Acceleron, LLC*,
  818 F.3d 1293 (Fed. Cir. 2016) ......................................................... 45, 52

*DeSolms v. Schoenwald*,
  15 U.S.P.Q.2d 1507 (B.P.A.I. Feb. 22, 1990) ........................................ 42

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Dickinson v. Zurko*,
   527 U.S. 150 (1999) ........................................................................ 25

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
   815 F.3d 1314 (Fed. Cir. 2016) .................................................... 51

*Griffith v. Kanamaru*,
   816 F.2d 624 (Fed. Cir. 1987) ............................................... 37, 38

*In re Donaldson Co.*,
   16 F.3d 1189 (Fed. Cir. 1994) ...................................................... 25

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) .................................................... 25

*Jones v. Evans*,
   46 F.2d 197 (C.C.P.A. 1931) ......................................................... 36

*Keizer v. Bradley*,
   270 F.2d 396 (C.C.P.A. 1959) ...................................................... 40

*Monsanto Co. v. Mycogen Plant Science, Inc.*,
   261 F.3d 1356 (Fed. Cir. 2001) .............................................. 35, 36

*Pause Tech. LLC v. TiVo, Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005) .................................................... 64

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
   815 F.3d 747 (Fed. Cir. 2016) ...................................................... 63

*Pride Mobility Products Corp. v. Permobil, Inc.*,
   818 F.3d 1307 (Fed. Cir. 2016) .................................................... 45

*Randall Mfg. v. Rea*,
   733 F.3d 1355 (Fed. Cir. 2013) .................................................... 25

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**<u>Page(s)</u>**

*Rasterops v. Radius, Inc.*,
  861 F. Supp. 1479 (N.D. Cal. 1994) ........................................................ 42

*Scott v. Koyama*,
  281 F.3d 1243 (Fed. Cir. 2002) ........................................................passim

*Symantec Corp. v. Comput. Assoc. Int'l, Inc.*,
  522 F.3d 1279 (Fed. Cir. 2008) ................................................................ 64

*Tempo Lighting, Inc. v. Tivoli, LLC*,
  742 F.3d 973 (Fed. Cir. 2014) ................................................................... 65

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015) ................................................................................. 25

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ............................................................................. 1

37 C.F.R. § 42.100(b) (2012) ....................................................................... 45

## STATEMENT OF RELATED CASES

No other appeal in or from this case has been before this or another court.  Counsel is aware of the following cases this Court's decision will directly affect: *Crossroads Sys., Inc. v. Oracle Corp.*, No. 1:13-cv-895 (W.D. Tex. filed Oct. 7, 2013); *Crossroads Sys., Inc. v. Cisco Sys., Inc.*, No. 1:14-cv-148 (W.D. Tex. filed Feb. 18, 2014); *Crossroads Sys., Inc. v. NetApp, Inc.*, No. 1:14-cv-149 (W.D. Tex. filed Feb. 18, 2014); *Crossroads Sys., Inc. v. Quantum Corp.*, No. 1:14-cv-150 (W.D. Tex. filed Feb. 18, 2014).

Counsel is also aware of the following consolidated appeals, currently pending before this Court, that concern the patent on appeal here and related patents: *Crossroads Systems, Inc. v. Cisco Systems, Inc.*, Nos. 2016-2017, -2026, -2027 (Fed. Cir. consolidated May 17, 2016).

## STATEMENT OF JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).  The Board issued its final written decisions January 29, 2016, and Crossroads timely filed its notices of appeal in both cases February 22, 2016.  Under Rule 28(a)(5), Crossroads represents that the judgments appealed from are final.

## STATEMENT OF THE ISSUES

1.    Did the Board err in finding a first group of claims obvious over Kikuchi combined with various secondary references, where the Board used the wrong legal standard for determining priority and the wrong claim construction for assessing obviousness?

2.    Did the Board err in finding a second group of claims obvious over the *CRD-5500 User's Manual* combined with various secondary references, where the Board misconstrued the claimed requirement of a "map" between "devices"?

## INTRODUCTION

This appeal challenges three fundamental legal errors by the Board in joined IPR proceedings, where each error turns on the Board's improper notion of what the patent at issue—U.S. Patent No. 7,051,147 ("the '147 patent") covers.

First, for priority and diligence, the Board faulted the inventors for working on some parts of their system that undeniably practices their patent claims, but not on what the Board seemingly viewed to be the heart of the invention or the point of novelty.  This was legal error—i.e., nothing in this Court's law requires diligence on some

elements of a claimed invention rather than other elements. Rather, diligence on any part of the invention suffices.

Second, the Board misconstrued what it means to "control access" to resources stored on a network. The patent makes plain that such control requires the ability to block some devices from accessing certain resources while allowing those devices to access other resources. The cited prior art, in contrast, simply directs each device to a storage location that is offset a set amount from the location the device submitted—so that any device can access data for another device simply by submitting the location that corresponds to that other device. There is no blocking—no actions to "control access."

Third, the Board misconstrued what it means to provide a "map" describing a relationship between a device on a computer network and storage space elsewhere on the network. The Board believed that a more simplistic map—one describing a relationship between a physical network interface and storage space—was legally the same as the device-to-device map in the claims. That reasoning ignores that hard-wired physical connections between network elements are different than a device-to-device mapping maintained by a storage router—which the claims here require—and lack benefits of such

mapping.  For example, a device-to-device map allows flexibility and security—i.e., easy reprogramming of mappings through a storage router, and security by preventing access even in the presence of unauthorized physical connections.

As explained below, these errors compel reversal of the Board's rejections.

## STATEMENT OF THE FACTS AND THE CASE

This case results from Crossroads' mid-1990s development of a new type of computer networking device known as a "storage router." Such a device sits in a computer network and automatically mediates access by various computers to different storage devices (e.g., hard disk drives).  The storage router does so by using a device-to-device "map" that defines which computer can have access to which portions of storage.  The map provides flexibility and security—flexibility by allowing the storage router to define and redefine particular mappings by updating its mapping tables, and security by controlling access that any particular computer can have to storage devices and thus to the data on the devices.  All of this is transparent to the users and their computers—i.e., the storage looks as if it is storage local to a particular

computer because the device-to-device mapping obscures the particular physical arrangement of the system.

These innovations cut the cost and complexity of shared remote storage while increasing its usefulness, enabling deployment in contexts from small offices to data centers that offer "cloud" storage. After other storage companies began using Crossroads' technology, it licensed fifty-one of them on reasonable terms, and obtained a jury verdict of infringement and damages in 2001 that this Court affirmed on appeal.[1]  These appeals are from IPRs subsequently instituted on Crossroads' patents.

### A.    Crossroads' Invention—Device-to-Device "Maps" That Control Access of Computer Devices to Storage Devices.

The '147 patent addresses techniques that a storage router uses to mediate computer access to data storage over a computer network. *See* '147 patent, Appx164–77.[2]  Annotated Figure 3, below, shows a

---

[1] *Crossroads Sys., (Tex.), Inc. v. Chaparral Network Storage, Inc.*, No. 1:00-cv-217, slip op. (W.D. Tex. Nov. 15, 2001) (No. 179), *aff'd without op.*, 56 F. App'x 502 (Fed. Cir. 2003) (involving the parent patent to the one in this appeal).

[2] This brief omits parallel citations to documents from PTAB trial no. IPR2014-01207 ("the -1207 proceeding") and PTAB trial no. IPR2014-01209 ("the -1209 proceeding") where the identical reference appears in both records.

storage router 56 placed physically between five networked computer workstations on the left and three storage devices on the right:



*FIG. 3*

*Id.* at fig.3, Appx169; *see also id.* at 4:20–60, Appx172.[3]  The computer workstations make requests to write data to or read data from storage, and the storage router controls what parts of storage each workstation can access.  *Id.* at 4:32–40, Appx172.  The coloring in the figure shows such control.  Specifically, all workstations can access all parts of storage device 60 (it shows all colors), only workstation E can access storage device 64 (they are both pink), and each of the other four

---

[3] Unless otherwise noted, all coloring, emphasis, and annotations added.

workstations can access its own individual portion of storage device 62. *Id.* at 4:30–40, Appx172; *see also id.* at 4:63–5:4, Appx172–3. Although all workstations communicate over a single Fibre Channel loop 52 "transport medium," they see their own allocated storage as their own local drives, and are not even aware of the other storage in the system. *Id.*

The storage router enables such control via device-to-device "mapping"—which is critical to the invention's overall concept, and is explicit in the specification and claims. A map that the storage router manages, such as in the form of a table, dictates permissible data communication between each workstation (the first device) on one end, and its corresponding assigned storage (the second device) on the other. *See, e.g.*, *id.* at 2:16–19, Appx171; *see also id.* at 4:20–29, Appx172. Each workstation has a unique identifying address—a critical component that allows the device to be identified regardless of its physical location in the system, and even though all devices use a common network. *See id.* at 7:3–15, Appx174. When a particular workstation requests access to storage (whether to read it or write to it), the storage router consults the map to determine whether the

7

particular workstation should be able to see the particular portion of storage.  *See id.* at 4:56–5:4, Appx172–3.

This device-to-device mapping provides capabilities not available in the prior art.  For example, it provides great flexibility because an administrator at a "central management station" can change the mapping tables and thus easily update what storage is available to any particular computer or group of computers such as when adding access to shared storage for a new employee's computer or deleting a computer's access in the event of a security breach.  *E.g.*, *id.* at 2:43–53, 4:41–66, 5:5–9, Appx171–3.  As shown in Figure 3 above, the storage router can change storage allocation in various manners to meet the changing needs of the computer users.  As another critical advantage, the device-to-device mapping allows the system to be secure by imposing access control—i.e., no computer can get to storage that the map has not allocated to it, even if it is on the same physical network wire.  *E.g.*, *id.* at 3:67–4:9, 4:20–29, Appx172.

These appeals involve seven independent claims.  Claim 21 is representative and describes (1) how the storage router "map[s] between" the end devices (e.g., the computer and disk drive), and (2)

the requirement of "access controls" that control the access of the

computer devices to the storage devices:[4]

> 21. A system for providing virtual local storage on remote
>    storage devices, comprising:
> a first controller operable to connect to and interface with a
>    first transport medium operable according to a Fibre
>    Channel protocol;
> a second controller operable to connect to and interface
>    with a second transport medium operable according to a
>    Fibre Channel protocol; and
> at least one device connected to the first transport medium;
> at least one storage device connected to the second
>    transport medium; and
> ***an access control device*** coupled to the first controller and
>    the second controller, the access control device operable
>    to:
>> ***map between the at least one device and a storage
>>    space on the at least one storage device***; and
>> ***control access from the at least one device to the at
>>    least one storage device*** using native low level, block
>>    protocol in accordance with the map.

*Id.* at 11:48–67, Appx176 (emphasis added).

Certain dependent claims further emphasize the invention's ability to

have differentiated access rights for any number of computers, even if

---

[4] All the independent claims have essentially these issues, with
distinctions between the claims not affecting these appeals.

those computers share a single network "channel."  For example, claim

24 requires an express mapping that links "host device ID"—that is, an

ID specific to that computer host—to a "remote storage device":[5]

> 24. The system of claim 21, wherein the access control de-
> vice is further operable to maintain a configuration includ-
> ing the map, wherein the map provides a mapping from a
> host device ID to a virtual LUN [logical unit] representa-
> tion of the at least one storage device to a physical LUN of
> the at least one storage device.

*Id.* at 12:10–15, Appx176; *see also id.* at 7:47–49 (defining "LUN"),

Appx174.

Prior art systems that did not map from one end device to the

other failed to provide the flexibility and the security that the inventive

mapping provided.  One type of system—exemplified by the *CRD-5500*

---

[5] Technically, the claim requires mapping a host device ID to a "virtual
LUN representation" of a storage device, and from there to a physical
device.  As the patent describes, a LUN ("logical unit") is an arbitrary
identifier that signifies a set of storage.  The boundaries of such the
virtual LUN's set could be physical (e.g., "this physical drive") or logical
(e.g., "these drives together").  The claim thus requires a tripartite
relationship: a host device, mapped by its ID to a virtual LUN, which is
mapped to another LUN (a "physical LUN") corresponding to at least
one storage device.  Claims 17, 31, and 36 use similar language for this
device-discrimination capability.  *See* '147 patent, 11:31–36, 12:51–53,
14:3–6, Appx176–7.

*User's Manual* discussed below—relied on the way a router was physically connected by sending data to particular input/output ports of the router, and trusting that the physical connections would get the data from the port to the proper storage device.  Such systems were not flexible because the physical connections that they depended on could only be altered in the field, and not via adjustments at a central management station as with the mapping of the '147 patent.  They also were not secure, because physical rewiring out in the field—away from the control of a central management station—could cause a computer to be connected to a storage device it should not access, without anyone knowing it (except the person who is suddenly seeing data she should not see).  Other prior art systems—exemplified by the Kikuchi reference discussed below—let users share a storage device simply by adding a unique address offset for each computer, so that nominally each computer would end up using a different segment of a storage device.  But such an approach did not control access because had no means to prevent a device from intruding on storage earmarked for another.

## B.    Reducing the Storage Router to Practice

Crossroads employees Geoffrey Hoese and Jeffry Russell conceived their invention as part of a project to develop a better network device.  Their conception by March 22, 1997, is evidenced by, *inter alia*, a memorandum by Mr. Hoese.  It shows a figure essentially identical to Figure 3 from the '147 patent above, with the features of connected workstations, connected storage, and "access[ing] storage through low-level protocols" and "access control":[6]

---

[6] Memo fr. G. Hoese to A. Peterman, Esq. (May 28, 1997) at 3, Appx12398–400; *see also* Trial Tr. for *Crossroads Sys. (Tex.), Inc. v. Chaparral Network Storage, Inc.* (W.D. Tex. proceedings of Sept. 4, 2001) at 71–72 (discussing same) [hereinafter D. Ct. Tr.], Appx12401–03, 12421–22.



Drawing 3. Network storage device with routing and security controls. Workstations access storage through low-level protocols, with the appearance and methods of local storage access. Access control is combined with routing in the storage router, such that each workstation has controlled access only to specified storage devices or section thereof.

Concept by Geoffrey Hoese, March 22, 1997. First draft May 15, 1997.

Beginning that March, Hoese and Russell worked under the project code name "Verrazano" with the rest of Crossroads' small engineering team to produce the actual storage router—Crossroad's first-ever such product. Middleton Decl. ¶¶ 2–3, Appx12514 –16; *see also* D. Ct. Tr. at 29, Appx12413. Verrazano was a major commitment, involving Crossroads' entire technical staff of ten employees. *See generally* Middleton Decl. ¶¶ 2–3, Appx12514–16.

The reduction to practice issue in this appeal centers on whether the Board could focus its diligence inquiry on only particular aspects of the invention, or whether diligence directed to the overall physical

storage router the inventors were developing is the correct legal standard. The basic facts are not in dispute, and show extensive work during the relevant August-December 1997 time frame on the Verrazano router project to develop product CPx400 (i.e., "Verrazano"). For illustration, the following table denotes record locations for the undisputed evidence of ongoing Verrazano work, with specific reference to corroborating dates:

| Date | Corroboration of ongoing work |
| --- | --- |
| Aug. 18, 1997 | Initial release of Verrazano Programmable Device Instructions (*See* Revision History, Appx12963, 12964) |
| Aug. 21, 1997 | Original CPx400 Product Specification (*See* Revision History, Appx12825, 12827) |
| Aug. 27, 1997 through Sept. 3, 1997 | History of Revisions to Verrazano Hardware Architecture (Revision 1.0) (*See* Revision History to Technical Diagrams, Appx12744) |
| Sept. 4, 1997 | Revision History of CPx400 Product Specification (Appx12825, 12827) |
| Sept. 5, 1997 | Verrazano Programmable Device Instructions update (*See* Revision History, Appx12963) |
| Sept. 12, 1997 | CPx400 Production Specification updated (*See* Revision History, Appx12825, 12827) |
| Sept. 29, 1997 | Component and Insertion List completed (*See* Date Stamp, Appx12971–2) |
| Oct. 5, 1997 | CPx400 Product Specification updated (*See* Revision History, Appx12825, 12827) |
| Oct. 19, 1997 | CPx400 Product Specification updated (*See id.*) |
| Nov. 3, 1997 | Mr. Hoese's lab notebook notes describing "4100 Core Team" targets for November and early December (Appx12976, 12980–81) |

| Date | Corroboration of ongoing work |
|---|---|
| Nov. 7, 1997 | Mr. Hoese's lab notebook notes "Get 4100 spec out by Wednesday" (*Id.* at 12982) |
| Dec. 5, 1997 | Mr. Hoese's lab notebook states "Programmed logic corp…" (*Id.* at 12989) |
| Dec. 11, 1997 | Mr. Hoese's lab notebook states "…Review …questions on SCSI behavior…" (*Id.* at 12990) |
| Dec. 12, 1997 | Mr. Hoese's lab notebook states "…Build target is 12/19." (*Id.*) |
| Dec. 18, 1997 | Mr. Hoese's lab notebook states "Support Strategy" (*Id.* at 12991) |
| Dec. 19, 1997 | Lab notebook describing "Test Setup" and "Code" (*Id.* at 12992) |

Because the Verrazano product was to be full-featured, not all the work focused on access control, and because the team was small, it could not address all features at once. It started, naturally, with foundational design, such as the Fibre Channel interfaces, and the ability to link workstations to storage devices using native, low level protocols—features expressly recited in each independent claim. Other aspects of the claims, such as access control, came later in the process, after Crossroads' December 31, 1997, constructive reduction to practice via its patent filing. The diligent work before the filing does not lose weight, however, simply because it was directed to some parts of the physical embodiment of the invention, or because its constructive reduction to practice preceded its actual reduction to practice.

## C.     The Parties' Dispute and the Present IPRs

The PTAB instituted the appealed-from IPRs January 30, 2015, on petitions from Oracle and NetApp.[7]  *See* -1207 Inst. Dec., Appx6488–6501; -1209 Inst. Dec., Appx21953–68.  Relevant to these appeals, the IPRs concerned two primary references: Kikuchi and the *CRD-5500 User's Manual*,[8] along with various secondary references.

### 1.     Kikuchi

Kikuchi post-dates the '147 inventors' conception (it is not prior art), was cited during the original prosecution of the '147 patent (Appx166), and as discussed above, differs from the '147 claims because it uses a simplistic offset method to sharing storage that does not "control access" to the storage "in accordance with [a] map."  The Kikuchi device first has a "whitelist" of devices that are permitted to access the device.  Kikuchi 2:13–15 (describing "an address registration unit, in which the host address of each host device has

[7] Although Huawei Technologies Co., Ltd joined in the petitions, the PTAB terminated proceedings as to Huawei after institution, and Huawei is not in these appeals.

[8]  Kikuchi is U.S. Patent No. 6,219,771, filed Aug. 18, 1997 (Appx775–85).  The *CRD-5500 User's Manual* is a 1996 manual from CMD Technology, Inc. titled *CRD-5500 SCSI RAID Controller User's Manual* (Appx662–753).

been registered in advance[.]"), Appx781.  When a computer requests access to storage, the Kikuchi device first checks to see if that computer is on the list—but does not use a map for this and does not provide additional functionality such as defining the portion of storage the computer can access.

The mapping and associated access control that the Board identified occurs when the Kikuchi device uses "address offsets" to determine where in the storage to send a request.  Kikuchi 3:21–29, Appx782; *see also* -1207 Dec. 26–27, Appx26–27; -1209 Dec. 14–15, Appx62–63.  These "offsets" are integers that the Kikuchi device adds to the address of every data read, write, or delete request.  Each computer gets a different offset.  With such offsets, the Kikuchi system essentially gives each connected computer a different "starting point" on the storage device.[9]

---

[9] The spaces between adjacent starting points are called "partitions" by Kikuchi.  According to Kikuchi, an administrator can create an ad hoc apportionment of the available partitions by a "correlation chart" that assigns an offset for each computer.  Kikuchi 3:24–29, Appx782.  When requests arrive, the Kikuchi system checks the correlation chart to get the appropriate offset, and redirects the incoming request to the appropriate partition via simple arithmetic (i.e., adding the offset to the "address").  *Id.* at 3:29–33, Appx782.



Although this method is useful for dividing storage into assigned subsets, the focus on "starting points" creates a problem. **Kikuchi lacks any mechanism for keeping hosts from accessing data outside of their partitions**. There are only starting points in Kikuchi. There are no end points, nor any mechanisms to prevent overwriting or unauthorized access. Because it teaches no ability to enforce access restrictions, Kikuchi fails to teach "controlling access."

### 2. *CRD-5500 User's Manual*

As noted above, the *CRD-5500 User's Manual* discusses a system that sends communications to its particular input/output ports, but does not map to devices beyond those ports. *See CRD-5500 User's Manual*, Appx662–753. Relevant to this appeal, it describes connecting

four "hosts"—e.g., computers in an office (colored blue)—to an array of

disks (orange) via the CRD-5500 controller (pink):



Appx672.  These connections are over links, or cable paths, that the

*Manual* calls "channels," and to which the controller assigns channel

numbers 0 through 3 (above, yellow). [10]

---

[10] In deep technical detail, a "channel" denotes one of nine "SCSI I/O
modules" inside the controller's body.  *Manual* at 1-1, Appx670.  The
controller can send and receive signals on the wiring ("buses")
attached to each module through these channels.  Because each
"module" is relevant here only as an intermediary between an attached
SCSI bus and the CRD-5500 controller, this brief elides the role of the
modules and treats the *Manual*'s references to "channels" as effectively
referring to the SCSI wires that carry data in and out of the modules.

The CRD-5500 assigns storage resources (which are logical subsets of the storage in the array, called "redundancy groups") to these channels rather than to the actual hosts.[11]  Each channel is assigned certain "host logical unit numbers," or "Host LUNs," that each correspond to a particular redundancy group in the storage, where the correspondence is tracked by a "Host LUN Mapping Table" for each channel.  The table below shows which host LUNs correspond to which redundancy groups for "channel 0":



*Id.* at 4-5, Appx705.  Here, a host on channel 0 would have no ability to access redundancy groups 2, 3, or 4, because there is no Host LUN corresponding to those groups.  Such restrictions would apply to **that**

---

[11] Each "redundancy group" can cover different storage.  One group could represent a single storage device; another could represent just a part of the storage on a different device; a third could represent storage from multiple devices.  *See generally Manual* at 1-2, Appx671.

***entire channel***, i.e., to all hosts connected to that channel. Because the Host LUN Mapping Tables are per-channel only, the *Manual* teaches no ability to differentiate based on "device" (i.e., computer)—but instead only by channel. The "Host LUNs" do not map computers to storage; they are arbitrarily-selected integers used to implement the *Manual*'s channel-oriented mapping.

Even where a single device is connected to a particular channel, as shown in the simplified system diagram from the *Manual* above, there is no device-to-device mapping as the '147 claims require. In the claims, a map is something maintained by the router itself, not something achieved by physical hard-wiring. The map can be readily remapped, which hard-wiring cannot. And the map can ensure, at the controller, that only the proper devices communicate, whereas a reliance on hard wiring does not provide such security.

### 3.    The Board Proceedings

Before the Board, Crossroads argued that neither Kikuchi nor the *CRD-5500 User's Manual* rendered the claims obvious, even accounting for various secondary references in the Petition.

Crossroads urged, first, that Kikuchi was not prior art. As discussed, the undisputed evidence proved that Mr. Hoese and Mr.

Russell conceived of their invention several months prior to the filing of the Kikuchi application.  And there was a robust record establishing the inventors' diligence in reducing the entire claimed invention to practice, right up until the filing of the '147 patent's priority application.

Even if Kikuchi were prior art, Crossroads urged that it did not invalidate, even in combination with secondary references.  Oracle had relied on Kikuchi to satisfy the "controlling access" limitations of the '147 claims, but Crossroads pointed out that Kikuchi did not actually teach "controlling access."  Instead, Kikuchi taught only a simplistic technique for directing storage requests to one "partition" or another, with no technique for actually preventing one device from accessing partitions beyond its *ad hoc* assignment of starting points.

For the *CRD-5500 User's Manual*, Crossroads pointed out that the CRD-5500 failed to organize resources by "device" but only by "channel."  Crossroads urged that this "channel-oriented mapping" was qualitatively different from the "device-to-device" mapping required by the '147 claims.

Rejecting these arguments, the Board found all claims under review unpatentable.[12]  It found that none of the Verrazano work counted for diligence purposes, and on that basis concluded that Kikuchi was prior art.  It then found that the combination of Kikuchi with a secondary reference invalidated a series of claims, and also found invalidity for some claims over a combination of *CRD-5500 User's Manual* and various secondary references.  Crossroads timely appealed.

## SUMMARY OF THE ARGUMENT

**Diligence and Priority**:  Under this Court's case law, an inventor's diligence is measured against the invention as claimed.  Here, that invention is a system (centered on a storage router) with components for connecting to various network media, memory for buffering data, and a "supervisor unit" or similarly-identified management unit.  The Board erred by ignoring diligence focused on these elements, and requiring complete diligence on sub-elements of the claims (e.g., access control).  Denying diligence unless the inventors worked only on this one portion of their claimed system was legal error.

---

[12] The Board rejected claims 1, 2, 4–5, 10, 11, and 13–39 over Kikuchi, and claims 14–39 over the *CRD-5500 User's Manual*.

**Controlling Access and Kikuchi**:  Kikuchi does not "control access . . . in accordance with a [device-to-device] map."  Its whitelist lacks any ability to link devices with specific allocated storage, and its offset technique merely moves a received request over by a defined amount, but cannot prevent a device from accessing storage that it should not access.  Kikuchi does not "control access" because it has zero enforcement ability.

**Device-to-Device Maps and the *CRD-5500 User's Manual***:  The claims require a map or mapping in the router from one end device (e.g., a computer) to the other end device (e.g., a disk drive).  The mere presence of a connection between devices that depends on how a network is hard-wired cannot meet that requirement because the map in the router must itself define the connection between the devices— that connection cannot be defined by hard-wiring outside the router.  Indeed, a system that depends on hard-wiring is vastly inferior because the wiring cannot be changed or controlled from the router—thus robbing such a system of the flexibility and security that a true mapping between devices offers.

24

## STANDARD OF REVIEW

The propriety of a Board decision that declares patent claims obvious is a question of law with underlying issues of fact. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). Absent disputed fact issues, this Court reviews the Board's claim construction determinations *de novo*. *In re Donaldson Co.*, 16 F.3d 1189, 1192 (Fed. Cir. 1994) (*en banc*); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840–41 (2015). Where the claim construction determinations involve resolution of disputed fact issues, this Court examines the Board's subsidiary fact finding on extrinsic evidence for substantial evidence. *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999); *see Teva Pharms.*, 135 S. Ct. at 840–41; *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000).

Priority of invention is "a question of law, based on [subsidiary] findings of evidentiary fact directed to conception, reduction to practice, and diligence." *Scott v. Koyama*, 281 F.3d 1243, 1246 (Fed. Cir. 2002).

## **ARGUMENT**

### I.    **THE BOARD MISAPPLIED § 102(E) IN ANALYZING CROSSROADS' CLAIM TO PRIORITY OVER KIKUCHI**

The Board's failure to credit the inventors' work on the "Verrazano" project as establishing diligence sufficient to grant priority over Kikuchi was based on a fundamental misconception of this Court's law.  Crossroads is aware of no case in which the Court has used the diligence requirement to undermine an inventor's own preferences about the best path to reduce an invention to practice.  So long as the inventor was actually working on the device he would later claim—and not setting it aside—he is entitled to rely on his date of conception to defeat a § 102(e) attack.[13]  Contrary to the Board's apparent view, the Court has never read the § 102(e) diligence requirement to impose an obligation to only work on some limitations of the later claim, or to work on all of the limitations simultaneously.

---

[13] The application leading to the '147 patent was filed before the America Invents Act's effective date, and citations here are to the pre-Act versions.

The dates here are not in dispute. The Crossroads inventors continued to work on their invention during the entire period in question—August 18 to December 31, 1997:[14]



As discussed in more detail below, the record amply shows the Crossroads inventors working on various aspects of the claimed

_____

[14] The Crossroads inventors conceived on March 22, 1997 and constructively reduced to practice via patent filing on December 31 of that year. *See* -1207 Dec. 20–22, Appx20–22. The Kikuchi § 102(e) priority challenge arises from Kikuchi's filing date of August 17, 1997. Kikuchi at (45), Appx775.

storage router without pause for the entire critical period.[15]  This

appeal concerns whether the Board was correct in its determinations

that such work was a "gap" in the diligence record.

### A.    The Board Erred by Preferring Some Limitations Over Others in Applying the Diligence Analysis

The Board's first error concerns its conclusion that the

"reasonable diligence" inquiry treats as a "gap" any work not

specifically related to what the Board identified (*post hoc*) as the

invention's main point of novelty.  Crossroads assembled a robust

record of its inventors' work during the August–December '97 time

frame, all of which the PTAB discounted.  This was wrong as a matter of

law.

During the August–December '97 period, Crossroads devoted

much of its technical resources to the development of a storage router

product called "Verrazano."  "Verrazano" was Crossroads' first-ever

---

[15] The Board characterized this period as two "intervals," and discussed, for the latter interval, the diligence of Crossroads' prosecution counsel.  -1207 Dec. 22–25, Appx22–25; *see also* -1209 Dec. 11–12, Appx59–60.  As discussed *infra*, because the evidence establishes diligence by the inventors themselves through the entire August–December period, prosecution counsel's activities are immaterial.

storage bridge product and Crossroads developed both Verrazano's hardware and software.  Middleton Decl. ¶ 2, Appx12514–16; Middleton Dep. Tr. 40:22–41:9, Appx13452–55, 13491–92.  In order to do that, Crossroads had to design, test, revise, and ultimately build systems that would become critical parts of the invention claimed by the '147 patent.  For example, Crossroads had to research and implement "Fibre Channel controller" technology that would permit the storage router to communicate with network devices (e.g., workstations) on a Fibre Channel network.  *See* Middleton Dep. Tr. 41:10–19, 104:10–12, Appx13492, 13593 *see also* Verrazano Overview Presentation (dated June 19, 1996), Appx12614–12630.  It also had to research and implement "SCSI controller" technology to facilitate connecting the storage router to the storage devices that would provide the shared storage.  *See* Middleton Dep. Tr. 41:10–19, 104:10–12, Appx13492, 13593 *see also* Verrazano Overview Presentation (dated June 19, 1996), Appx12614–12630.  It had to build technology capable of coordinating communications between devices on the two networks, particularly the "native low level, block protocols" necessary to avoid bottlenecks in the system.  *See* Middleton Dep. Tr. 41:10–19, Appx13492; *see also* Verrazano Overview Presentation (dated June 19,

1996), Appx12614–12630.  And it had to link it all with memory that the storage router could use to keep track of its activities, and as a work space for various computations.  *See* Verrazano Software Development (dated Sept. 10, 1996), Appx12631–48 (describing Verrazano software, controllers, address mapping, and buffer management).

For several months in late 1997, the Verrazano team was occupied with solving these problems.  That work was directed to features that would later become prominent limitations of the '147 claims.  Reviewing the team's work with reference to '147 claim 21 is illustrative.  Its work on Fibre Channel interfaces, for example, later supported the "first controller" and "second controller" limitations.  Its work connecting workstations and other "hosts" to the storage router became part of the "at least one device connected to the first transport medium" limitation.  Its work connecting storage devices to the storage router over SCSI became part of "at least one storage device connected to the second transport medium" limitation.  And its work on relaying storage requests from the workstations to the storage devices via native low level, block protocols played into the claim's final limitation, as follows:

| Claim 21 | Verrazano work |
|---|---|
| **A system for providing virtual local storage on remote storage devices, comprising:** | |
| **a first controller operable to connect to and interface with a first transport medium operable according to a Fibre Channel protocol;** | Work included research and integration of Fibre Channel controllers into the Verrazano storage router; |
| **a second controller operable to connect to and interface with a second transport medium operable according to the Fibre Channel protocol;** | |
| **at least one device connected to the first transport medium;** | Work included research and development on communications between the Verrazano storage router and connected workstations; |
| **at least one storage device connected to the second transport medium; and** | Work included research and development on communications between the Verrazano storage router and connected storage drives; |
| **an access control device coupled to the first controller and the second controller, the access control device operable to:** | |
| **map between the at least one device and a storage space on the at least one storage device; and** | Work included research and development into mapping space on connected storage drives to attached workstations; |
| **control access from the at least one device to the at least one storage device** | |

| using native low level, block protocol in accordance with the map. | Verrazano was designed to use native low level, block protocol in accordance with a map. |
|---|---|

Reviewing the record, the Board wrongly held that the Verrazano work—although it addressed numerous limitations of the later-issued '147 claims—amounted to a "gap" in diligence. The Board based that determination on a holding that the "reasonable diligence" inquiry precluded Crossroads from relying on any Verrazano-related work because that work, during the time period at issue, did not advance the "access control" limitation. *See* -1207 Dec. 20–25, Appx20–25; -1209 Dec. 9–13, Appx57–61. That determination was wrong as a matter of law. The Court should reverse.

### B. The "Reasonable Diligence" Inquiry Does Not Preclude Reliance on Development Activities Concerning Subsidiary Limitations of the Later-Issued Claims

The Court has repeatedly held that the "reasonable diligence" inquiry is a flexible one that takes into account the larger context of the inventors' work and the technological environment of the claims:

> The basic inquiry is whether, on ***all of the evidence***, there was ***reasonably continuing activity to reduce the invention to practice***. There is no rule requiring a

> specific kind of activity in determining whether the applicant was reasonably diligent in proceeding toward an actual or constructive reduction to practice.

*Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006) (emphasis added).  The Court has also emphasized that the act of actually "reducing to practice" occurs when the inventors "construct[] an embodiment . . . that [meets] ***all the limitations***" of the claim at issue, and in doing so "determine[s] that the invention would work for its intended purpose."  *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998) (emphasis added).

Applying the *Barbacid* and *Goldfarb* standards, the Board's determination that Crossroads could not rely on the Verrazano work as supporting diligence is inexplicable.  It is undisputed by the parties that the Verrazano work addressed numerous limitations of the later-issued claims.  *Compare* Crossroads -1207 Resp. 22 ("Verrazano . . . contained all elements of the '972 invention except for access controls and virtual local storage."), Appx6607, 6644–47 *and* Crossroads -1209 Resp. 22 (same), Appx22068, 22112, *with* Oracle -1207 Reply 11 (not disputing that Verrazano practiced non-access control limitations), Appx13194, 13207.  It is axiomatic that, if Crossroads were to achieve *Goldfarb*'s reduction-to-practice goal of a device practicing "all

33

limitations" of the later-filed claims it would need to spend engineering resources developing technology to practice those limitations. Crossroads is aware of no case—and certainly neither the Board nor Oracle ever cited any—requiring that the diligence inquiry emphasize pursuit of some limitations over others.

To the contrary, the Court has repeatedly promoted flexibility in the diligence analysis, particularly where (as here) the undisputed evidence shows that inventors continued to work on tasks directly related to—though not in every instance fully practicing—their invention throughout the diligence period.  *Scott v. Koyama*, 281 F.3d 1243, 1248 (Fed. Cir. 2002), for example, reversed a Board of Patent Appeals and Interferences determination that a period of activity in which the inventor lined up manufacturing capacity for large-scale exploitation of his invention was a gap in diligence. *Koyama* expressly rejected the BPAI's finding of a gap as an "incorrect view of the law." *Id.*  The inventor's manufacturing-related activity, though it did not help him reduce to practice his invention *per se*, was clearly directed towards the invention's ultimate practice.  *Id.* at 1248–49. *Koyama*'s rule highlights the Board's error here.  The Crossroads inventors' Verrazano work, though it was not expressly directed to the invention's

access control features, was certainly directed to other portions of the invention and directed towards its ultimate reduction.

Other decisions from the Court, such as *Barbacid*, confirm that the diligence inquiry is flexible and without the inelastic requirements applied by the Board. 436 F.3d at 1382. In *Barbacid*, a collaborator of the inventor offered a laboratory notebook reciting various experiments tangential to the later-claimed invention. *Id.* at 1380–81. The Board declined to consider them for diligence due to an "absence of explanation of the content and purpose of these experiments." *Id.* at 1381–82 (describing an attack on the notebook as "not explain[ing] how each experiment moved the inventive process toward completion"). The Court reversed, again emphasizing the flexibility of the diligence analysis, and expressly rejecting the idea that diligence could only be shown via a "specific kind of activity." *Id.* at 1380, 1382. Similarly, *Monsanto Co. v. Mycogen Plant Science, Inc.*, 261 F.3d 1356, 1370 (Fed. Cir. 2001), held that four months of "various activities, most notably the tending of the growing plants" could be taken as evidence of diligence in reducing to practice claims addressing genetically-modified plant cells. *Monsanto* further reminded that "determining whether the required 'reasonable diligence' has been satisfied is a case

specific inquiry" in which "all the surrounding circumstances must be viewed and considered." *Id.* at 1369 (internal citation omitted) (quoting *Jones v. Evans*, 46 F.2d 197, 203 (C.C.P.A. 1931)).

In view of these cases, the Board's refusal to consider the Verrazano work as supporting diligence was wrong as a matter of law. By this work, Crossroads' inventors were on a path to—as in *Koyama* and *Monsanto*—a subsequent practice of their claims. That they were not working on the "access control" features does not mean that they were non-diligent.

### C.    The Board Misapplied This Court's Cases Concerning Non-Diligence Due to Commercial Considerations

In several places, the Board's Decision characterizes Crossroads' choices concerning allocation of resources for Verrazano as "commercial" in one way or another, and seems to rely on that characterization in refusing to consider the Verrazano work for diligence purposes. *See, e.g.*, -1207 Dec. 24, Appx24; -1209 Dec. 13 ("[Crossroads] made a business decision to develop and launch the Verrazano product [] without access controls[.]"), Appx61  The Board's authority for its apparent holding that the presence of "business decisions" negates diligence is unclear.  In any event, the Court's law

makes clear that there is no bar on an inventor's path to reduction to practice being influenced by economic realities.

*Koyama*, discussed above, gives guidance on how the presence of business considerations affects review of an inventor's diligence. *Koyama* recognizes that such considerations frequently come into play—and ***expressly rejects*** the notion that the mere presence of a "business decision" automatically negates diligence.  281 F.3d at 1248 (finding diligence in an inventor's efforts to line up manufacturing).   To the contrary, *Koyama* describes a "continuum between, on the one hand, ongoing laboratory experimentation, and on the other hand, pure money-raising activity that is entirely unrelated to practice of the process."  *Id.*

Other cases are consistent.  While they generally find that pure commercial activity, such as efforts to line up funding or to find marketing partners, are non-diligent, diligence can still exist in circumstances where decision-making mixes commercial and technical considerations.  For example, *Griffith v. Kanamaru*, 816 F.2d 624, 627 (Fed. Cir. 1987), is an example of pure commercial activity defeating diligence.  In that case, the Court held that an inventor's decision to

delay reduction to practice until he could apply for the funding required by his employer defeated his diligence claim. *Id.* at 627–29.

Crossroads' decision to focus its Verrazano work on certain limitations of its later-filed claim—e.g., Fibre Channel controllers, communication using native low-level protocols—is far afield from the *Griffith* inventor's decision not to work at all until he could find an ideal funding source, and equally far from the "pure money-raising activity" that *Koyama* describes as unrelated to the invention. The Verrazano work was deeply technical, and squarely aimed at the exact storage router technology that Crossroads would later claim in its application.

Before the Board, Oracle made much of a statement by non-inventor John Middleton that it was "possible" that the inventors' decision about how to allocate their scarce resources during the diligence period was a "business decision" (to use the Board's phrase).[16] *See* -1207 Dec. 24 (citing Middleton Dep. Tr. 71–72, Appx13522–23), Appx24; -1209 Dec. 13 (same), Appx61. The Board,

---

[16] Even if the presence of economic considerations were sufficient to render an inventor non-diligent—and the law says otherwise—Mr. Middleton said he had no personal knowledge as to Crossroads' reasoning for prioritizing foundational technology in Verrazano's early development. *See* Middleton Dep. Tr. 71:10–23, Appx13522.

wrongly, relied on that testimony to deny Crossroads its diligence claim. But, as described *supra*, whether economic considerations influenced diligence is of no consequence to the legal analysis—all that matters is that the inventor continued to work on the invention. Although technical decisions may have had economic influences, the inventors plainly continued to work on Verrazano throughout the critical period. It was thus wrong for the Board to conclude that, merely because Crossroads may have been motivated to get to market quickly, the Crossroads inventors were non-diligent. *See* -1207 Dec. 24 (reasoning that the inventors put their invention aside out of a motivation that "possibly had to do with reasons relating to interest in early revenue generation[.]"), Appx24; -1209 Dec. 13 (same), Appx61. The Board is mistaken. At no point did Mr. Middleton, or any other witness, testify that the Crossroads inventors stopped working on the basic technology of the '147 patent for any reason. As discussed *supra*, the inventors worked on the Verrazano project, and the invention of the '147 patent, right up until filing. That is what the law requires.

### D. The Board's Focus on Attorney Diligence Was Misdirected

The Board further compounded its errors by overlooking Crossroads' evidence of diligence in November–December 1997. In

concluding that the inventors lacked "reasonably continuous activity" during that period, the Board's analysis wrongly assumed that Crossroads' only work during that time was in preparing its patent application. *See* -1207 Dec. 24–25, Appx24–25. That assumption was unfounded. In addition to its work on the patent application during December, Crossroads submitted voluminous evidence of its continued work on Verrazano throughout the entire critical period. As such, inquiry into "attorney diligence" is irrelevant. *Keizer v. Bradley*, 270 F.2d 396, 400 (C.C.P.A. 1959) ("This issue [attorney diligence] now appears moot since we have found that there was diligence by Bradley [the inventor] during the critical period.").

Crossroads assembled a substantial record of its work during the November–December 1997 period, including a lab notebook from Mr. Hoese showing continued work on the project. *See, e.g.*, Hoese Lab. Notebook at 1–7, 12–17, Appx12976–82, 12987–92. Moreover, Crossroads specifically identified this evidence to the Board in its briefing. *See* Crossroads Resp. 22–25 (citing and discussing the Hoese Notebook as "Exhibit 2322"), Appx6644–47. The Board's decision fails to analyze the Hoese Notebook in any respect, and assumes—contrary to the evidence—that Crossroads had no evidence of work on

Verrazano for the month of December 1997.  -1207 Dec. at 12, Appx12.

Such assumption was clearly wrong.[17]  Crossroads' briefing directed

the Board to Mr. Hoese's notebook, which, as discussed, demonstrated

diligent activity throughout December 1997.  *See* Crossroads Resp. at

24–25 (citing Hoese Notebook as "Ex. 2322"), Appx6646–47.  The

Board's apparent failure to consider this evidence is inexplicable, as

the notebook plainly has entries through the months of November and

December, and generally demonstrates continued work on the

Verrazano project during that time.

### E.    Properly Considered, the Record Establishes Crossroads' Diligence and Defeats Kikuchi's Prior Art Status

The Court has repeatedly instructed that diligence may take a

"diversity of forms."  *Koyama*, 281 F.3d at 1248.  Under the appropriate

standards, it is beyond reasonable dispute that the Verrazano work

---

[17] Oracle's Reply argued to this effect, and Crossroads had no opportunity to respond.  *See* Oracle Reply 10, Appx13206.  Crossroads attempted to offer further clarification at the hearing, but the Board moved the discussion in another direction.  Tr. of Oct. 30, 2015 Hr'g 50:8–11 ("[Crossroads] created our invention before Kikuchi.  Crossroads was off working on a product.  They were diligently pursuing patents and they showed diligence throughout this process[.]"), Appx15518.

was a "step in [Crossroads'] plan for realizing" the invention.  *See id.*
That the Verrazano work did not make much progress reducing the
"access control" limitations to practice is not inconsistent.  The law
recognizes that the path from conception to reduction to practice is not
always a straight line.  *See, e.g.*, *DeSolms v. Schoenwald*, 15 U.S.P.Q.2d
1507, 1511 (B.P.A.I. Feb. 22, 1990) ("[I]t is not material to the question
of diligence that Schoenwald did not take the most expeditious course,
so long as there was diligent activity toward the end in view.");
*Rasterops v. Radius, Inc.*, 861 F. Supp. 1479, 1494 (N.D. Cal. 1994) ("To
satisfy the 'reasonable diligence' requirement, however, it is not
necessary to show that an inventor moved from conception to
reduction to practice in the shortest possible time, or as quickly as
another inventor did."); *see also Koyama*, 281 F.3d at 1248 ("[E]ach and
every activity during that period . . . was a step in the plan for realizing
the process on a commercial scale."(internal quotation omitted)).

The Board's analysis incorrectly required a single-minded
pursuit of the claimed invention—and specifically that invention's
access control limitation—via the fastest route possible.  This is not the

law.  All that is required is that the patentee's work is reasonably continuous and directed towards the invention.  In this case, Crossroads worked diligently on developing a platform for the invention and continually worked on many of the later-claimed aspects thereof.  That is all that is required of a patentee.

Crossroads respectfully submits that the Board's priority analysis of the Verrazano project was fatally flawed.  Correcting for the myriad of legal errors, the Board's determination that the Crossroads inventors were non-diligent in reducing their invention to practice was inconsistent with any reasonable view of the record.  The Court should thus reverse the Board's determination of insufficient diligence and, with it, the Board's obviousness determinations over Kikuchi.

## II.    THE BOARD'S INTERPRETATION OF THE "CONTROL ACCESS" LIMITATIONS WAS ERRONEOUS

Even if Kikuchi were prior art to the '147 patent, serious claim construction errors in the Board's analysis of the proposed Kikuchi

combinations would still require reversal.[18]  In considering Kikuchi, the Board applied an interpretation of the phrase "control access" far broader than any reasonable conception of what that phrase means in the context of the '147 patent.[19]  The Board's analysis improperly abridged the claims' requirement of an ability to "control access" not just to a storage device as a whole, but at the level of specific storage space within a storage device.  Kikuchi, even if it teaches the former, does not teach the latter, and it was error as a matter of law for the Board to find otherwise.

---

[18] In its discussion of these combinations, the Board relied exclusively on Kikuchi as allegedly meeting the limitations, citing no secondary reference.  -1207 Dec. 27 ("We agree with Petitioner that Kikuchi's disclosure of access authorization assigned to specific host devices meets the 'access control' limitation of the claims."), Appx27; -1209 Dec. 16 (same), Appx64.  Accordingly, this brief focuses on Kikuchi.

[19] Each independent claim under review requires that the system "control access [from connected devices to connected storage devices] . . . in accordance with the map," or words of similar meaning.  *See* '147 patent, claim 21 (quoted), Appx176; *see also id.* claims 1 ("implements access controls"), 6 ("implement access controls"), 10 ("implements access controls"), 14 ("to control access . . . according to a map"), 28 ("implementing access controls"), 34 ("implement access controls"), Appx175–76.

As the Court knows, in *inter partes* review, PTO regulations require that claims receive their broadest reasonable interpretation in view of the specification.  37 C.F.R. § 42.100(b) (2012); *see also Cuozzo Speed Techs., LLC v. Lee*, __ U.S. __, 2016 WL 3369425, at *12–14 (June 2, 2016).  The Court has repeatedly held that this standard is not a license for the Board to ignore clear guidance in a patent concerning the scope of the invention.  In *Pride Mobility Products Corp. v. Permobil, Inc.*, 818 F.3d 1307, 1314–16 (Fed. Cir. 2016), the Court reversed as "unreasonable" a PTAB claim interpretation that was wholly divorced from the express language of the claim and the teachings of the specification.  In *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1299–1301 (Fed. Cir. 2016), the Court reversed a PTAB interpretation that skewed so broad as to leave both the claim language and the specification behind.  And in *Cutsforth, Inc. v. MotivePower, Inc.*, No. 2015-1314, 2016 WL 1358628, at *3–4 (Fed. Cir.  Apr. 6, 2016) (non-precedential), the Court reversed PTAB constructions that were facially incompatible with normal dictionary usages and with the text of the claim.

Those decisions should govern this appeal.  There, as here, the PTAB's final decision was predicated on a claim construction that was

45

erroneous as a matter of law, particularly in view of the '147 patent's teachings.  The Court should reverse.

### A.    The Claims Under Review All Require Ensuring That Devices Have No Access to Storage Not Expressly Authorized For Them

As discussed above, a central requirement of the claims under review is a "map" that governs the relationships among connected devices (e.g., workstations) and prescribes the access each device has to connected storage.  Using this map, the claimed storage router can both determine the proper destination for requests to read, write, or delete stored data, but also determine whether the workstation's request is to a section of storage the workstation is authorized to access.  And, crucially, the storage router can use its "map" and its central role in coordinating communication to ensure that no device accesses any storage space to which it lacks authorization.

The patent describes that the storage router limits connected workstations from reading, writing, or deleting information in storage spaces they are not authorized to enter.  *See* '147 patent, 4:45–47 ("[S]ubsets 66, 68, 70 and 72 can ***only be accessed by the associated workstation* . . . ."), Appx174.  It also states that the claimed invention

secures each storage set (i.e., the logical divisions within the storage device) from unauthorized access—even unauthorized access within the network:

> Storage router 56 combines access control with routing such that **each workstation 58 has <u>controlled access</u> to <u>only</u> the specified partition** of storage device 62 which forms virtual local storage for [that workstation]. This access control allows **security control for the specified data partition[].**

'147 patent, 4:31–46, Appx172; *see also* Levy Decl. ¶¶ 56–59 (confirming that one of ordinary skill would understand this to denote a capability to deny unauthorized access to particular partitions), Appx10107–10. Similar statements are throughout the patent. *See, e.g.*, '147 patent, 2:29–31 (stating in the Summary of the Invention: "The configuration . . . implements **access controls for storage space** on the SCSI storage devices. Access is then allowed . . . in accordance with the configuration."), Appx171; *id.* at 4:26–29 ("Storage router 56 allows the configuration and modification of the **storage allocated to each** attached workstation 58 through the use of mapping tables[.]"), Appx172.

The Board's treatment of "controlling access" cannot be reconciled with these statements.  As discussed below, Kikuchi lacks any ability to actually enforce access restrictions.

**B.    No Reasonable Interpretation of the "Control Access" Limitations Could Cover Kikuchi's Simplistic "Offsetting" Approach to Dividing Up Storage**

The Board held, wrongly, that the "control access" language of the '147 claims was broad enough to cover Kikuchi's system of using offsets to divide up available storage.  As discussed above, the Kikuchi system uses a simplistic "correlation chart" to offset the various "starting points" used when devices access shared storage.  When a device attempts to communicate with storage in the Kikuchi system, the system retrieves an "offset" from the correlation chart.  The offset is then used to transform the communication request so that it applies the right "starting point." *See* Kikuchi 2:35–36, Appx781.  There is no disclosure in Kikuchi of anything that keeps a device from straying into partitions beyond its enumerated "starting point."

The Board reasoned, wrongly, that, Kikuchi's system of "offsetting" requests from various devices—i.e., giving each device a different "starting point" on the storage device, then hoping that no device exceeds its allocation—fell within the "controlling access"

48

limitations. This was error, as it was predicated on an unreasonably broad conception of what "controlling access" means.

The '147 patent plainly establishes that "controlling access" requires an ability to secure ***each set of allocated space*** in a storage device against unauthorized access. *See* '147 patent, 4:41–46 (requiring that "each workstation 58 has ***controlled access to only [its] specified partition***," and requiring "***security control for [each] specified data partition[]***."), Appx172. Kikuchi's "correlation chart" falls far short of providing that level of "controlling access." As discussed, nothing in the "correlation chart," or anything else in Kikuchi, secures the allocations within a storage device against improper access, whether accidental or intentional. The Board's conclusion to the contrary demonstrates that the definition of "controlling access" applied in its Decision was far broader than any reasonable interpretation under the '147 patent.

Kikuchi's statement that "access authorization can be assigned solely to specific host devices, [and] each host device can gain access to a different partition" is not contrary. Kikuchi 2:3–6, Appx781; *see also id.* at 8:40–42 ("[T]he disk apparatus is able to allocate a different disk partition to each host device."), Appx784. This statement, and others

like it, do no more than describe how Kikuchi maintains a "whitelist," and also uses offsets in the correlation chart to assign different "starting points" for devices using the same storage.  As discussed above, the "whitelist" is totally incapable of controlling hosts' access to storage space within the storage device, in any respect.  *See* Kikuchi 2:13–15 (describing a simple list of device addresses, "registered in advance," authorized to access the disk as a whole, but with no provision to segregate authorization partition-by-partition), Appx781. Nothing about the whitelist keeps any "authorized" device from intruding into partitions within that disk where it lacks authorization. And, as already discussed, neither do the "offsets" in the correlation chart.

The Board's analysis of Kikuchi (in combination with a secondary reference) thus improperly expanded the scope of the claims to include a simple authorization system, rather than the specific "controlling access" claimed by the '147 patent.  Such is error, and Crossroads respectfully requests that this Court reverse and enter a holding confirming that "controlling access," in the '147 patent,

means establishing and enforcing access limits not just to a storage device as a whole, but to partitions therein.[20]

## III. THE BOARD'S INTERPRETATION OF THE "MAPS BETWEEN DEVICES" LIMITATION WAS ERRONEOUS

In matching the claims to the *CRD-5500 User's Manual*, the Board again committed serious claim construction errors.  Again, it gave the claims far broader scope than the patent reasonably supports, and in so doing abridged the "broadest reasonable interpretation" standard.  That error led the Board to conclude that the vastly-different technology in the *CRD-5500 User's Manual* made the '147 claims obvious.  The Court should reverse.

### A. The Board's Conclusion that the Device-to-Device Mapping Limitation Covered the *CRD-5500 User's Manual* Was Wrong as a Matter of Law

As in *Acceleron*, the Board's error in assessing the *Manual* was in how it resolved the legal question of claim scope—i.e., are the '147

---

[20] Reversal, not remand, is appropriate because there is no factual dispute as to the technology that Kikuchi discloses.  *See Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320, 1320 n.3 (Fed. Cir. 2016).

patent's claims so broad as to cover the technology in the *Manual*?[21]
*Acceleron*, 818 F.3d at 1299–1301. And, as in *Acceleron*, legal error by
the Board in answering this question requires reversal.

As discussed above, it is not in dispute—and, indeed, the Board
acknowledged—that the *Manual* describes a system in which attached
devices' access to storage is arranged on a channel-by-channel, not
device-by-device, basis. -1207 Dec. 14, Appx13–14 (acknowledging
"the host LUN mapping feature [of the *CRD-5500 User's Manual*] only
maps storage devices to host ***channels***, not the specific hosts
themselves" (emphasis original)). Such a "channel-oriented" approach
is qualitatively different from the device-to-device mapping the '147
claims require.

Because the *Manual* can only organize access control regimes by
channel, and not by device, it is inflexible, inefficient, and difficult to

---

[21] The Board's ultimate obviousness determinations applied combined
disclosures from the *Manual*, *CRD-5500 Data Sheet*, and Smith. -1207
Dec. 10, Appx10. The Board relied only on the *Manual* for the device-
to-device mapping" requirements (which appear, in various forms, in
all independent claims). *Id.* For the Court's convenience, *CRD-5500
Data Sheet* is CMD Technology, Inc., *CRD-5500* (web page) (Dec. 4,
1996), Appx754–57, and Smith is Judith A. Smith & Meryem Primmer,
*Tachyon: A Gigabit Fibre Channel Protocol Chip*, HEWLETT-PACKARD J., Oct.
1996, Appx758–74.

customize.  If anything, it highlights how the device-to-device mapping of the '147 claims was a major advance.  As discussed above, in the *Manual*'s system, access control decisions are dependent on the physical arrangement of a network.  If an administrator wants to give one device different access options than another, the administrator must make sure the two devices are not on the same channel.  This is because, as discussed, the channel-oriented approach in the *Manual* can only ever treat all devices on a channel the same.  The '147 invention, by contrast, is ***device-to-device***, and can differentiate access rights among any number of devices, no matter how they are physically connected to the network.

After recognizing the distinction between the "channel-oriented" approach in the *Manual* and the device-to-device approach required by the claims, the Board entered the following construction for the crucial "map between" limitation, purportedly to help it determine if the *Manual*'s more limited approach could fall within the '147 claims:

| Term | Construction |
|------|--------------|
| **"map between the device and the remote storage device"** | "To create a path from a device on one side of the storage router to a device on the other side of the router. A 'map' contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices." |

-1207 Dec. 8, Appx8.[22]  The reversible legal error comes not from the words of this construction itself, but in the Board's later expansion of the construction when it applied the claims to the *Manual*.

Specifically, the Board wrongly interpreted its phrase "a representation of devices" by finding that a "channel" (in the *Manual*) could be a "representation" of the device.  That conclusion was incompatible with any proper interpretation of the claims.

For the following reasons, the specification and file history establish beyond doubt that the '147 claims' requirement of ***device-to-device mapping*** cannot be satisfied merely by pointing to the "channels" set up by physical wiring, as the Board did.  The Court

---

[22] This construction is for claim 14; the parties and the Board treated it as also applying to similar requirements in independent claims 21, 28, and 34.

should correct the Board's error and reverse the obviousness

determination.

**B.    No Reasonable Interpretation of the '147 Claims Could Cover the *CRD-5500 User Manual*'s Channel-Oriented Mapping**

**1.    The '147 Claims, Specification and File History Establish that the Claims Require Device-to-Device Mapping**

Each of the four independent claims at issue expressly recites a

***device-to-device*** mapping feature—that is, a flexible map that defines

for some "device" (e.g., a workstation on a network) the appropriate

storage device(s) available to it:[23]

| 14. | "operable to control access . . . ***according to a map between*** the ***device*** and the remote storage ***device***" |
| --- | --- |
| | ('147 patent, 11:17–22) |
| 21. | "the access control device operable to: ***map between*** the at least one ***device*** and a storage space on the at least one storage ***device***; and control access from the at least one ***device*** to the at least one storage ***device*** . . ." |
| | (*Id.* at 11:61–64) |

_____

[23] Crossroads' appeal concerning the *CRD-5500 User's Manual* addresses claims 14–39.  The Board declined to institute IPR on the other independent claims over *CRD-5500 User's Manual*.  -1209 Dec. 5–8, Appx21957–60.

28. "***mapping between*** a ***device*** connected to a first transport medium and a storage ***device*** connected to a second transport medium . . . ; implementing access controls for storage space on the storage ***device***; and allowing access from the ***device*** connected to the first transport medium to the storage device . . ."

(*Id.* at 12:29–31)

34. "operable to: maintain a configuration that ***maps between*** the ***host device*** and at least a portion of the storage space on the storage ***device***; and implement access controls according to the configuration"

(*Id.* at 13:6–9)

The Board's application of its construction is contrary to the plain language of the claims for multiple reasons. First, a "map" by its ordinary meaning is something that shows the endpoints of the route it is mapping. Second, the claims explicitly recite that these points are from the one endpoint device (e.g., a computer host device) all the way to the other endpoint device (e.g., a hard disk storage device)—and not to some intermediate point like a port on the router that represents a channel. And third, claims like claim 21 sate explicitly that the "access control device" (or some similar term for the router) itself maintains the mapping—not some manner in which a technician has physically connected devices on the network. It is by using the device-to-device

"map" explicit in the claims that the inventive storage router can establish—on a ***device-by-device basis,*** in which the authorization regime is not dependent on specific network wiring or other physical details—access rights for storage.

The '147 patent's figures and written description are explicit in making device-to-device mapping central to the invention. In particular figure 3 and the associated text (*infra*) set forth in detail how "mapping tables" are used to set up discrete access permissions for "each" device on the network. They teach a system in which all the "devices"—workstations A–E—are on a single network wire. They are all attached to Fibre Channel interconnect 52. With device-to-device mapping tables, this creates no difficulty. Such mapping tables readily distinguish one "device" from another, even if all their communication comes over a single network wire. And the patent describes that distinction expressly:



*FIG. 3*

According to the present invention, storage router 56 has enhanced functionality to implement security controls and routing such that ***each workstation 58 can have access to a specific subset*** of the overall data stored in storage devices 60, 62, and 64. . . .  Storage router 56 allows the configuration and modification of the storage allocated to ***each*** attached workstation 58 through the use of mapping tables or other mapping techniques.

As shown in fig. 3 [*supra*], . . . . [s]torage device 62 can be configured to provide partitioned subsets 66, 68, 70 and 72, where each partition is allocated to ***one*** of the workstations 58 (workstations A, B, C and D). These subsets 66, 68, 70 and 72 can ***only be accessed by the associated workstation 58*** and appear to the associated workstation 58 as local storage[.]

'147 patent, fig.3, 4:20–38, Appx172.

Nothing in any of this disclosure embraces the "channel-oriented" approach in the *CRD-5500 User's Manual*.  To the contrary,

the embodiment of figure 3 would be inoperative under the "channel-oriented" approach ventured by the Board.  In the figure, all of the "devices" (network workstations 58) share a single network channel (Fibre Channel interconnect 52).  If a "channel-oriented" approach were applied—if storage router 56 only organized storage based on channel, and not based on device identity—it would be impossible for any workstation on interconnect 52 to have different access privileges than any other workstation on that interconnect.  *See, e.g.*, Levy Decl. ¶¶ 203, 220–21, Appx10076–77, 10197, 10208–10, 10228; *see also* Levy Decl. App'x A (Levy CV), Appx10230–43.  Figure 3 strongly reaffirms that the "map" in Crossroads' invention **must be device-to-device** for this reason—from one end device to another, and not just to a cable connected to one of the router's output ports.

Other sections of the '147 patent reaffirm the centrality of device-to-device mapping.  Further confirmation is in the "Summary of the Invention," which has particular relevance to understanding the claims' scope.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).  The Summary, too, points to device-to-device mapping:

> The storage router maps between ***the workstations*** [not "channels"] and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. The storage router then allows access from the workstations to the SCSI storage devices . . . ***in accordance with the mapping*** and the access controls.

'147 patent, 2:17–23, Appx171. Other references to mapping between "devices" and storage suffuse the rest of the patent. *E.g.*, *id.* at 2:29–31 (discussing, in "Summary of the Invention," how the invention "maps between Fibre Channel ***devices*** and the SCSI storage devices"), Appx171. In one instance, the '147 patent describes in detail how it is necessary to use "addressing information" to distinguish one attached device from another when the two devices share a network wire such as an "arbitrated loop." *Id.* at 7:16–24 ("[A]ddressing information [i.e., addresses of devices themselves] is needed to map from FC addressing [Fiber Channel, used to connect workstations and other "devices"] to SCSI addressing and vice versa."), Appx174.[24]

----

[24] The '147 patent refers from time to time to SCSI ("Small Computer Serial Interface") as technology for connecting a storage router to storage such as hard drives. SCSI is a set of standards for connecting peripheral devices to computers. Fibre Channel, a network technology that the '147 claims recite, is a wiring/interconnection standard sometimes used to implement SCSI.

Examination of the file history further confirms that the '147 claims require "device-to-device" mapping and, in doing so, demonstrate the Board's error. During initial prosecution, the applicants ***expressly defined*** what was meant by the "mapping between" limitation, highlighting that it expressly required representations of devices—not "channels":

> Mapping between devices connected to the first transport medium and storage devices in the present application refers to a mapping between ***workstations/host computers and storage devices such that a particular workstation/host computer on the first transport medium is associated with a storage device, storage devices or portion thereof on the second transport medium. . . . [T]he Specification points out that mapping provides a correlation between a host device and a storage device*** so as to create a path the storage router can use to connect a host device to the storage device.

'147 FH, Resp. of Jul. 27, 2005, at 14, Appx308.

In view of the foregoing, the Board's expansion of the claims to cover "channel-oriented" mapping as in the *CRD-5500 User's Manual* is wholly unjustified. There is no support ***anywhere*** in the intrinsic record for such an expansion. Where, as here, the Board expands a claim beyond anything reasonably supported by the intrinsic record, reversal is appropriate.

61

### 2. The Reference to "Representations" in the Board's Construction Cannot Expand the Claim to Cover Channel-Oriented Mapping

As purported justification for its holding, the Board relied heavily on the reference in the construed claim to the map containing "representations" of attached devices. The Board reasoned that the phrase "a representation of devices on each side of the storage router" could reasonably cover a system, such as in the *CRD-5500 User's Manual*, that had in its purported "maps" (i.e., the Host LUN Mapping Tables) no references to "devices" at all, but only channel numbers. *See* -1207 Dec. 13–14, Appx13–14. The Board's reasoning, by finding that "devices" could be so broad as to cover a "channel," improperly vitiated the "devices" limitation. The '147 patent makes clear that a "channel" cannot act as a stand-in for a "device." This requirement extends from the claims, the description, the figures, and the file history.

The '147 claims clearly treat the "devices" and the "transport medium" (i.e., the connection linking "devices" for communication purposes) as different concepts. *E.g.*, '147 patent, 11:48–67 (requiring a "device connected to the first transport medium"), Appx176. The '147 Summary of the Invention does the same. *Id.* at 2:9–12 ("A plurality of Fibre Channel *devices*, such as workstations, are connected

to a Fibre Channel ***transport medium***[.]"), Appx171.  And figure 3

illustrates the distinction, too.  *Id.* at fig.3 (depicting numerous

workstations 58 sharing a single Fibre Channel interconnect (i.e.,

"transport medium") 52), Appx169.  At no point anywhere in the

patent are the two concepts of "devices" and "transport medium"

treated as interchangeable.  To the contrary, they are universally

treated as distinct concepts.

The Board's treatment of the *CRD-5500 User's Manual* wrongly

abrogates that distinction.  In the *Manual*, the term "channel" is used to

refer to the same concept that the patent calls a "transport medium"—

i.e., it is the medium used to connect devices for communication.  By

reasoning that the *Manual*'s disclosure of a "channel number" was akin

to disclosure of a "device," the Board unreasonably derogated the '147

patent's clear distinction between "device" and "transport medium."

The Court has repeatedly found error in claim interpretations

that fail to respect the conceptual distinctions clearly present in a

patent claim.  *E.g.*, *PPC Broadband, Inc. v. Corning Optical Commc'ns RF,*

*LLC*, 815 F.3d 747, 752 (Fed. Cir. 2016) ("There is a canon of

construction: 'the general assumption is that different terms have

different meanings.'" (quoting *Symantec Corp. v. Comput. Assoc. Int'l,*

*Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008)); *Pause Tech. LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ("In construing claims, however, we must give each claim term the respect that it is due."); *CAE Screenplates Inc. v. Heinrich Fielder GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."). Those cases should control this one. The Board seemed to reason that a channel number could serve as a "representation" or "intermediate identifier" for a "device." -1207 Dec. 13–14, Appx13–14. That reasoning assumes that a channel/transport medium and a "device" are interchangeable concepts. But that assumption is incorrect in view of the patent. The '147 patent treats the two concepts—a "device" and a "transport medium"—as plainly distinct, with no hint that the one might "represent" the other to practice the claim. In that light, the Board's conclusion that "mapping to a host channel is tantamount to mapping to a particular host" is clear legal error. *See* -1207 Dec. 14, Appx14. Even if the one were "tantamount" to the other within the narrow confines of the *CRD-5500 User's Manual*, they are not "tantamount" in the '147 patent—and it is the patent that controls claim interpretation.

64

The Board attempted to justify its collapsing of the distinction between "device" and "transport medium" by citing extrinsic evidence, but that path is improper. *See* -1207 Dec. 14 ("[T]he CRD Manual expressly refers to mapping hosts and host channels interchangeably[.]"), Appx14.  It does not matter if a single prior art reference used the terms "host" and "host channel" interchangeably. What matters is whether the '147 claims or description used the claim terms "device" and "transport medium" interchangeably.  As already discussed, they did not.

It is beyond question that, in determining a term's broadest reasonable meaning, the intrinsic evidence of the '147 patent is far more reliable than selectively-chosen excerpts from unrelated prior art.  "Extrinsic evidence may be used only to assist in the proper understanding of the disputed limitation; it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977–78 (Fed. Cir. 2014) (quoting *Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001)).

**3.    The Legal Error in the Board's Approach Was its Vitiation of the Device-to-Device Mapping Requirement, Not its Citation to "Intermediate Identifiers"**

The Board devoted a substantial portion of its Decision to reasoning that the '147 patent did not bar a "map" that used "intermediate identifiers" to represent devices.  -1207 Dec. 7–8, 14, Appx7–8, 14.  But "intermediate identifiers" are not the issue. Certainly it is possible to use an "intermediate identifier" such as a device's name or network address in a "map" so as to practice the '147 claims, as these identifiers signify the device itself.  Indeed, the '147 patent describes the use of some "intermediate identifiers" such as addressing information.  '147 patent, 7:16–18 ("[A]ddressing information is needed to map from [Fibre Channel] addressing to SCSI addressing and vice versa."), Appx174.  It also describes communicating with certain Fibre Channel devices by using the device's "unique port identifier" or its "loop-unique ID (AL_PA)."  *Id.* at 8:1–26, Appx174.  Again, such identifiers are suitable for use in the claimed "map" because they signify the device itself.

The "channel numbers" relied on by the Board, though they might be "intermediate identifiers," may not be used to practice the device-to-device mapping limitation because such numbers ***do not***

***signify the identity of a device—they signify a network channel (i.e., a "transport medium")***.  That a "channel" might, in some implementations of the *CRD-5500 User's Manual*'s technology, have just one host on it is no basis to abrogate the qualitative emphasis on "device" that the '147 patent applies.  That emphasis makes clear that the '147 patentees were not attempting to claim channel-oriented systems like the *Manual*'s.  They claimed a ***device-to-device*** mapping system.  That the *Manual* discloses some channels with only one device on them does not make its "channel-oriented" regime resemble that of the claim.  As already discussed, the *Manual*'s approach is qualitatively different, as evidenced by the inflexibility, insecurity, and inefficiency imposed by tying access control to physical wiring.

### 4.    Under the Proper Construction, the Independent Claims are Nonobvious Over the *CRD-5500 User's Manual*

In view of the above, the Board's conclusion that any independent claims of the '147 patent were so broad as to cover the "channel-oriented" mapping operation described in *CRD-5500 User's Manual* was wrong as a matter of law.  The Court should correct this error by making explicit what, in Crossroads' view, was implicit in the previous construction of the claims: the claims require a map that is

fundamentally "device-to-device"—i.e., the term "representation of a device" in the previously-entered construction must signify a device connected to the first transport medium, and not the transport medium itself.

With this correction, the Court should conclude as a matter of law that the claims under review are not obvious over the *CRD-5500 User's Manual* because there is no material fact question as to whether the *User's Manual* teaches such a "map."

## IV. THE BOARD COMMITTED FURTHER LEGAL AND FACTUAL ERRORS IN ITS ANALYSIS OF THE "HOST DEVICE ID" DEPENDENT CLAIMS

In addition to its claim construction errors for the four independent claims affected by the *CRD-5500 User's Manual*, the Board also committed serious errors in its treatment of four dependent claims: 17, 24, 30, and 36. Each of these dependent claims supplies more detail to the device-to-device mapping described above, and adds an additional requirement that the map contain a "host device ID." For purposes of this appeal, claim 24 is representative:

> 24. The system of claim 21, wherein the access control device is further operable to maintain a configuration including the map, wherein the map provides a mapping from a ***host device ID*** to a virtual LUN [logical unit

> number] representation of the at least one storage de-
> vice to a physical LUN of the at least one storage device.

'147 patent, 12:10–15 (emphasis added), Appx176.

The Board neglected to discuss the "host device ID" limitation in any respect, despite Crossroads expressly highlighting how the "host device ID" limitation clearly established the claims' nonobviousness. *Compare* -1207 Dec. 16 (offering no discussion of the "host device ID" term), Appx16, *with* Crossroads -1207 Resp. 50–51 (highlighting issues for this term), Appx6672–73. The Board merely cited the same reasoning it had applied when it found the independent claims broad enough to cover the *Manual*'s channel-oriented mapping.

Even should the Court find the independent claims broad enough to cover the *Manual*'s channel-oriented mapping, the "host device ID" limitation in the dependent claims requires a different result. That limitation ***expressly requires*** that the map reflect a relationship between allocated storage (the "virtual LUN") and a "host device ID."

It is beyond reasonable dispute that nothing in the *CRD-5500 User's Manual* depicts or describes mapping a "host device ID" to a LUN in the required fashion. The *Manual*'s Host LUN Mapping Tables—the purported "map" apparently offered in satisfaction of this limitation—include nothing, anywhere, that could be characterized in any sense as

a "host device ID."  The closest they come is the identification of a

"channel," in the heading at the top of the Host LUN Mapping Table

(highlighted green), below.[25]  The discussion *supra* describes how, for

the independent claims, it was error as a matter of law for the Board to

conclude that this "channel" was not legally distinct from the claims'

requirement of a "device."  For these dependent claims, it is doubly

improper for the Board to go further and conclude that this "channel"

is legally indistinct from a "host device ID."  As already discussed, the

"channel" does not identify a device, but only the path through which

device communications may flow.  It is possible that arbitrarily-many

hosts might be attached to a "channel"; the Host LUN Mapping Table of

the *Manual* would look no different if there were three hosts on that

channel, or thirty.  Neither do the "Host LUNs" or "Redundancy Groups"

(highlighted orange and blue) teach any "host device ID."  As discussed

---

[25] The "Host LUNs" in the left-most column of the Host LUN Mapping Table do not satisfy the "host device IDs" limitation.  As discussed *supra*, the Host LUNs are arbitrarily-assigned lookup numbers that a device attached to "channel 0" may use when communicating with the various redundancy groups set up in the CRD-5500 array.  The Host LUNs do not identify specific devices on the network.

above, these are mere integers used in the identification and assignment of the storage sets.  None of them is a "host device ID." *CRD-5500 User's Manual* at 4-5, Appx705.  As such, it was error as a



matter of law for the Board to conclude that the "host device ID" requirement of these dependent claims was so broad as to encompass anything in the Table.

    The Board's discussion of the dependent claims was cursory at best, and offers no resolution to this serious deficit in the Board's reasoning.  *See* -1207 Dec. 16, Appx16.  The Court should reverse the obviousness finding for claims 17, 24, 30, and 36 over the *CRD-5500 User's Manual.*

## CONCLUSION

For the foregoing reasons, Crossroads respectfully requests that the Court reverse the findings of the Board and enter judgment that the claims under review are patentable over the cited art.


Dated: June 30, 2016                   */s/ John A. Dragseth*
                                        John A. Dragseth
                                        Robert Courtney
                                        Conrad Gosen
                                        FISH & RICHARDSON P.C.
                                        3200 RBC Plaza, 60 South 6th St.
                                        Minneapolis, MN 55402
                                        612-335-5070

                                        *Attorneys for Appellant*
                                        *Crossroads Systems, Inc.*


## CERTIFICATE OF COMPLIANCE

The Opening Brief for Appellant complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). The relevant portions of the Brief, including all footnotes, contain 13,145 words, as determined by Microsoft Word 2013.

                                        */s/ John A. Dragseth*
                                        John A. Dragseth

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on June 30, 2016.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system, in addition to service via email to Appellee by serving the email address of record as follows:

Jared Bobrow
Jared.Bobrow@weil.com
Derek C. Walter
Derek.Walter@weil.com


Dated:  June 30, 2016              */s/ John A. Dragseth*
                                   John A. Dragseth

ADDENDUM

Trials@uspto.gov                                                     Paper 78
571-272-7822                                      Entered:  January 29, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ORACLE CORPORATION and NETAPP INC.,
Petitioner,

v.

CROSSROADS SYSTEMS, INC.,
Patent Owner.
_____

Case IPR2014-01207
Patent 7,051,147 B2
_____

Before NEIL T. POWELL, KRISTINA M. KALAN, J. JOHN LEE, and
KEVIN W. CHERRY, *Administrative Patent Judges.*

KALAN, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-01207
Patent 7,051,147 B2

## I. INTRODUCTION

Oracle Corporation and NetApp Inc. (collectively, "Petitioner")[1] filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 14–39 of U.S. Patent No. 7,051,147 B2 (Ex. 1001, "the '147 patent") pursuant to 35 U.S.C. §§ 311–319. Crossroads Systems, Inc. ("Patent Owner") filed a Preliminary Response (Paper 11, "Prelim. Resp.").

On February 2, 2015, we instituted trial as to claims 14–39 of the '084 patent. Paper 12 ("Dec."). During trial, Patent Owner filed a Patent Owner Response (Paper 29, "PO Resp."), which was accompanied by a Declaration from John Levy, Ph.D. (Ex. 2053). Petitioner filed a Reply to the Patent Owner Response. Paper 45 ("Reply"). An oral hearing was held on October 30, 2015. A transcript of the consolidated hearing has been entered into the record. Paper 77 ("Tr.").

Petitioner filed a Motion to Exclude (Paper 59) and Reply in support of the Motion to Exclude (Paper 71). Patent Owner filed an opposition to Petitioner's Motion to Exclude (Paper 64).

Patent Owner also filed a Motion to Exclude (Paper 61) and Reply in support of the Motion to Exclude (Paper 70). Petitioner filed an opposition to Patent Owner's Motion to Exclude (Paper 66).

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

---

[1] Huawei Technologies Co. Ltd. was a Petitioner in the original Petition. Pet. 1. On October 8, 2015, we granted a joint motion to terminate Petitioner Huawei Technologies Co. Ltd. Paper 69.

2

IPR2014-01207
Patent 7,051,147 B2

We determine that Petitioner has shown by a preponderance of the evidence that claims 14–39 of the '147 patent are unpatentable.

## II.  BACKGROUND

### A.  Related Matters

The parties indicate that the '147 patent is asserted in co-pending matters captioned *Crossroads Systems, Inc. v. Oracle Corp.*, Case No. 1-13-cv-00895-SS (W.D. Tex.) and *Crossroads Systems, Inc. v. NetApp, Inc.*, Case No. 1-14-cv-00149-SS (W.D. Tex.).  Pet. 2–3; Paper 9, 3.  The '147 Patent is also involved in IPR2014-01209 and IPR2014-01544.

### B.  The '147 Patent (Ex. 1001)

The '147 patent, titled "Storage Router and Method for Providing Virtual Local Storage," issued on May 23, 2006.  The '147 patent relates to a storage router and storage network where devices (e.g., workstations) connected to a Fibre Channel ("FC") transport medium are provided access to storage devices connected to a second FC transport medium.  Ex. 1001, Abstract.  The storage router interfaces with both FC media, mapping workstations on the first FC transport medium, for example, to the storage devices on the second FC transport medium.  *Id.*  The storage router of the '147 patent allows access from the workstations to the storage devices using "native low level, block protocol."  *Id.*  One advantage of using such native low level block protocols is greater access speed when compared to network protocols that must first be translated to low level requests, and vice versa, which reduces access speed.  *Id.* at 1:58–67.

### C.  Illustrative Claim

Claim 14 of the '147 patent is reproduced below:

IPR2014-01207
Patent 7,051,147 B2

14.    An apparatus for providing virtual local storage on a remote storage device to a device operating according to a Fibre Channel protocol, comprising:

a first controller operable to connect to and interface with a first transport medium, wherein the first transport medium is operable according to the Fibre Channel protocol;

a second controller operable to connect to and interface with a second transport medium, wherein the second transport medium is operable according to the Fibre Channel protocol; and

a supervisor unit coupled to the first controller and the second controller, the supervisor unit operable to control access from the device connected to the first transport medium to the remote storage device connected to the second transport medium using native low level, block protocols according to a map between the device and the remote storage device.

Ex. 1001, 11:5–22.

### D.  Prior Art Supporting Instituted Unpatentability Grounds

1. CRD-5500 SCSI RAID Controller User's Manual (1996) ("CRD Manual") (Ex. 1003);

2. CRD-5500 SCSI RAID Controller Data Sheet (Dec. 4, 1996) ("CRD-5500 Data Sheet") (Ex. 1004);

3. Judith A. Smith & Meryem Primmer, *Tachyon: A Gigabit Fibre Channel Protocol Chip*, HEWLETT-PACKARD J. 1, 1–17 (1996) ("Smith") (Ex. 1005);

4. U.S. Patent No. 6,219,771 B1, issued Apr. 17, 2001 ("Kikuchi") (Ex. 1006);

5. U.S. Patent No. 6,073,209, issued June 6, 2000 ("Bergsten") (Ex. 1007); and

6. JP Patent Application Pub. No. Hei 5[1993]-181609, published July 23, 1993 ("Hirai") (Ex. 1008).

Petitioner also relies on the Declaration of Professor Jeffrey S. Chase, Ph.D. (Ex. 1010, "Chase Declaration").

IPR2014-01207
Patent 7,051,147 B2

### E. Instituted Unpatentability Grounds

We instituted an *inter partes* review of claims 14–39 of the '147

patent on the following grounds:

| References | Basis | Claims Instituted |
|---|---|---|
| CRD Manual, CRD-5500 Data Sheet, and Smith | § 103 | 14–39 |
| Kikuchi and Bergsten | § 103 | 14–39 |
| Bergsten and Hirai | § 103 | 14–39 |

## III.  ANALYSIS

For the challenged claims, Petitioner must prove unpatentability by a

preponderance of the evidence.  35 U.S.C. § 316(e).  We begin with a

claim construction analysis, and then follow with specific analysis of the

prior art.

### A.  Claim Interpretation

The Board interprets claim terms in an unexpired patent using the

"broadest reasonable construction in light of the specification of the patent

in which [they] appear[]."  37 C.F.R. § 42.100(b); *see* Office Patent Trial

Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Under the

broadest reasonable interpretation standard, claim terms are given their

ordinary and customary meaning in view of the specification, as would be

understood by one of ordinary skill in the art at the time of the invention.

*In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  Only

those terms which are in controversy need be construed, and only to the

extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci.

& Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

IPR2014-01207
Patent 7,051,147 B2

During trial, the parties disputed the claim construction of the term "map between the device and the remote storage device," which we address below. No other claim terms require express construction to resolve the issues raised in this *inter partes* review.

Claim 14 recites "a supervisor unit . . . operable to control access . . . according to a *map between the device and the remote storage device*." (emphasis added). Each challenged independent claim recites a similar limitation. This term was not construed expressly in the Decision on Institution.

Patent Owner argues that the term "requires that the map specifically identify the host (through some representation of that host) and its associated storage (through some representation of that storage) in order to allocate storage to particular hosts." PO Resp. 3. Further, Patent Owner makes clear its position that the recited mapping requires the storage devices to be mapped directly to a particular device, such as a host computer. *Id.* at 2–3, 36. According to Patent Owner, it is not enough to map between a storage device and an intermediate identifier associated with a particular device because the identifier is not directly and immutably associated with the device itself—in other words, mapping to an identifier is insufficient unless the identifier is associated with a particular device and *cannot* be associated with any other device. *See id.* at 41–47 (arguing that mapping to a channel identifier does not suffice, even if the channel is connected to only one host device, because the channel identifier *could* be associated with another device if another device were connected to that channel).

The construction proposed by Patent Owner is overly narrow. Although Patent Owner emphasizes that the map must identify specific host devices, it does not explain persuasively why the claim language should be construed to exclude doing so via intermediate identifiers. *See* PO Resp. 2–3. Patent Owner does not identify any disclosure in the '147 patent's specification that clearly disavows mapping to a device indirectly, or mapping to a device via an intermediate identifier that could identify a different host if the system were configured differently. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (holding that "words or expressions of manifest exclusion or explicit disclaimers in the specification are necessary to disavow claim scope" (internal quotations omitted)). Its discussion of Figure 3, for example, is insufficient to compel a narrow construction of the term because it analyzes only a preferred embodiment of the invention. PO Resp. 45–46; *see*, *e.g.*, *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1369 (Fed. Cir. 2004) (holding that limitations should not be imported from preferred embodiments into the claims absent a clear disclaimer of claim scope in the specification).

Moreover, the '147 patent specifically discusses mapping with identifiers that are not immutable. For example, the specification discusses addressing devices on an FC loop using an AL_PA (arbitrated loop physical address), and the possibility of "FC devices changing their AL-PA due to device insertion or other loop initialization." Ex. 1001, 8:40–46; Reply 3–6 (discussing evidence supporting the use of intermediate identifiers, including testimony by Patent Owner's proffered expert).

IPR2014-01207
Patent 7,051,147 B2

Further, the challenged claims of the '147 patent indicate the mapping may use mere representations of a device rather than requiring direct mapping to the device itself. Claim 15, for example, recites mapping including "virtual LUNs that provide a representation of the storage device," and claim 17 recites "mapping from a host device ID to a virtual LUN representation of the remote storage device." Although these claims refer to "virtual" representations of storage devices rather than host devices, the "maps between" term of the independent claims uses the same language when referring to both the devices and storage devices—for example, claim 14 merely recites a "map between the device and the remote storage device." The claim language does not indicate that the mapping may address storage devices one way, but that devices must be addressed in a different, more specific or direct way.

For the reasons above, we are not persuaded that the broadest reasonable interpretation of "map between the device and the remote storage device" mandates mapping directly or immutably to a host device itself, or excludes mapping to devices using intermediate identifiers.

The parties note that a district court in a related case construed the term as follows, and the Special Master in the co-pending litigation between the parties recommended adoption of this construction:

> To create a path from a device on one side of the storage router to a device on the other side of the router. A "map" contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices.

Ex. 2034, 4; *see also* PO Resp. 2. Although we are not bound by the construction or reasoning of the district court, we do not disregard the

IPR2014-01207
Patent 7,051,147 B2

analysis and conclusions of a court construing the same claim term in a concurrent proceeding concerning the same patent. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326–1327 (Fed. Cir. 2015) (discussing the Board's error in declining to address or acknowledge the district court's claim construction). After considering the construction of the district court, we determine this construction corresponds to the broadest reasonable interpretation and adopt it for purposes of this Decision.

### B. Asserted Ground Based on CRD Manual, CRD-5500 Data Sheet, and Smith

Petitioner challenges claims 14–39 as obvious under 35 U.S.C. § 103 over CRD Manual, CRD-5500 Data Sheet, and Smith. Pet. 12–27. As discussed below, Petitioner has demonstrated by a preponderance of the evidence that all challenged claims are unpatentable on this ground.

#### 1. The CRD Manual

The CRD Manual describes the CRD-5500 RAID controller, a device that enables access to an array of disk drives on a SCSI bus. Ex. 1003, 9.[2] This controller has a modular design that permits customization of its I/O channels using different I/O hardware modules, which allow support of multiple hosts and multiple drives. *Id.* at 9–11.

#### 2. The CRD-5500 Data Sheet

The CRD-5500 Data Sheet discusses the benefits and features of the CRD-5500 RAID controller. Ex. 1004. Specifically, it provides that "CMD's advanced 'Viper' RAID architecture and ASICs were designed to

---

[2] For clarity, we refer to the pagination of Exhibit 1004 provided by Petitioners and not its native pagination.

IPR2014-01207
Patent 7,051,147 B2

support tomorrow's high speed serial interfaces, such as Fiberchannel (FCAL) and Serial Storage Architecture (SSA)." *Id.* at 1.

### 3. Smith

Petitioner relies on an article titled "Tachyon: A Gigabit Fibre Channel Protocol Chip." Ex. 1005. This article discusses the Tachyon chip, an FC interface controller that "enables a seamless interface to the physical FC-0 layer and low-cost [FC] attachments for hosts, systems, and peripherals on both industry-standard and proprietary buses through the Tachyon system interface." *Id.* at 1.

### 4. Analysis

Petitioner asserts, in a section of the Petition titled "The Combined System of *CRD-5500 User Manual*, *CRD-5500 Data Sheet* and *Smith*," that the references, in combination, disclose the claimed subject matter. Pet. 16–19 (including a figure representing the hypothetical combined system on page 18). In the "Correspondence between Claims 14–39 and the Combined System of *CRD-5500* and *Smith*" section, Petitioner alternately refers to the references and to paragraphs in the Chase Declaration in support of its arguments. *Id.* at 19–27. Petitioner presents specific arguments with respect to claims 14–20, and then, for claims 21–39, relies on its arguments for claims 14–20 and the Chase Declaration. *Id.* at 24–27.

Petitioner argues that the disclosures of the CRD Manual and CRD-5500 Data Sheet disclose substantially all the limitations of claims 14–20, apart from the "first controller" and "second controller," which Petitioner argues are disclosed by the incorporation of Smith's Tachyon chip into an FC host interface module and into a FC storage interface module,

IPR2014-01207
Patent 7,051,147 B2

respectively. *Id.* at 19–22. Petitioner further argues that it would have been obvious to one of ordinary skill in the art to combine the CRD-5500 references and Smith "to enhance the communication and storage options of a host device on a FC transport medium, benefit from the 'Host LUN Mapping' feature of the CRD-5500 controller, and avail the host computing device of ubiquitous mass storage applications (*e.g.,* RAID)." *Id.* at 16 (citing Ex. 1010 ¶¶ 39–43). We adopt Petitioner's reasoning for combining the references as supported by the record, including Dr. Chase's Declaration. Patent Owner includes a section in its Patent Owner Response titled "Petitioner's Reasons for Combining Do Not Lead to the Claimed Invention," but this short section focuses primarily on Patent Owner's allegation that the recited combination would still lack the features of the claimed invention. PO Resp. 53–54. Thus, Patent Owner has not persuasively presented arguments to counter Petitioner's position that a person of ordinary skill would have had reason to combine the teachings of these references.

The Petition identifies the "first controller" and the "second controller" as being created "through the incorporation of the Tachyon chip" into a FC host interface module and into a FC storage interface module, respectively. Pet. 20. The Petition identifies the CPU disclosed in the CRD Manual as teaching the recited "supervisor unit." *Id.* at 21. The CRD Manual describes a feature of its Monitor Utility used to "map LUNs on each host channel to a particular redundancy group." Ex. 1003, 44. Petitioner argues that the CRD-5500 controls access by using this "Host LUN Mapping," which accepts only host LUN addresses for which a redundancy group mapping associated with the requesting host exists.

11

IPR2014-01207
Patent 7,051,147 B2

Pet. 21.  The map limitation, according to Petitioner, is evidenced by the "Host LUN Mapping" used to map between LUNs assigned to the host device and RAID redundancy groups each representing a physical storage drive.  *Id.*  The hosts in the proposed combination communicate the LUN to the CRD-5500 in SCSI commands; the '147 patent discloses that SCSI is an example of a "native low level, block protocol" within the meaning of the claims.  *Id.*; Ex. 1001, 5:13–17, 5:46–50.  Based on the full record after trial, we find that the combination of the CRD Manual and the HP Journal teaches or suggests each limitation of the challenged claims of the '147 patent.  Patent Owner's counterarguments are unpersuasive.

Patent Owner argues the asserted combination does not teach the "Fibre Channel transport medium," "mapping," and "access controls/controlling access" functions of the patent.  PO Resp. 36–51.

First, Patent Owner challenges Petitioner's assertion that the Tachyon chip passes the host device identity to the CRD-5500 controller processor, where the host device information is cross-referenced with the "Host LUN Mapping" maintained by the CRD-5500 controller to identify storage.  *Id.* at 38.  Patent Owner faults Dr. Chase for failing to cite to evidence supporting that the CRD-5500 matches the combination of LUN and host identification in the SCSI command with a RAID redundancy group, providing testimony from Dr. Levy that the CRD-5500 would not operate in this manner.  *Id.* at 39 (citing Ex. 1010 ¶ 42; Ex. 2053 ¶¶ 200–201).  Petitioner relies on its arguments in the Petition and on Dr. Chase's testimony to respond that, in certain implementations, host device identity is passed directly to the CRD controller.  Reply 6–7 (citing Pet. 18–19; Ex. 1010 ¶ 42 (discussing identification of the host by the "FC unique

IPR2014-01207
Patent 7,051,147 B2

identifier")), 8–9 (discussing this limitation in relation to claims 17, 24, and 36). Patent Owner does not explain persuasively why this disclosure or implementation should be overlooked. Based on Petitioner's evidence regarding the passing of host device identity to the CRD controller, including Dr. Chase's credible testimony, we are persuaded that the sending host would be identifiable in this implementation.

Patent Owner next alleges that the CRD Manual fails to teach the recited mapping because the host LUN mapping feature only maps storage devices to host *channels*, not the specific hosts themselves. PO Resp. 41–47 (citing Ex. 2053 ¶¶ 203, 205, 212–13, 218–19, 221, 223, 229–31, 233), 50 (discussing the limitation in relation to claims 15 and 22). This argument, however, relies on the overly narrow claim construction rejected above, and is unpersuasive as a result. For example, Patent Owner addresses Figure 1-2 of the CRD Manual, which is reproduced below:



IPR2014-01207
Patent 7,051,147 B2

Figure 1-2 of the CRD Manual depicts a configuration of the CRD-5500 controller where each of four different hosts are assigned to a different channel, i.e., channel 0 through channel 3. Ex. 1003, 10. These hosts may then access redundancy groups via the CRD-5500 controller. *Id.*

The specific configuration depicted in Figure 1-2 meets the mapping limitation because each host channel is dedicated to a single host—thus, in effect, mapping to a host channel is tantamount to mapping to a particular host. *See* Reply 3–5. In recognition of this fact, the CRD Manual explicitly refers to mapping to hosts and host channels interchangeably, which Patent Owner acknowledges at least with respect to Figure 1-2. *See* Ex. 1003, 9; PO Resp. 44; Reply 4–5. The analysis presented by Patent Owner regarding other configurations *different* from that in Figure 1-2— i.e., configurations where two hosts are connected to the same host channel (PO Resp. 45)—does not cancel or negate the configuration disclosed by Figure 1-2. As discussed above, the broadest reasonable interpretation of the mapping limitation is not limited only to mapping directly and immutably to a specific host device, and does not exclude categorically the use of intermediate identifiers. Consequently, Patent Owner has not shown persuasively why the configuration disclosed in the CRD Manual falls outside the scope of the claim language.

Patent Owner additionally contends that the CRD Manual fails to teach the access controls limitations of the challenged claims. *Id.* at 47–50. Similar to its arguments relating to the mapping limitation, Patent Owner purports to show how the redundancy group access controls of the CRD Manual can be defeated by changing the disclosed configuration in Figure 1-2, i.e., by rewiring the hosts such that multiple hosts are connected to the

14

IPR2014-01207
Patent 7,051,147 B2

same host channel. *Id.* at 48–49. Patent Owner has not persuasively demonstrated, however, that the purported inadequacy of the access control method disclosed for the Figure 1-2 configuration, when directly applied to a *different* configuration, shows that the CRD Manual fails to teach implementing access controls at least for the configuration of Figure 1-2.

Lastly, Patent Owner argues that no evidence exists that the CRD-5500 could accommodate Smith's Tachyon chip FC host interface. PO Resp. 51–53. Patent Owner critiques the statement in Exhibit 1004 stating that the architecture of the technology supports FC as "forward-looking and speculative." *Id.* at 51. Petitioner counters that a proper obviousness analysis does not require bodily incorporation. Reply 7–8; *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art."). Moreover, Petitioner states that neither Patent Owner nor Dr. Levy asserts that the proposed combination would have been outside the level of ordinary skill in the art to adapt. *Id.* at 8 (citing Ex. 2053 ¶¶ 192–223; Ex. 1010 ¶¶ 39–40). Regarding this issue, the record as a whole supports Petitioner's contention that a person of ordinary skill would have been able to combine the teachings of the CRD Manual, CRD-5500 Data Sheet, and Smith to arrive at a system in which the CRD-5500 could accommodate the Tachyon chip FC host interface. Ex. 1010 ¶¶ 39–41.

IPR2014-01207
Patent 7,051,147 B2

Claims 15–20 depend, directly or indirectly, from claim 14 and recite limitations similar to those recited in claim 1 and its dependent claims. Both parties rely on essentially the same arguments as those discussed above for the previous claims. *See* Pet. 22–24; PO Resp. 36, 50–51. For reasons similar to those discussed above for the previous claims, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claims 15–20.

Each of the remaining independent claims (claims 21, 28, and 34), as well as their dependent claims (claims 22–27, 29–33, and 35–39) recite limitations similar to those recited in previous claims discussed above. The parties advance similar arguments and evidence with respect to these claims as for those previous claims. *See* Pet. 24–27; PO Resp. 36, 50–51. For similar reasons as discussed above, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claims 21–39.

In sum, based on the full record after trial, we find that a preponderance of the evidence supports Petitioner's contention that the combination of CRD Manual, CRD-5500 Data Sheet, and Smith teaches or suggests each limitation of claims 14–39. As discussed below, we are not persuaded that Patent Owner has established secondary considerations of non-obviousness. Thus, Petitioner has shown by a preponderance of the evidence that claims 14–39 are unpatentable under 35 U.S.C. § 103(a).

### C. *Asserted Ground Based on Kikuchi and Bergsten*

Petitioner challenges claims 14–39 as obvious under 35 U.S.C. § 103 over Kikuchi and Bergsten. Pet. 27–42.

IPR2014-01207
Patent 7,051,147 B2

*1. Kikuchi*

Kikuchi is titled "Data Storage Apparatus with Improved Security Process and Partition Allocation Functions," and discloses an apparatus that enables access authorization to be assigned solely to specific host devices. Ex. 1006, Abstract. In one embodiment, Kikuchi discloses address offset information conversion unit 121 and actual partition address conversion unit 122, as shown in Figure 5:



Figure 5 is a diagram showing the configuration of an embodiment of the claimed invention of Kikuchi, in which offset information indicating a disk partition corresponding to each host device has been stored in advance in the address offset information conversion unit 121, and the host address input from command interpretation and execution unit 120 is converted to this offset information. *Id.* at 3:48–49, 7:55–63. In this embodiment, actual partition address conversion unit 122 combines the disk partition address output from command interpretation and execution unit 120 with

17

**Appx00017**

IPR2014-01207
Patent 7,051,147 B2

the offset information output from address offset information conversion unit 121 to generate an actual disk partition address. *Id.* at 7:64–8:3.

> ### 2. *Bergsten*

Bergsten is titled "Data Storage Controller Providing Multiple Hosts with Access to Multiple Storage Subsystems," and describes a storage controller that allows multiple host computer systems at different locations to access any of multiple copies of stored data. Ex. 1007, 3:1–4. The storage controller emulates a local storage array for the host computer system that it services, and emulates a host computer system for the local storage array that it accesses. *Id.* at 3:14–17. The host computer systems access stored data using virtual device addresses, which are mapped to real device addresses by the storage controller. *Id.* at 3:17–19. Figure 1 of Bergsten is reproduced below.



**FIG. 1**

Figure 1 of Bergsten is a block diagram illustrating a computing system in which a number of Bergsten's storage controllers provide a number of host computer systems with access to a number of storage arrays. *Id.* at 3:20–23. Figure 1 shows a computing system with M storage controllers, 3-1 through 3-M; M host computers, 2-1 through 2-M, which are coupled to storage controllers 3-1 through 3-M, respectively; and M storage arrays 4-1 through 4-M, which are coupled to storage controllers 3-1 through 3-M respectively. *Id.* at 3:23–28. Each of the storage arrays includes a number of mass storage devices ("MSDs"). *Id.* at 3:28–34. Storage controllers 3-1 through 3-M function cooperatively to provide any of host computer systems 2-1 through 2-M with access to any of storage

IPR2014-01207
Patent 7,051,147 B2

arrays 4-2 through 4-M. *Id.* at 4:7–9. Storage controller 3-1 is coupled directly to host computer system 2-1 using data communication path 7 and to local data storage array 4-1 via another communication path 8. *Id.* at 4:13–17. Data communication paths 7 and 8 may conform to a variety of protocols, including SCSI, serial SCSI, Fiber Channel, or ESCON. *Id.* at 4:19–28.

A local host computer accesses data by transmitting a (virtual) host address to its local storage controller. *Id.* at 6:10–11. The host address is then mapped to a real address representing a location on one or more physical MSDs. *Id.* at 6:11–14. The mapping is completely transparent to all of the host computers. *Id.* at 6:14–16. A single host address may map to multiple physical addresses, which may be distributed among multiple MSDs, and such MSDs may further be located in different storage arrays. *Id.* at 6:16–21. The storage controller maintains and uses a tree structure to map the host interface ID and block number to a logical device. *Id.* at 9:21–24, Fig. 8.

### 3. *Kikuchi as Prior Art*

Patent Owner argues that Kikuchi, which was filed on August 18, 1997, is not prior art. PO Resp. 20. Patent Owner argues that the invention of the '147 patent was conceived as early as March 22, 1997, and that the '147 patent claims priority to U.S. Patent No. 5,941,972, which was filed on December 31, 1997.[3] *Id.* More particularly, Patent Owner

---

[3] The '147 patent sets forth its parentage as follows: "Continuation of application No. 10/081,110, filed on Feb. 22, 2002, now Pat. No. 6,789,152, which is a continuation of application No. 09/354,682, filed on Jul. 15, 1999, now Pat. No. 6,421,753, which is a continuation of application No.

IPR2014-01207
Patent 7,051,147 B2

alleges that the invention of the '972 patent, representing the earliest filing in the '147 patent's chain of title, was conceived as early as March 1997. *Id.* at 21. According to Patent Owner: "Only two dates are important for the prior invention analysis. Crossroads must have a complete conception just before Kikuchi's filing date (Aug. 17, 1997) and diligence in reduction to practice (here, constructive reduction to practice on Dec. 31, 1997) ('the critical period')." *Id.* at 23.

During the period in which reasonable diligence must be shown, there must be continuous exercise of reasonable diligence. *In re McIntosh*, 230 F.2d 615, 619 (CCPA 1956); *see also Burns v. Curtis*, 172 F.2d 588, 591 (CCPA 1949) (referring to "reasonably continuous activity"). A party alleging diligence must account for the entire critical period. *Griffith v. Kanamuru*, 816 F.2d 624, 626 (Fed. Cir. 1987); *Gould v. Schawlow*, 363 F.2d 908, 919 (CCPA 1966).

Even a short period of unexplained inactivity is sufficient to defeat a claim of diligence. *Morway v. Bondi*, 203 F.2d 742, 749 (CCPA 1953); *Ireland v. Smith*, 97 F.2d 95, 99–100 (CCPA 1938). In *In re Mulder*, 716 F.2d 1542, 1542–46 (Fed. Cir. 1983), the Federal Circuit affirmed a determination of lack of reasonable diligence, where the evidence of record was lacking for a two-day critical period. Likewise, in *Rieser v. Williams*, 255 F.2d 419, 424 (CCPA 1958), there was insufficient diligence where no activity was shown during the first 13 days of the critical period.

To support its conception date, Patent Owner relies, *inter alia*, on an abstract and drawing sent from the inventor to outside counsel on May 28,

_____

09/001,799, filed on Dec. 31, 1997, now Pat. No. 5,941,972." Ex. 1001, at [63].

IPR2014-01207
Patent 7,051,147 B2

1997, and a draft patent application returned by outside counsel on July 11, 1997, as evidence. PO Resp. 21 (citing Exs. 2300–2303). To support its allegations of reduction to practice, Patent Owner argues that the "precursor to the invention claimed in the '972 patent was the 'Verrazano' project." *Id.* at 22. According to Patent Owner, "Verrazano was a bridge for linking FC and SCSI devices and contained all elements of the '972 invention except for access controls and virtual local storage." *Id.* During the critical period, according to Patent Owner, all of its employees were working to create a viable Verrazano product. *Id.* at 23. "Verrazano would eventually become Crossroads' CP4100 product," according to Patent Owner, and because "Verrazano was the basic hardware platform that would be used to support access controls, its development was required before that feature could be added and the entire invention could actually be reduced to practice." *Id.* at 23–24 (citing *Thompson v. Dunn*, 166 F.2d 443, 447 (CCPA 1948); *Keizer v. Bradley*, 270 F.2d 396, 398–99 (CCPA 1959)). Patent Owner also points to "revising multiple draft patent applications prior to constructive reduction to practice on December 31, 1997" as evidence of diligence. *Id.* at 25.

Petitioner's arguments address two time periods: the "first time period" from August 18, 1997, to November 25, 1997, during which inventors were engaged in constructive reduction to practice of the Verrazano bridge product, and the "second time period" from November 25, 1997, to December 31, 1997, during which Petitioner was allegedly revising the patent application. Reply 10–15. Petitioner does not provide arguments specifically directed to Patent Owner's allegations regarding conception.

IPR2014-01207
Patent 7,051,147 B2

Regarding the "first time period," Petitioner argues that Patent Owner's attempt to antedate Kikuchi fails because "about four months of the diligence period was dedicated *only* to developing a product that, Patent Owner also admits, was outside the scope of the claims." *Id.* at 9. During this "first time period" in which inventors were working on the Verrazano bridge product, Petitioner argues that Patent Owner "made a conscious decision to prioritize development of the Verrazano bridge and delay development of the claimed subject matter." *Id.* at 11. Petitioner disagrees with Patent Owner's contention that the completion of the Verrazano product was necessary for commencement of work on the access controls. *Id.* at 11–12. Instead, Petitioner argues, "Patent Owner opted to omit the access controls from the Verrazano product to accelerate commercial introduction of that product." *Id.* at 12.

Regarding the "second time period" from November 25, 1997, to December 31, 1997, Petitioner argues that, although a draft of the patent application from counsel was received by Patent Owner in July 1997, subsequent edits were "so minimal that they could not have accounted for the five week delay." *Id.* at 14 (citing Ex. 1228). Petitioner summarizes: "A single patent application review meeting and the transmission of a draft patent application with minimal revisions cannot have required more than a couple days of effort. Patent Owner offers no other evidence of diligence during the five week period." *Id.* at 14–15.

We do not agree with Patent Owner's assertions that developing the Verrazano product was a necessary precursor to developing access controls. Petitioner's evidence, including deposition testimony of diligence declarant John Middleton, indicates that Patent Owner could

IPR2014-01207
Patent 7,051,147 B2

have tested access controls during the "first time period," but decided not

to.  Reply 11–12 (citing Ex. 1220, 54, 58–59, 63–65).  Patent Owner relies

on Mr. Middleton's declaration statement that "until the Verrazano bridge

could be completed, Crossroads had no working device which could

implement access controls."  Ex. 2305, 3.  However, during his deposition,

Mr. Middleton stated that Crossroads was interested in "becoming

profitable as soon as possible" and agreed that the exclusion of access

controls from the Verrazano bridge possibly had to do with reasons

relating to interest in early revenue generation and delay of the commercial

launch.  Ex. 1220, 71:4–5, 71:10–72:22.  Mr. Middleton also stated that,

during testing, the functionality of the Verrazano hardware prototypes

could have included access control functionality.  *Id.* at 63:21–64:4.

Petitioner's evidence, in total, indicates Patent Owner made a business

decision to develop and launch the Verrazano product, without access

controls, because development of access controls would have lengthened

the time to market for the Verrazano product.  Reply 12–13 (citing Ex.

1220, 70:16–72:22).  Thus, Patent Owner cannot rely on *Thompson v.

Dunn* to excuse its inactivity in developing access controls.  As discussed

above, even a short period of unexplained inactivity is sufficient to defeat a

claim of diligence, and Patent Owner's four-month gap of activity exceeds

the short periods found to prevent an earlier priority date by the courts.

*Morway*, 203 F.2d at 749.  Patent Owner's additional evidence of

reasonable diligence during the "second time period" also is insufficient.

The minor changes to the patent application during this time period do not

represent reasonably continuous activity.  Because Patent Owner had a

draft application since July 1997, it is unclear if those changes were even

IPR2014-01207
Patent 7,051,147 B2

made during this "second time period," or if they were made at some other point between drafting and filing the application. Thus, based on the totality of the evidence before us, we are persuaded that Kikuchi is prior art.

### 4. Arguments

Petitioner asserts, in a section titled "The Combined System of *Kikuchi* and *Bergsten*," that the references, in combination, disclose the claimed subject matter. Pet. 30–33. Petitioner argues that "[i]n the combined system of *Kikuchi* and *Bergsten*, multi-protocol intercommunication capabilities of the command and interpretation unit described in *Kikuchi* are enhanced by incorporating *Bergsten's* emulation drivers 21 and physical drivers 22, which are detailed in *Bergsten* with a greater degree of specificity." *Id.* at 30–31. Petitioner emphasizes that "[t]o the extent that *Kikuchi* fails to explicitly detail every nuance of FCP-based encapsulation and de-encapsulation, the details of *Bergsten's* emulation drivers 21 and physical drivers 22 more than sufficiently provide specific details." *Id.* at 31. Based on the full record after trial, we find that the combination of Kikuchi and Bergsten teaches all of the limitations of the instituted claims. *Id.* at 27–42 (explaining how each limitation is taught by the asserted prior art).

Patent Owner argues that Bergsten does not teach the claimed access controls, and Kikuchi does not teach the claimed map or access controls. PO Resp. 25. Instead, Patent Owner argues, Kikuchi's simple address offset is designed to create different "partitions of a physical storage device," and thus does not provide the claimed map or access controls. *Id.* at 26–28. Patent Owner relies on the testimony of Dr. Levy to support its

IPR2014-01207
Patent 7,051,147 B2

assertions that the "simple offset is designed to create different 'partitions' of a physical storage device." *Id.* at 27 (citing Ex. 2053 ¶¶ 149–151). Patent Owner also argues that access controls are not present in the asserted combination, because Bergsten's emulation driver prevents host identity from reaching any map. *Id.* at 32–34.

Petitioner replies that the combination of Kikuchi and Bergsten does in fact restrict access to specific host devices, in that the "correlation chart and address conversion units described in *Kikuchi* are modified to include the virtual mapping functionality of *Bergsten's* storage controller." Reply 16. Regarding Dr. Levy's testimony that Kikuchi does not really talk about disk partitions, Petitioner argues that Dr. Levy fails to understand properly the operation of Kikuchi, and furthermore attacks Kikuchi individually. *Id.* at 15–16 (citing *Keller,* 642 F.2d at 426). Petitioner supports its argument by citing to portions of Kikuchi stating that Kikuchi's apparatus "enables access authorization to be assigned solely to specific host devices." *Id.* at 17 (citing Ex. 1006, Abstract, 1:65–2:6, 8:40–46). Petitioner also states that Kikuchi, as a form of access control, evaluates the host address to determine whether a host has any rights to access the storage device. Pet. 28 (citing Ex. 1006, 4:35–44); Tr. 20:22–25. According to Petitioner, there is no express support for Patent Owner's contention that the Kikuchi host ID would be stripped from the combination. Tr. 23:11–15. Petitioner argues that, based on the asserted combination set forth in the Petition, Kikuchi has the ability to extract the host device ID and communicate it on, even in an FC embodiment such as that in Bergsten. Pet. 28; Tr. 23:17–24:2. As disclosed in Bergsten and discussed by Dr. Chase, Bergsten's host ID identifies the particular host,

IPR2014-01207
Patent 7,051,147 B2

and is received by the storage controller in Bergsten.  Ex. 1007, 9:8–20,
Fig. 7; Tr. 63:9–17; Ex. 1010 ¶¶ 299, 313.

We agree with Petitioner that Kikuchi's disclosure of access
authorization assigned to specific host devices meets the "access control"
limitation of the claims.  In the sections of Kikuchi cited by Petitioner,
Kikuchi expressly states that host addresses that match those in an address
registration are given access authorization, and certain hosts receive access
to certain portions of the disk based on their access authorization, which
demonstrates the presence of "access control."  Ex. 1006, Abstract, 1:65–
2:6, 4:35–44, 8:37–46.  We agree that the express disclosures of Kikuchi
should be given substantial weight in our consideration of whether Kikuchi
discloses access controls.  Additionally, based on the evidence presented,
including the disclosures of Bergsten itself and the testimony of Dr. Chase,
we are not persuaded that Bergsten prevents host identity from reaching
any map.  Petitioner's citations to Bergsten and to Kikuchi support the
position that the host ID in each system, or the combined system, is used
for mapping purposes rather than being stripped or discarded.

Patent Owner also argues that the asserted combination
impermissibly enhances both Kikuchi and Bergsten by ignoring their
purposes and modifying their principles of operation.  PO Resp. 28.
Specifically, Patent Owner argues that one of ordinary skill in the art
would not modify the references as proposed by Petitioner, as the
combination is highly complex and destroys the intended purposes of both
references by modifying their principles of operation.  *Id.* at 28–32.

Petitioner responds by arguing that the proposed combination does
not change the principles of operation, stating that both parties' experts

IPR2014-01207
Patent 7,051,147 B2

agree that "making modifications of the type described by Patent Owner would have been rudimentary and well within the skill of an ordinary artisan in this field," such as changing between a mapping tree (as in Bergsten) and a mapping chart (as in Kikuchi). Reply 17 (citing Ex. 1218, 103; Ex. 1010 ¶ 145, Ex. 2054, 200, 214).

We credit the testimony of Dr. Chase that one of ordinary skill in the art would have been motivated and able to combine Kikuchi and Bergsten in the manner proposed by Petitioner. Ex. 1010 ¶¶ 142–147; Ex. 2054, 180–213. Patent Owner's arguments to the contrary address the purported complexity of the combination, but do not establish that a person of ordinary skill would not have had a reasonable expectation of success. Obviousness does not require absolute predictability. *In re Kronig*, 539 F.2d 1300, 1304 (CCPA 1976). Both experts agree that the modifications were within the level of ordinary skill in this field (Ex. 1010 ¶ 145; Ex. 1218, 103:16–21). Dr. Chase's Declaration states that tables and trees are interchangeable data lookup constructs for address translations, and that the "tree mapping" of Bergsten may be collapsed into a simple mapping table construct such as that of Kikuchi in a single-controller implementation; his deposition testimony provides greater detail in response to Patent Owner's questions on how the collapsing would occur in different circumstances. Ex. 1010 ¶ 145; 2054, 180–219. Thus, we are persuaded by Petitioner's testimony and evidence that the combination of Kikuchi and Bergsten was within the skill level of an ordinarily skilled artisan, and would not change the principles of operation of the respective references.

IPR2014-01207
Patent 7,051,147 B2

Finally, Patent Owner argues that Petitioner has not provided a motivation to combine Kikuchi and Bergsten. PO Resp. 35–36. According to Petitioner, one of ordinary skill in the art would have been motivated to combine Kikuchi and Bergsten to "improve the *Kikuchi* system with the advantage of virtualized, networked storage," to "increase both the number of storage devices accessible to hosts and the storage address range available," and to "benefit from increased restructuring capabilities." Pet. 32–33 (citing Ex. 1010 ¶ 142–147); Reply 13 (citing Ex. 1010 ¶ 146). Patent Owner challenges each of these statements, and the supporting testimony, as lacking evidence supporting how Bergsten would provide the alleged benefits or explaining why one of ordinary skill in the art would be motivated to combine the references as proposed by Petitioner. PO Resp. 35–36.

Here, too, we credit the testimony of Dr. Chase that one of ordinary skill in the art would have been motivated to combine Kikuchi and Bergsten in the manner proposed by Petitioner. Ex. 1010 ¶¶ 142–147. Bergsten itself indicates that it would be "desirable" for a storage controller to not be "dependent on any particular hardware or software configuration of any host computer or mass storage device which it services." Ex. 1007, 1:48–51. The numerous reasons articulated by Petitioner for the combination of Kikuchi with Bergsten, resulting in an enhanced system with advantages including virtualized storage, increased capacity and increased flexibility, are detailed by Petitioner and supported by testimony. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421–22 (2007). Patent Owner's arguments to the contrary are unavailing.

IPR2014-01207
Patent 7,051,147 B2

As discussed below, we are not persuaded that Patent Owner has established secondary considerations of non-obviousness. Accordingly, we find that Petitioner has demonstrated by a preponderance of the evidence that claims 14–39 are obvious over Kikuchi and Bergsten.

### D. Asserted Grounds Based on Bergsten and Hirai

Petitioner challenges claims 14–39 as unpatentable over Bergsten and Hirai. Pet. 42–55.

### 1. Hirai

Hirai is a Japanese published patent application titled "Personal Computer System." Ex. 1008, (54). Hirai describes a personal computer system that allows the sharing of multiple magnetic disk devices by multiple personal computers. *Id.* at Abstract. The multiple disks are considered as one virtual magnetic disk device with a partition control table that manages and specifies the access right of the personal computers connected to the sharing device for each partition of the memory region of the virtual magnetic disk device. *Id.* ¶¶ 5, 11, 12. The access right to a partition includes R (read), W (write), C (create), D (delete), and X (execute). *Id.* ¶ 12. Figure 2 of Hirai is reproduced below.

IPR2014-01207
Patent 7,051,147 B2

| Partition | Computer name | Access right |
|---|---|---|
| Partition 1 | Personal computer 1 | RWCX |
| | Personal computer 2 | RWCX |
| | Personal computer 3 | RWCX |
| Partition 2 | Personal computer 1 | RW |
| | Personal computer 3 | R |
| Partition 3 | Personal computer 1 | R |
| | Personal computer 2 | R |
| Partition n | .<br>.<br>.<br>. | .<br>.<br>.<br>. |

(R: Readable, W: Writable, C: Creatable, X: Executable)

Figure 2

Figure 2 shows an example of a partition control table. For example, Personal computer 1 can read, write create, and execute with a partition 1, read and write with a partition 2, and read with a partition 3. *Id.* ¶ 13. The system can prevent illegal access from a personal computer that is not authorized. *Id.*

## 2. Analysis

Petitioner asserts, in a section titled "The Combined System of *Bergsten* and *Hirai*," that the references, in combination, disclose the claimed subject matter. Pet. 44–47. Petitioner argues that "[i]n the combined system [of Bergsten and Hirai], *Hirai's* access controls are incorporated into *Bergsten's* storage controllers." Pet. 45. Petitioner contends that "[t]o the extent that Patent Owner attempts to argue that *Bergsten* may lack explicit and nuanced detail regarding the implementation of access controls and the ramifications of write-protecting data . . . the access control map described in *Hirai* is detailed with a greater

31

IPR2014-01207
Patent 7,051,147 B2

degree of particularity." *Id.* Petitioner explains that in the combined system, the storage controller "maps the identification of the host device and the host address within the command to a logical storage location and verifies that the access type (which is requested within the storage command) matches the access controls specified for the host device for the particular logical storage location." *Id.* at 45–46 (citing Ex. 1010 ¶¶ 248–250). Petitioner reasons that "[a]n artisan skilled in network storage during the relevant timeframe would combine the *Bergsten* and *Hirai* teachings in the above-described manner in order to provide additional levels of granularity to the access controls of the *Bergsten* system based on the mapping-based access controls of *Hirai*." *Id.* at 46.

Patent Owner disputes whether Bergsten or Hirai, either alone or in combination, teach or suggest certain limitations of claim 14, including that the supervisor unit be operable to allow hosts access to storage using native low level, block protocols. PO Resp. 5–18. Patent Owner raises additional arguments regarding the sufficiency of Petitioner's obviousness analysis based on reasonable expectation of success and Petitioner's asserted motivation to combine. *See id.* at 18–19.

We note that the claims require use of native low-level block protocol to effect communication between the controllers. Ex. 1001, 9:23–14:16. The specification emphasizes the importance of native low-level block protocols ("NLLBP"): "storage access involves native low level, block protocols and does not involve the overhead of high level protocols and file systems required by network servers." *Id.* at 5:14–16. In particular, Patent Owner submits, and Dr. Levy testifies, that Hirai does not "allow access . . . using NLLBP" because Hirai uses only high level

IPR2014-01207
Patent 7,051,147 B2

file system access rights.  PO Resp. 6–7 (citing Ex. 2053 ¶¶ 59, 66, 103–114).  Patent Owner contends that Petitioner must impermissibly pick and choose from Hirai's teachings regarding access rights, ignoring the teaching of Hirai as a whole, to combine it with Bergsten.  *Id.* at 10.  Patent Owner argues that the combination of Hirai's file system access controls with the open access system of Bergsten results in "allowing access . . ." in the same manner as the prior art "network servers," which was the problem identified by the inventors of the '147 patent.  *Id.* at 12.

We are persuaded by Patent Owner's arguments that Petitioner and its Declarant, Dr. Chase, fail to account for the prior art as a whole and improperly pick and choose from the references in their reasoning to support their contention that the proposed combination of Bergsten and Hirai renders the claims obvious.  To begin with, the Petition appears to implicitly assume, without any explanation, that Hirai's access controls are NLLBP controls, but never provides any explanation for this assumption. Pet. 42–47.  Even in its Reply, Petitioner does not attempt to show that Hirai is directed to NLLBP access controls, but instead only argues that Hirai does not disclose high level controls.  Reply 19.  The only evidence Petitioner provides to support its contentions is the testimony of Dr. Chase. We are not persuaded by Petitioner's contention and Dr. Chase's testimony that Hirai is directed to block-level access controls.  *See id.*; Ex. 1010 ¶¶ 245–246.

As Patent Owner explains, looking at all of the access rights described in Hirai, the evidence suggests that these are high-level access controls rather than low level block permissions.  Ex. 2053 ¶¶ 88–99.  We find that the evidence supports Patent Owner's contentions that all of the

IPR2014-01207
Patent 7,051,147 B2

permissions described in Hirai are consistent with file system permissions, not block level permissions. *See id.* ¶¶ 89–91; Ex. 2048, 28–29 (describing permissions used in Network File System); Ex. 2057, 15 (discussing UNIX file permissions); Ex. 2055, 308:25–310:7 (explaining that read, write, create, and execute are standard file system permissions). We also agree with Patent Owner that, based on the record currently before us, a person of ordinary skill would not understand Hirai to disclose block level access controls. Ex. 2053 ¶ 92. Such a reading is most consistent with all of the disclosure of Hirai and, unlike Dr. Chase's reading, does not ignore or discount some of the permissions. *Id.* ¶ 98 (discussing Dr. Chase's cross-examination testimony regarding the "create" permission).

Petitioner raises two principal arguments in the Reply. Reply 18–20. First, Petitioner argues that Hirai does not teach that the access controls are at the network file system level. *Id.* at 16. Petitioner contends that the "create" and "delete" commands ignore the fact that an administrator could use the "create" and "delete" commands to control the formation and removal of partitions. *Id.* at 19 (citing Ex. 1008 ¶¶ 12–13). However, the portions of Hirai cited to support these statements merely establish that the disk is divided into partitions. Ex. 1008 ¶¶ 12–13. Petitioner cites to no evidence that would establish that the administrator in Hirai would create or delete partitions after they are established. Indeed, it is directly inconsistent with Dr. Chase's testimony under cross-examination that "since the partition already exists, create permission can't refer to a permission to create the partition. So it must mean something else." Ex. 2055, 322:22–323:4. Petitioner contends that "'execute' would be nonsensical in a remotely located storage NFS-level solution" and that

IPR2014-01207
Patent 7,051,147 B2

"*Hirai's* sharing device 3 would have no way of enforcing an execute permission because the remote devices would of course execute the files locally, without the intervention or cooperation of the sharing device 3." Reply 19. Even if it were appropriate to ignore portions of the references, there is no evidence cited to support Petitioner's allegation that "execute" is nonsensical. *See In re Wesslau*, 353 F.2d 238, 241 (CCPA 1965) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."). Thus, we do not find it persuasive. Moreover, Petitioner fails to explain how this establishes that Hirai's access controls must, therefore, be block level. Thus, we do not find this argument overcomes Patent Owner's significant evidence to the contrary.

Second, Petitioner argues that Patent Owner's argument is irrelevant because it relies on the combination of Bergsten and Hirai to teach "access controls," and that Patent Owner's arguments are only an attack on the references individually, which is insufficient. Reply 20 (citing *Keller*, 643 F.2d at 426; *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986)). Petitioner argues that "[t]he petition explains that, to the extent *Bergsten* fails to describe the privileges associated with write-protecting data, *Hirai's* access controls may be incorporated into *Bergsten's* storage controller (which operates at the block level, not the file level)." *Id.* (citing Pet. 45–46). The Petition notes that Bergsten allows write-protection of certain blocks, but then vaguely asserts that "[t]o the extent that Patent Owner attempts to argue that *Bergsten* may lack explicit and nuanced

IPR2014-01207
Patent 7,051,147 B2

detail regarding the implementation of access controls and the ramifications of write-protecting data upon a single storage controller of a daisy-chained storage controller network, the access control map described in Hirai is detailed with a greater degree of particularity." Pet. 45. We are not persuaded that this presents the combination that Petitioner now argues, in which the access controls are obtained from Bergsten rather than Hirai, in sufficient detail. Indeed, that is not how we recognized the combination at institution. *See* Dec. 10–11. Even assuming that this new variation on the combination was presented, we do not find this argument persuasive because, even assuming that Petitioner is relying on Bergsten and Hirai to teach this element, the question of whether Hirai discloses high level or low level protocols is not irrelevant—it is relevant to assessing the adequacy of the rationale for combining and modifying Bergsten and Hirai in the manner Petitioner proposed.

Dr. Chase testifies in his Declaration that "[i]n the combined system [of Bergsten and Hirai], the partition control table of Hirai would be merged with the map of Bergsten to implement access controls to particular data sections. The access controls would be based upon logical addressing." Ex. 1010 ¶ 250. Dr. Chase also testifies that "[t]he effort to merge the access rights allocations of Hirai into the mapping tree (or table) of Bergsten would be a straightforward exercise for one of skill in the art at the time." *Id.* ¶ 251. However, on cross examination, when asked about the "create" permissions that undeniably do not apply at the block level, Dr. Chase testified that "this is immaterial to me because I understand them to be an illustration of how this table might be used to represent various access rights and certainly read and write access are applicable in

IPR2014-01207
Patent 7,051,147 B2

the scenario that we're concerned with and in the combination that we've used Hirai for." Ex. 2055, 325:23–326:13.  Dr. Chase continued that "as I said, the interpretation of create permission is immaterial to me because read and write permission are clearly applicable in the combination." *Id.* at 325:6–327:13.  Dr. Chase testified similarly with respect to the "execute" permission.  *Id.* at 327:24–328:25.

This type of reasoning—where relevant parts of the reference are disregarded for the proposed combination without sufficient explanation of why a person of ordinary skill would do so—is precisely the type of hindsight reasoning that must be rejected.  "Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'"  *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) (quoting *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983)).  We have been asked without sufficient justification to carve out and perhaps modify the access controls disclosed in Hirai and combine them with Bergsten to hold that the addition of a certain type of access controls to Bergsten would have been obvious.  But "[t]his type of piecemeal analysis is precisely the kind of hindsight that the Board must not engage in."  *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011).  Petitioner has not explained why a person of ordinary skill, without the claims in front of them, would have been motivated to take the access control table of Hirai and merge it with the alleged map of Bergsten in the manner that they have proposed.  The only thing that Petitioner suggests is that a person of ordinary skill could have done it, but that is not the test of

IPR2014-01207
Patent 7,051,147 B2

obviousness. *See Belden, Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("Obviousness concerns whether a skilled artisan not only *could have made but would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention.").

Petitioner's analysis of all challenged claims relies on the same principles. Accordingly, we find that Petitioner has failed to show by a preponderance of the evidence that claims 14–39 are obvious over the combination of Bergsten and Hirai.

### E. *Objective Indicia of Non-Obviousness*

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of nonobviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).

Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise. *See Graham*, 383 U.S. at 17; *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *In re Tiffin*, 448 F.2d 791, 792 (CCPA

IPR2014-01207
Patent 7,051,147 B2

1971)); *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998). In that regard, in order to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). The burden of producing evidence showing that there is a nexus lies with the patent owner. *Id.*; *Prometheus Labs, Inc. v. Roxane Labs, Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015).

### 1. Long-Felt Need

Patent Owner presents arguments regarding long-felt need in its Response. PO Resp. 56. Patent Owner's evidence of long-felt need includes selected quotes from an article by an expert used by Petitioner in a co-pending lawsuit and citations to testimony by the same expert to the effect that "before Crossroads' invention, there was no such thing as a storage router and that the term 'storage router' did not exist." *Id.* (citing Ex. 2038, 14; Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14).

"Establishing long-felt need requires objective evidence that an art-recognized problem existed in the art for a long period of time without solution." *Ex parte Jellá*, 90 USPQ2d 1009, 1019 (BPAI 2008) (precedential).

We have reviewed the cited testimony (Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14), and we do not find it to demonstrate a long-felt need. The testimony is directed to whether the term "storage router" was

IPR2014-01207
Patent 7,051,147 B2

used in the art in the late 1990s.  *See, e.g.*, *id.* at 104:24–105:1.  It does not address what the needs or problems of the art were at that time.  Thus, we do not find it supports Patent Owner's contention.

The article cited by Patent Owner (Ex. 2038), which suggests that a problem might have existed in file system performance generally, nevertheless does not establish that there was long-felt need for the claimed invention.  Patent Owner has proffered no evidence as to how long this problem had been recognized, the extent of the problem, whether it remained unresolved at the time of the invention, and whether the invention resolved this need.  *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332–33 (Fed. Cir. 2009).  As such, we find that Patent Owner has not shown adequately that there was any long-felt need.

2. *Commercial Success*

Patent Owner submits evidence of the number of products it has sold, revenue from those sales, and the relative sales of its various products as demonstrating the commercial success of the claimed invention.  PO Resp. 56–60 (citing Ex. 2043; Ex. 2044).  Petitioner argues that Patent Owner's attempt to establish a nexus between the alleged secondary considerations and the claimed invention falls short.  Reply 22–23.

Evidence of commercial success "is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).  To establish a proper nexus between a claimed invention and the commercial success of a product, a patent owner must offer "proof that the sales [of the allegedly successful product] were a direct result of the unique characteristics of the claimed invention—as opposed to other economic

40

IPR2014-01207
Patent 7,051,147 B2

and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

As a threshold matter, Patent Owner has not established a nexus between its commercial product and the features of its claimed invention. Patent Owner's technology includes many features besides those identified as allegedly non-obvious in the '147 patent. Patent Owner has not shown that the items listed in its summary sheets embody the claimed invention, or that sales of the listed products resulted from the novel, non-obvious features of the claimed invention rather than other features. *See Ormco Corp.*, 463 F.3d at 1312–13 (evidence did not show that commercial success was due to claimed and novel features).

Even if Patent Owner had established a nexus between its marketed technology and the invention claimed in the patent, its commercial success argument would not be persuasive. Patent Owner's declarant's statements that certain products include "mapping" or "access controls" (Ex. 2043 ¶¶ 5–6) are insufficient to show commercial success of the claimed invention. An important component of the commercial success inquiry is determining market share associated with the alleged success, relative to all competing products. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012). Even sales volume, if provided without market share information, is only weak evidence, if any, of commercial success. *Id.* at 1299. Here, the fact that Patent Owner sold a certain number of these devices and that they made up a certain share of its sales is insufficient to establish commercial success without some context about the larger market. *See In re Baxter Travenol Labs.*, 952 F.2d 388, 391–392 (Fed. Cir. 1991).

IPR2014-01207
Patent 7,051,147 B2

### 3. *Licensing*

Patent Owner argues that "[a]s shown in Exhibit 2050, a large number of licensees have taken a license directed specifically to Crossroads' '972 patent family." PO Resp. 59 (citing Ex. 2050). Patent Owner submits that "[t]he total license payments through FY2014 are over $60 million" and that "[p]rominent members of the industry have paid millions of dollars to Crossroads in exchange for a license." *Id.* Patent Owner concludes that because these companies were willing to pay millions of dollars to license the invention claimed in the '972 patent family, the claims are not obvious. *Id.*

"While licenses can sometimes tilt in favor of validity in close cases, they cannot by themselves overcome a convincing case of invalidity without showing a clear nexus to the claimed invention." *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361–62 (Fed. Cir. 2015); *see also Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'"); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) ("[T]he mere existence of these licenses is insufficient to overcome the conclusion of obviousness, as based on the express teachings in the prior art that would have motivated one of ordinary skill to modify [other prior art].").

Indeed, the mere existence of several licenses, without more specific information about the circumstances surrounding the licensing, is not a good indicator of nonobviousness. In *EWP Corp. v. Reliance Universal*

IPR2014-01207
Patent 7,051,147 B2

*Inc.*, 755 F.2d 898, 907–08 (Fed. Cir. 1985), the Court of Appeals for the Federal Circuit stated that such licensing programs "are not infallible guides to patentability.  They sometimes succeed because they are mutually beneficial to the licensed group or because of business judgments that it is cheaper to take licenses than to defend infringement suits, or for other reasons unrelated to the unobviousness of the licensed subject matter."

Here, we lack sufficient information about the circumstances surrounding these licenses to be able to assess whether they truly weigh in favor of nonobviousness.  Patent Owner directs us to no testimony from any licensee regarding why the licensee took a license from Patent Owner. It is unknown how much of the decision to take a license stems from a business cost-benefit analysis with regard to defending an infringement suit or from another business reason, rather than from acknowledged merits of the claimed invention.  Patent Owner does not provide any information about how many entities refused to take a license, or why they refused.

In addition, as Patent Owner admits, these licenses are directed to an entire family of patents.  Without more evidence, we are unable to determine whether the claimed subject matter of the '147 patent was the motivator for taking the license.  Given these circumstances, we determine that Patent Owner has failed to establish an adequate nexus between the claimed invention of the '147 patent and the licenses.  Thus, we do not find Patent Owner's evidence of licensing weighs in favor of nonobviousness.

IPR2014-01207
Patent 7,051,147 B2

## IV.    PETITIONER'S MOTION TO EXCLUDE

We have reviewed Petitioner's Motion to Exclude (Paper 59), Patent Owner's Opposition to the Motion (Paper 64), and Petitioner's Reply in support of the Motion (Paper 70).  Petitioner moves to exclude Exhibits 2300–2304, 2306–2323, 2035–36, 2043 ¶ 6, 2044, 2045, and 2050.  Exhibit 2311, which is a chronology of events leading up to the filing of the '972 patent application, is fairly termed a demonstrative.  It cites to Exhibits 2300–2304, 2306–2310, and 2312–2323.  Even when we consider Exhibits 2300–2304, 2306–2310, and 2312–2323, or any portions of Exhibit 2311 that reference Exhibits 2300–2304, 2306–2310, and 2312–2323, we determine that they do not provide sufficient corroboration of reduction to practice.  Similarly, even when we consider Exhibits 2035–36, 2043 ¶ 6, 2044, 2045, and 2050, we determine that they do not provide sufficient support for Patent Owner's objective indicia arguments.  Accordingly, because we are in agreement with Petitioner's position on these issues for the reasons set forth above, even when considering the evidence that Petitioner seeks to exclude, Petitioner's Motion to Exclude is dismissed as moot as to these exhibits.

## V.  PATENT OWNER'S MOTION TO EXCLUDE

We have reviewed Patent Owner's Motion to Exclude (Paper 61, "PO Mot. to Exclude"), Petitioner's Opposition to the Motion (Paper 66, "Pet. Opp. Mot. To Exclude"), and Patent Owner's Reply in Support of the Motion (Paper 70).  Patent Owner moves to exclude certain cross examination testimony of Dr. Levy, Mr. Middleton, and Exhibits 1008, 1009, 1224, 1225, and 1226.  PO Mot. to Exclude.  We consider each in turn.

IPR2014-01207
Patent 7,051,147 B2

Patent Owner seeks to exclude certain cross examination testimony of Dr. Levy because "it was obtained pursuant to objectionable questioning and/or mischaracterizes his testimony." PO Mot. to Exclude 1. Patent Owner seeks to exclude testimony of Mr. Middleton because Petitioner mischaracterizes his testimony "via selective citation." PO Mot. to Exclude 11. Petitioner responds that these objections go to the weight that should be given the evidence, not its admissibility. Pet. Opp. Mot. to Exclude 6, 9. We agree with Petitioner. Regarding exhibits 1009, 1224, 1225, and 1226, we did not rely on either the testimony to which Patent Owner objects or any of the exhibits identified in Patent Owner's motion. Patent Owner also seeks to exclude Exhibit 1008 as having an improper certificate of translation. However, even considering Exhibit 1008, we find for Patent Owner on the asserted ground of unpatentability based on Hirai. Accordingly, for these reasons, we deny-in-part and dismiss-in-part as moot Patent Owner's Motion to Exclude.

## VI. PATENT OWNER'S MOTION TO SEAL

Patent Owner filed several exhibits (Exhibits 2044, 2045, 2050, and 2052) under seal, along with a motion to seal (Paper 27) and a protective order (Paper 28). We previously granted Patent Owner's motion for entry of the default protective order. Paper 53. Patent Owner's motion to seal is unopposed. Patent Owner's motion to seal is *granted*.

There is an expectation that information will be made public where the information is identified in a final written decision, and that confidential information that is subject to a protective order ordinarily would become public 45 days after final judgment in a trial, unless a motion to expunge is granted. 37 C.F.R. § 42.56; Office Patent Trial

IPR2014-01207
Patent 7,051,147 B2

Practice Guide, 77 Fed. Reg. 48,756, 48,761 (Aug. 14, 2012).  In rendering this Final Written Decision, it was not necessary to identify, nor discuss in detail, any confidential information.  However, a party who is dissatisfied with this Final Written Decision may appeal the Decision pursuant to 35 U.S.C. § 141(c), and has 63 days after the date of this Decision to file a notice of appeal.  37 C.F.R. § 90.3(a).  Thus, it remains necessary to maintain the record, as is, until resolution of an appeal, if any.

In view of the foregoing, the confidential documents filed in the instant proceeding will remain under seal, at least until the time period for filing a notice of appeal has expired or, if an appeal is taken, the appeal process has concluded.  The record for the instant proceeding will be preserved in its entirety, and the confidential documents will not be expunged or made public, pending appeal.  Notwithstanding 37 C.F.R. § 42.56 and the Office Patent Trial Practice Guide, neither a motion to expunge confidential documents nor a motion to maintain these documents under seal is necessary or authorized at this time.  *See* 37 C.F.R. § 42.5(b).

Petitioner filed a number of documents (Exhibits 1217–1223) under seal without filing a corresponding motion to seal those documents.  *See* 37 C.F.R. § 42.14.  If a motion to seal is not filed within 20 days of this decision, those documents will be made public.

## VII.  CONCLUSION

For the reasons expressed above, we determine that Petitioner has shown by a preponderance of the evidence that claims 14–39 are unpatentable as obvious over the CRD Manual, CRD-5500 Data Sheet, and Smith, as well as Kikuchi and Bergsten.  The relatively weak secondary evidence of non-obviousness, diminished further by Patent Owner's failure

46

IPR2014-01207
Patent 7,051,147 B2

to show nexus to the claimed invention, is not sufficient to overcome the relatively strong evidence of obviousness presented by Petitioner. *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) (requisite nexus between secondary indicia and invention must be shown for evidence to be accorded substantial weight, and where a claimed invention represents no more than the predictable use of prior art elements according to established functions, evidence of secondary indicia is often inadequate to establish non-obviousness). Petitioner has *not* shown by a preponderance of the evidence that claims 14–39 are unpatentable as obvious over Bergsten and Hirai.

## VIII.  ORDER

For the reasons given, it is:

ORDERED that claims 14–39 of the '147 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is *dismissed as moot*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied-in-part and dismissed-in-part as moot*;

FURTHER ORDERED that Patent Owner's Motion to Seal Exhibits 2044, 2045, 2050, and 2052 is *granted*;

FURTHER ORDERED that Exhibits 1217–1223 are to be unsealed within 20 days of this Final Written Decision, unless a motion to seal those exhibits is filed; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-01207
Patent 7,051,147 B2

FOR PETITIONER:

Greg H. Gardella
Oblon, McClelland, Maier & Neustadt, L.L.P
CPDocketGardella@oblon.com

Scott McKeown
Oblon, McClelland, Maier & Neustadt, L.L.P
cpdocketmckeown@oblon.com

FOR PATENT OWNER:

Steven Sprinkle
Sprinkle IP Law Group
ssprinkle@sprinklelaw.com

John Adair
Sprinkle IP Law Group
crossroadsipr@sprinklelaw.com

Russell Wong
Wong, Cabello, Lutsch, Rutherford & Brucculeri, LLP
CrossroadsIPR@counselip.com

James Hall
Wong, Cabello, Lutsch, Rutherford & Brucculeri, LLP
CrossroadsIPR@counselip.com

Keith Rutherford
Wong, Cabello, Lutsch, Rutherford & Brucculeri, LLP
CrossroadsIPR@blankrome.com

Trials@uspto.gov
571-272-7822

Paper 77
Entered: January 29, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ORACLE CORPORATION and NETAPP INC.,
Petitioner,

v.

CROSSROADS SYSTEMS, INC.,
Patent Owner.
_____

Case IPR2014-01209
Patent 7,051,147 B2
_____

Before NEIL T. POWELL, KRISTINA M. KALAN, J. JOHN LEE, and
KEVIN W. CHERRY, *Administrative Patent Judges.*

KALAN, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-01209
Patent 7,051,147 B2

## I. INTRODUCTION

Oracle Corporation and NetApp Inc. (collectively, "Petitioner")[1] filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1–13 of U.S. Patent No. 7,051,147 B2 (Ex. 1001, "the '147 patent") pursuant to 35 U.S.C. §§ 311–319. Crossroads Systems, Inc. ("Patent Owner") filed a Preliminary Response (Paper 11, "Prelim. Resp.").

On January 30, 2015, we instituted trial as to claims 1, 2, 4, 5, 10, 11, and 13 of the '147 patent. Paper 12 ("Dec."). During trial, Patent Owner filed a Patent Owner Response (Paper 29, "PO Resp."), which was accompanied by a Declaration from John Levy, Ph.D. (Ex. 2053). Petitioner filed a Reply to the Patent Owner Response. Paper 44 ("Reply"). An oral hearing was held on October 30, 2015. A transcript of the consolidated hearing has been entered into the record. Paper 76 ("Tr.").

Petitioner filed a Motion to Exclude (Paper 58) and Reply in support of the Motion to Exclude (Paper 69). Patent Owner filed an opposition to Petitioner's Motion to Exclude (Paper 63).

Patent Owner also filed a Motion to Exclude (Paper 60) and Reply in support of the Motion to Exclude (Paper 70). Petitioner filed an opposition to Patent Owner's Motion to Exclude (Paper 65).

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. We determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 4, 5, 10, 11, and 13 of the '147 patent are unpatentable.

---

[1]  Huawei Technologies Co. Ltd. was a Petitioner in the original Petition. Pet. 1. On October 8, 2015, we granted a joint motion to terminate Petitioner Huawei Technologies Co. Ltd. Paper 68.

IPR2014-01209
Patent 7,051,147 B2

## II. BACKGROUND

### A. Related Matters

The parties indicate that the '147 patent is asserted in co-pending matters captioned *Crossroads Systems, Inc. v. Oracle Corp.*, Case No. 1-13-cv-00895-SS (W.D. Tex.) and *Crossroads Systems, Inc. v. NetApp, Inc.*, Case No. 1-14-cv-00149-SS (W.D. Tex.). Pet. 2–3; Paper 9, 3. The '147 Patent is also involved in IPR2014-01207 and IPR2014-01544.

### B. The '147 Patent (Ex. 1001)

The '147 patent, titled "Storage Router and Method for Providing Virtual Local Storage," issued on May 23, 2006. The '147 patent relates to a storage router and storage network where devices (e.g., workstations) connected to a Fibre Channel ("FC") transport medium are provided access to storage devices connected to a second FC transport medium. Ex. 1001, Abstract. The storage router interfaces with both FC media, mapping workstations on the first FC transport medium, for example, to the storage devices on the second FC transport medium. *Id.* The storage router of the '147 patent allows access from the workstations to the storage devices using "native low level, block protocol." *Id.* One advantage of using such native low level block protocols is greater access speed when compared to network protocols that must first be translated to low level requests, and vice versa, which reduces access speed. *Id.* at 1:58–67.

### C. Illustrative Claim

Claim 1 of the '147 patent is reproduced below:

1.    A storage router for providing virtual local storage on remote storage devices to a device, comprising:
a buffer providing memory work space for the storage router;

a first Fibre Channel controller operable to connect to and interface with
a first Fibre Channel transport medium;

a second Fibre Channel controller operable to connect to and interface
with a second Fibre Channel transport medium; and

a supervisor unit coupled to the first and second Fibre Channel
controllers and the buffer, the supervisor unit operable:

> to maintain a configuration for remote storage devices connected
> to the second Fibre Channel transport medium that maps between the
> device and the remote storage devices and that implements access
> controls for storage space on the remote storage devices; and

> to process data in the buffer to interface between the first Fibre
> Channel controller and the second Fibre Channel controller to allow
> access from Fibre Channel initiator devices to the remote storage
> devices using native low level, block protocol in accordance with the
> configuration.

Ex. 1001, 9:24–47.

### D.  Prior Art Supporting Instituted Unpatentability Grounds

1. Judith A. Smith & Meryem Primmer, *Tachyon: A Gigabit Fibre Channel Protocol Chip*, HEWLETT-PACKARD J. 1, 1–17 (1996) ("Smith") (Ex. 1005);

2. U.S. Patent No. 6,219,771 B1, issued Apr. 17, 2001 ("Kikuchi") (Ex. 1006);

3. U.S. Patent No. 6,073,209, issued June 6, 2000 ("Bergsten") (Ex. 1007); and

4. JP Patent Application Pub. No. Hei 5[1993]-181609, published July 23, 1993 ("Hirai") (Ex. 1008).

Petitioner also relies on the Declaration of Professor Jeffrey S. Chase,

Ph.D. (Ex. 1010, "Chase Declaration").

### E.  Instituted Unpatentability Grounds

We instituted an *inter partes* review of claims 1, 2, 4, 5, 10, 11, and

13 of the '147 patent on the following grounds:

IPR2014-01209
Patent 7,051,147 B2

| References | Basis | Claim(s) Instituted |
|---|---|---|
| Kikuchi and Bergsten | § 103 | 1, 2, 4, 10, 11, and 13 |
| Kikuchi, Bergsten, and Smith | § 103 | 5 |
| Bergsten and Hirai | § 103 | 1, 2, 4, 10, 11, and 13 |
| Bergsten, Hirai, and Smith | § 103 | 5 |

## III.  ANALYSIS

For the challenged claims, Petitioner must prove unpatentability by a preponderance of the evidence.  35 U.S.C. § 316(e).

### A.  Claim Interpretation

The Board interprets claim terms in an unexpired patent using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]."  37 C.F.R. § 42.100(b); *see* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Under the broadest reasonable interpretation standard, claim terms are given their ordinary and customary meaning in view of the specification, as would be understood by one of ordinary skill in the art at the time of the invention.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  Only those terms which are in controversy need be construed, and only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

In our Decision to Institute, we determined that no claim terms required construction.  Based on our review of the complete record, we maintain our determination that no constructions are necessary.

5

IPR2014-01209
Patent 7,051,147 B2

### B. Asserted Ground Based on Kikuchi and Bergsten

Petitioner challenges claims 1–4 and 6–13 as obvious under 35 U.S.C. § 103 over Kikuchi and Bergsten. Pet. 29–43. We instituted *inter partes* review of claims 1, 2, 4, 10, 11, and 13 on this ground. Dec. 8–10.

#### 1. Kikuchi

Kikuchi is titled "Data Storage Apparatus with Improved Security Process and Partition Allocation Functions," and discloses an apparatus that enables access authorization to be assigned solely to specific host devices. Ex. 1006, Abstract. In one embodiment, Kikuchi discloses address offset information conversion unit 121 and actual partition address conversion unit 122, as shown in Figure 5:



Figure 5 is a diagram showing the configuration of an embodiment of the claimed invention of Kikuchi, in which offset information indicating a disk partition corresponding to each host device has been stored in advance in the address offset information conversion unit 121, and the host address input from command interpretation and execution unit 120 is converted to this

IPR2014-01209
Patent 7,051,147 B2

offset information.  *Id.* at 3:48–49, 7:55–63.  In this embodiment, actual partition address conversion unit 122 combines the disk partition address output from command interpretation and execution unit 120 with the offset information output from address offset information conversion unit 121 to generate an actual disk partition address.  *Id.* at 7:64–8:3.

### 2. *Bergsten*

Bergsten is titled "Data Storage Controller Providing Multiple Hosts with Access to Multiple Storage Subsystems," and describes a storage controller that allows multiple host computer systems at different locations to access any of multiple copies of stored data.  Ex. 1007, 3:1–4.  The storage controller emulates a local storage array for the host computer system that it services and emulates a host computer system for the local storage array that it accesses.  *Id.* at 3:14–17.  The host computer systems access stored data using virtual device addresses, which are mapped to real device addresses by the storage controller.  *Id.* at 3:17–19.  Figure 1 of Bergsten is reproduced below.

IPR2014-01209
Patent 7,051,147 B2



**FIG. 1**

Figure 1 of Bergsten is a block diagram illustrating a computing system in which a number of Bergsten's storage controllers provide a number of host computer systems with access to a number of storage arrays. *Id.* at 3:20–23. Figure 1 shows a computing system with M storage controllers, 3-1 through 3-M; M host computers, 2-1 through 2-M, which are coupled to storage controllers 3-1 through 3-M, respectively; and M storage arrays 4-1 through 4-M, which are coupled to storage controllers 3-1 through 3-M respectively. *Id.* at 3:23–28. Each of the storage arrays includes a number of mass storage devices ("MSDs"). *Id.* at 3:28–34. Storage controllers 3-1 through 3-M function cooperatively to provide any of host computer systems 2-1 through 2-M with access to any of storage arrays 4-2

8

IPR2014-01209
Patent 7,051,147 B2

through 4-M.  *Id.* at 4:7–9.  Storage controller 3-1 is coupled directly to host computer system 2-1 using data communication path 7 and to local data storage array 4-1 via another communication path 8.  *Id.* at 4:13–17.  Data communication paths 7 and 8 may conform to a variety of protocols, including SCSI, serial SCSI, Fiber Channel, or ESCON.  *Id.* at 4:19–28.

A local host computer accesses data by transmitting a (virtual) host address to its local storage controller.  *Id.* at 6:10–11.  The host address is then mapped to a real address representing a location on one or more physical MSDs.  *Id.* at 6:11–14.  The mapping is completely transparent to all of the host computers.  *Id.* at 6:14–16.  A single host address may map to multiple physical addresses, which may be distributed among multiple MSDs, and such MSDs may further be located in different storage arrays. *Id.* at 6:16–21.  The storage controller maintains and uses a tree structure to map the host interface ID and block number to a logical device.  *Id.* at 9:21–24; Fig. 8.

### 3.  *Kikuchi as Prior Art*

Patent Owner argues that Kikuchi, which was filed on August 18, 1997, is not prior art.  PO Resp. 26.  Patent Owner argues that the invention of the '147 patent was conceived as early as March 22, 1997, and that the '147 patent claims priority to U.S. Patent No. 5,941,972, which was filed on December 31, 1997.[2]  *Id.*  More particularly, Patent Owner alleges that the

---

[2] The '147 patent sets forth its parentage as follows:  "Continuation of application No. 10/081,110, filed on Feb. 22, 2002, now Pat. No. 6,789,152, which is a continuation of application No. 09/354,682, filed on Jul. 15, 1999, now Pat. No. 6,421,753, which is a continuation of application No. 09/001,799, filed on Dec. 31, 1997, now Pat. No. 5,941,972."  Ex. 1001 at [63].

IPR2014-01209
Patent 7,051,147 B2

invention of the '972 patent, representing the earliest filing in the '147 patent's chain of title, was conceived as early as March 1997. *Id.* at 21. According to Patent Owner: "Only two dates are important for the prior invention analysis. Crossroads must have a complete conception just before Kikuchi's filing date (Aug. 17, 1997) and diligence in reduction to practice (here, constructive reduction to practice on Dec. 31, 1997) ('the critical period')." *Id.* at 30.

During the period in which reasonable diligence must be shown, there must be continuous exercise of reasonable diligence. *In re McIntosh*, 230 F.2d 615, 619 (CCPA 1956); *see also Burns v. Curtis*, 172 F.2d 588, 591 (CCPA 1949) (referring to "reasonably continuous activity"). A party alleging diligence must account for the entire critical period. *Griffith v. Kanamuru*, 816 F.2d 624, 626 (Fed. Cir. 1987); *Gould v. Schawlow*, 363 F.2d 908, 919 (CCPA 1966).

Even a short period of unexplained inactivity is sufficient to defeat a claim of diligence. *Morway v. Bondi*, 203 F.2d 742, 749 (CCPA 1953); *Ireland v. Smith*, 97 F.2d 95, 99–100 (CCPA 1938). In *In re Mulder*, 716 F.2d 1542, 1542–46 (Fed. Cir. 1983), the Federal Circuit affirmed a determination of lack of reasonable diligence, where the evidence of record was lacking for a two-day critical period. Likewise, in *Rieser v. Williams*, 255 F.2d 419, 424 (CCPA 1958), there was insufficient diligence where no activity was shown during the first 13 days of the critical period.

To support its conception date, Patent Owner relies, *inter alia*, on an abstract and drawing sent from the inventor to outside counsel on May 28, 1997, and a draft patent application returned by outside counsel on July 11, 1997, as evidence. PO Resp. 28 (citing Exs. 2300–2303). To support its

IPR2014-01209
Patent 7,051,147 B2

allegations of reduction to practice, Patent Owner argues that the "precursor to the invention claimed in the '972 patent was the 'Verrazano' project." *Id.* at 29. According to Patent Owner, "Verrazano was a bridge for linking FC and SCSI devices and contained all elements of the '972 invention except for access controls and virtual local storage." *Id.* During the critical period, according to Patent Owner, all of its employees were working to create a viable Verrazano product. *Id.* at 30. "Verrazano would eventually become Crossroads' CP4100 product," according to Patent Owner, and because "Verrazano was the basic hardware platform that would be used to support access controls, its development was required before that feature could be added and the entire invention could actually be reduced to practice." *Id.* at 30–31 (citing *Thompson v. Dunn*, 166 F.2d 443, 447 (CCPA 1948); *Keizer v. Bradley*, 270 F.2d 396, 398–99 (CCPA 1959)). Patent Owner also points to "revising multiple draft patent applications prior to constructive reduction to practice on December 31, 1997" as evidence of diligence. *Id.* at 32.

Petitioner's arguments address two time periods: the "first time period" from August 18, 1997, to November 25, 1997, during which inventors were engaged in constructive reduction to practice of the Verrazano bridge product, and the "second time period" from November 25, 1997, to December 31, 1997, during which Petitioner was allegedly revising the patent application. Reply 2–3. Petitioner does not provide arguments specifically directed to Patent Owner's allegations regarding conception.

Regarding the "first time period," Petitioner argues that Patent Owner's attempt to antedate Kikuchi fails because "about four months of the diligence period was dedicated *only* to developing a product that, Patent Owner also admits, was outside the scope of the claims." *Id.* at 1. During

11

IPR2014-01209
Patent 7,051,147 B2

this "first time period" in which inventors were working on the Verrazano bridge product, Petitioner argues that Patent Owner "made a conscious decision to prioritize development of the Verrazano bridge and delay development of the claimed subject matter." *Id.* at 4. Petitioner disagrees with Patent Owner's contention that the completion of the Verrazano product was necessary for commencement of work on the access controls. *Id.* Instead, Petitioner argues, "Patent Owner opted to omit the access controls from the Verrazano product to accelerate commercial introduction of that product." *Id.* at 5.

Regarding the "second time period" from November 25, 1997, to December 31, 1997, Petitioner argues that, although a draft of the patent application from counsel was received by Patent Owner in July 1997, subsequent edits were "so minimal that they could not have accounted for the five week delay." *Id.* at 7 (citing Ex. 1228). Petitioner summarizes: "A single patent application review meeting and the transmission of a draft patent application with minimal revisions cannot have required more than a couple days of effort. Patent Owner offers no other evidence of diligence during the five week period." *Id.* at 7–8.

We do not agree with Patent Owner's assertions that developing the Verrazano product was a necessary precursor to developing access controls. Petitioner's evidence, including deposition testimony of diligence declarant John Middleton, indicates that Patent Owner could have tested access controls during the "first time period," but decided not to. Reply 4 (citing Ex. 1220, 54, 58–59, 63–65). Patent Owner relies on Mr. Middleton's declaration statement that "until the Verrazano bridge could be completed, Crossroads had no working device which could implement access controls."

IPR2014-01209
Patent 7,051,147 B2

Ex. 2305, 3.  However, during his deposition, Mr. Middleton stated that Crossroads was interested in "becoming profitable as soon as possible" and agreed that the exclusion of access controls from the Verrazano bridge possibly had to do with reasons relating to interest in early revenue generation and delay of the commercial launch.  Ex. 1220, 71:4, 71:10–72:22.  Mr. Middleton also stated that, during testing, the functionality of the Verrazano hardware prototypes could have included access control functionality.  *Id.* at 63:21–64:4.  Petitioner's evidence, in total, indicates Patent Owner made a business decision to develop and launch the Verrazano product, without access controls, because development of access controls would have lengthened the time to market for the Verrazano product.  Reply 5–6 (citing Ex. 1220, 70:16–72:22).  Thus, Patent Owner cannot rely on *Thompson v. Dunn* to excuse its inactivity in developing access controls.  As discussed above, even a short period of unexplained inactivity is sufficient to defeat a claim of diligence, and Patent Owner's four-month gap of activity exceeds the short periods found to prevent an earlier priority date by the courts.  *Morway*, 203 F.2d at 749.  Patent Owner's additional evidence of reasonable diligence during the "second time period" also is insufficient.  The minor changes to the patent application during this time period do not represent reasonably continuous activity.  Because Patent Owner had a draft application since July 1997, it is unclear if those changes were even made during this "second time period," or if they were made at some other point between drafting and filing the application.  Thus, based on the totality of the evidence before us, we are persuaded that Kikuchi is prior art.

IPR2014-01209
Patent 7,051,147 B2

### 4. *Arguments*

Petitioner asserts, in a section titled "The Combined System of *Kikuchi* and *Bergsten*," that the references, in combination, disclose the claimed subject matter. Pet. 32–35. Petitioner argues that "[i]n the combined system of *Kikuchi* and *Bergsten*, multi-protocol intercommunication capabilities of the command and interpretation unit described in *Kikuchi* are enhanced by incorporating *Bergsten's* emulation drivers 21 and physical drivers 22, which are detailed in *Bergsten* with a greater degree of specificity." *Id.* at 32. Petitioner emphasizes that "[t]o the extent that *Kikuchi* fails to explicitly detail every nuance of FCP-based encapsulation and de-encapsulation, the details of *Bergsten's* emulation drivers 21 and physical drivers 22 more than sufficiently provide specific details." *Id.* at 32–33. Based on the full record after trial, we find that the combination of Kikuchi and Bergsten teaches all of the limitations of the instituted claims. *Id.* at 35–43 (explaining how each limitation is taught by the asserted prior art).

Patent Owner argues that Bergsten does not teach the claimed access controls, and Kikuchi does not teach the claimed map or access controls. PO Resp. 32. Instead, Patent Owner argues, Kikuchi's simple address offset is designed to create different "partitions of a physical storage device," and thus does not provide the claimed map or access controls. *Id.* at 33–34. Patent Owner relies on the testimony of Dr. Levy to support its assertions that the "simple address offset mechanism of *Kikuchi* is designed to create different 'partitions' of a physical storage device." *Id.* at 34 (citing Ex. 2053 ¶¶ 149–151). Patent Owner also argues that access controls are not present

IPR2014-01209
Patent 7,051,147 B2

in the asserted combination, because Bergsten's emulation driver prevents host identity from reaching any map. *Id.* at 47–48.

Petitioner replies that the combination of Kikuchi and Bergsten does in fact restrict access to specific host devices, in that the "correlation chart and address conversion units described in *Kikuchi* are modified to include the virtual mapping functionality of *Bergsten's* storage controller." Reply 9. Regarding Dr. Levy's testimony that Kikuchi does not "really" talk about disk partitions, Petitioner argues that Dr. Levy fails to understand properly the operation of Kikuchi, and furthermore attacks Kikuchi individually. *Id.* at 9–10 (citing *In re Keller,* 642 F.2d 413, 426 (CCPA 1981)). Petitioner supports its argument by citing to portions of Kikuchi stating that Kikuchi's apparatus "enables access authorization to be assigned solely to specific host devices." *Id.* at 10–11 (citing Ex. 1006, Abstract, 1:65–2:6, 8:40–46). Petitioner also states that Kikuchi, as a form of access control, evaluates the host address to determine whether a host has any rights to access the storage device. Pet. 29–30 (citing Ex. 1006, 4:35–44); Tr. 20:22–25. According to Petitioner, there is no express support for Patent Owner's contention that the Kikuchi host ID would be stripped from the combination. Tr. 23:11–15. Petitioner argues that, based on the asserted combination set forth in the Petition, Kikuchi has the ability to extract the host device ID and communicate it on, even in an FC embodiment such as that in Bergsten. Pet. 29; Tr. 23:17–24:2. As disclosed in Bergsten and discussed by Dr. Chase, Bergsten's host ID identifies the particular host, and is received by the storage controller in Bergsten. Ex. 1007, 9:8–20, Fig. 7; Tr. 63:9–17; Ex. 1010 ¶¶ 299, 313.

15

IPR2014-01209
Patent 7,051,147 B2

We agree with Petitioner that Kikuchi's disclosure of access authorization assigned to specific host devices meets the "access control" limitation of the claims.  In the sections of Kikuchi cited by Petitioner, Kikuchi expressly states that host addresses that match those in an address registration are given access authorization, and certain hosts receive access to certain portions of the disk based on their access authorization, which demonstrates the presence of "access control."  Ex. 1006, Abstract, 1:65–2:6, 4:35–44, 8:37–46.  We agree that the express disclosures of Kikuchi should be given substantial weight in our consideration of whether Kikuchi discloses access controls.  Additionally, based on the evidence presented, including the disclosures of Bergsten itself and the testimony of Dr. Chase, we are not persuaded that Bergsten prevents host identity from reaching any map.  Petitioner's citations to Bergsten and to Kikuchi support the position that the host ID in each system, or the combined system, is used for mapping purposes rather than being stripped or discarded.

Patent Owner also argues that the asserted combination impermissibly enhances both Kikuchi and Bergsten by ignoring their purposes and modifying their principles of operation.  PO Resp. 36.  Specifically, Patent Owner argues that one of ordinary skill in the art would not modify the references as proposed by Petitioner, as the combination is highly complex and destroys the intended purposes of both references by modifying their principles of operation.  *Id.* at 36–42.

Petitioner responds by arguing that the proposed combination does not change the principles of operation, stating that both parties' experts agree that "making modifications of the type described by Patent Owner would have been rudimentary and well within the skill of an ordinary artisan in this

IPR2014-01209
Patent 7,051,147 B2

field," such as changing between a mapping tree (as in Bergsten) and a mapping chart (as in Kikuchi). Reply 12 (citing Ex. 1218, 103; Ex. 1010 ¶ 145, Ex. 2054, 200, 214).

We credit the testimony of Dr. Chase that one of ordinary skill in the art would have been motivated and able to combine Kikuchi and Bergsten in the manner proposed by Petitioner. Ex. 1010 ¶¶ 142–147; Ex. 2054, 180– 213. Patent Owner's arguments to the contrary address the purported complexity of the combination, but do not establish that a person of ordinary skill would not have had a reasonable expectation of success. Obviousness does not require absolute predictability. *In re Kronig*, 539 F.2d 1300, 1304 (CCPA 1976). Both experts agree that the modifications were within the level of ordinary skill in this field (Ex. 1010 ¶ 145; Ex. 1218, 103:16–21). Dr. Chase's Declaration states that tables and trees are interchangeable data lookup constructs for address translations, and that the "tree mapping" of Bergsten may be collapsed into a simple mapping table construct such as that of Kikuchi in a single-controller implementation; his deposition testimony provides greater detail in response to Patent Owner's questions on how the collapsing would occur in different circumstances. Ex. 1010 ¶ 145; 2054, 180–219. Thus, we are persuaded by Petitioner's testimony and evidence that the combination of Kikuchi and Bergsten was within the skill level of an ordinarily skilled artisan, and would not change the principles of operation of the respective references.

Finally, Patent Owner argues that Petitioner has not provided a motivation to combine Kikuchi and Bergsten. PO Resp. 50–52. According to Petitioner, one of ordinary skill in the art would have been motivated to combine Kikuchi and Bergsten to "improve the *Kikuchi* system with the

advantage of virtualized, networked storage," to "increase both the number of storage devices accessible to hosts and the storage address range available," and to "benefit from increased restructuring capabilities." Pet. 34–35 (citing Ex. 1010 ¶ 142–147); Reply 13 (citing Ex. 1010 ¶ 146). Patent Owner challenges each of these statements, and the supporting testimony, as lacking evidence supporting how Bergsten would provide the alleged benefits or explaining why one of ordinary skill in the art would be motivated to combine the references as proposed by Petitioner. PO Resp. 51–52.

Here, too, we credit the testimony of Dr. Chase that one of ordinary skill in the art would have been motivated to combine Kikuchi and Bergsten in the manner proposed by Petitioner. Ex. 1010 ¶¶ 142–147. Bergsten itself indicates that it would be "desirable" for a storage controller to not be "dependent on any particular hardware or software configuration of any host computer or mass storage device which it services." Ex. 1007, 1:48–51. The numerous reasons articulated by Petitioner for the combination of Kikuchi with Bergsten, resulting in an enhanced system with advantages including virtualized storage, increased capacity and increased flexibility, are detailed by Petitioner and supported by testimony. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421–22 (2007). Patent Owner's arguments to the contrary are unavailing.

As discussed below, we are not persuaded that Patent Owner has established secondary considerations of non-obviousness. Accordingly, we find that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 4, 10, 11, and 13 are obvious over Kikuchi and Bergsten.

IPR2014-01209
Patent 7,051,147 B2

### D.  Asserted Ground Based on Kikuchi, Bergsten and Smith

Petitioner challenges claim 5, which depends from claim 1, as unpatentable over Kikuchi, Bergsten and Smith.  Pet. 43–44.  Smith discusses a Tachyon chip, an FC interface controller that "enables a seamless interface to the physical FC-0 layer and low-cost [FC] attachments for hosts, systems, and peripherals on both industry-standard and proprietary buses."  Ex. 1005, 1.  Petitioner argues that "one of ordinary skill would understand that the emulation and physical drivers of *Bergsten* are designed to incorporate the functionality of the Tachyon chip of *Smith.*"  Pet. 43 (citing Ex. 1010 ¶¶ 239–240).  Specifically, Petitioner argues that the combined system, and in particular, Smith, describes a Fibre Channel protocol unit, a FIFO queue coupled to the FC protocol unit, and inbound and outbound sequence managers that perform DMA transfers of inbound data and outbound data.  *Id.* (citing Ex. 1005, pp. 5, 7, 9, Fig. 4).  Patent Owner argues that the challenge to claim 5 must fail for the same reasons as discussed for claim 1, because Petitioner does not allege that Smith changes the functionality of the Bergsten/Kikuchi combination, and challenges Petitioner's rationale for the combination.  PO Resp. 52.  We are persuaded by the evidence that one of ordinary skill in the art would have incorporated the functionality of the Tachyon chip into the system of Kikuchi and Bergsten.  As discussed below, we are not persuaded that Patent Owner has established secondary considerations of non-obviousness.  On this record, Petitioner has demonstrated by a preponderance of the evidence that claim 5 is unpatentable over the combination of Kikuchi, Bergsten, and Smith.

IPR2014-01209
Patent 7,051,147 B2

### E. *Asserted Grounds Based on Bergsten and Hirai*

Petitioner challenges claims 1–4 and 6–13 as unpatentable over Bergsten and Hirai. Pet. 44–57. We instituted *inter partes* review on claims 1, 2, 4, 10, 11, and 13 on this ground. Dec. 11–13.

### 1. *Hirai*

Hirai is a Japanese published patent application titled "Personal Computer System." Ex. 1008, (54). Hirai describes a personal computer system that allows the sharing of multiple magnetic disk devices by multiple personal computers. *Id.* at Abstract. The multiple disks are considered as one virtual magnetic disk device with a partition control table that manages and specifies the access right of the personal computers connected to the sharing device for each partition of the memory region of the virtual magnetic disk device. *Id.* ¶¶ 5, 11, 12. The access right to a partition includes R (read), W (write), C (create), D (delete), and X (execute). *Id.* ¶ 12. Figure 2 of Hirai is reproduced below.

| Partition | Computer name | Access right |
|---|---|---|
| Partition 1 | Personal computer 1 | RWCX |
| | Personal computer 2 | RWCX |
| | Personal computer 3 | RWCX |
| Partition 2 | Personal computer 1 | RW |
| | Personal computer 3 | R |
| Partition 3 | Personal computer 1 | R |
| | Personal computer 2 | R |
| Partition n | . | . |
| | . | . |
| | . | . |
| | . | . |

(R: Readable, W: Writable, C: Creatable, X: Executable)
Figure 2

20

IPR2014-01209
Patent 7,051,147 B2

Figure 2 shows an example of a partition control table. For example, Personal computer 1 can read, write create, and execute with a partition 1, read and write with a partition 2, and read with a partition 3. *Id.* ¶ 13. The system can prevent illegal access from a personal computer that is not authorized. *Id.*

　　*2. Analysis*

Petitioner asserts, in a section titled "The Combined System of *Bergsten* and *Hirai*," that the references, in combination, disclose the claimed subject matter. Pet. 46–49. Petitioner argues that "[i]n the combined system [of Bergsten and Hirai], *Hirai's* access controls are incorporated into *Bergsten's* storage controllers." Pet. 47. Petitioner contends that "[t]o the extent that Patent Owner attempts to argue that *Bergsten* may lack explicit and nuanced detail regarding the implementation of access controls and the ramifications of write-protecting data . . . the access control map described in *Hirai* is detailed with a greater degree of particularity." *Id.* at 47–48. Petitioner explains that in the combined system, the storage controller "maps the identification of the host device and the host address within the command to a logical storage location and verifies that the access type (which is requested within the storage command) matches the access controls specified for the host device for particular logical storage location." *Id.* at 48 (citing Ex. 1010 ¶¶ 248–50). Petitioner reasons that "[a]n artisan skilled in network storage during the relevant timeframe would combine the *Bergsten* and *Hirai* teachings in the above-described manner in order to provide additional levels of granularity to the access controls of the *Bergsten* system based on the mapping-based access controls of *Hirai*." *Id.* at 48–49.

IPR2014-01209
Patent 7,051,147 B2

Patent Owner disputes whether Bergsten or Hirai, either alone or in combination, teach or suggest certain limitations of claim 1, including that the supervisor unit be operable to: "to allow access . . . using [native low level, block protocols]." PO Resp. 10–26. Patent Owner raises additional arguments regarding the sufficiency of Petitioner's obviousness analysis based on reasonable expectation of success and Petitioner's asserted motivation to combine. *See id.* at 23–26.

We note that the claims require use of native low-level block protocol to effect communication between the controllers. Ex. 1001, 9:23–14:16. The specification emphasizes the importance of native low-level block protocols ("NLLBP"): "storage access involves native low level, block protocols and does not involve the overhead of high level protocols and file systems required by network servers." *Id.* at 5:14–16. In particular, Patent Owner submits, and Dr. Levy testifies, that Hirai does not "allow access . . . using NLLBP" because Hirai uses only high level file system access rights. PO Resp. 14 (citing Ex. 2053 ¶¶ 43, 59, 87, 89–91, 95–96). Patent Owner contends that Petitioner must impermissibly pick and choose from Hirai's teachings regarding access rights, ignoring the teaching of Hirai as a whole, to combine it with Bergsten. *Id.* at 16. Patent Owner argues that the combination of Hirai's file system access controls with the open access system of Bergsten results in "allowing access . . ." in the same manner as the prior art "network servers," which was the problem identified by the inventors of the '147 patent. *Id.* at 13.

We are persuaded by Patent Owner's arguments that Petitioner and its Declarant, Dr. Chase, fail to account for the prior art as a whole and improperly pick and choose from the references in their reasoning to support

IPR2014-01209
Patent 7,051,147 B2

their contention that the proposed combination of Bergsten and Hirai renders the claims obvious. To begin with, the Petition appears to implicitly assume, without any explanation, that Hirai's access controls are NLLBP controls, but never provides any explanation for this assumption. Pet. 44–49. Even in its Reply, Petitioner does not attempt to show that Hirai is directed to NLLBP access controls, but instead only argues that Hirai does not disclose high level controls. Reply 16. The only evidence Petitioner provides to support its contentions is the testimony of Dr. Chase. We are not persuaded by Petitioner's contention and Dr. Chase's testimony that Hirai is directed to block-level access controls. *See id.* at 17; Ex. 1010 ¶¶ 247–251.

As Patent Owner explains, looking at all of the access rights described in Hirai, the evidence suggests that these are high-level access controls rather than low level block permissions. Ex. 2053 ¶¶ 88–99. We find that the evidence supports Patent Owner's contentions that all of the permissions described in Hirai are consistent with file system permissions, not block level permissions. *See id.* ¶¶ 89–91; Ex. 2048, 28–29 (describing permissions used in Network File System); Ex. 2057, 15 (discussing UNIX file permissions); Ex. 2055, 308:25–310:7 (explaining that read, write, create, and execute are standard file system permissions). We also agree with Patent Owner that, based on the record currently before us, a person of ordinary skill would not understand Hirai to disclose block level access controls. Ex. 2053 ¶ 92. Such a reading is most consistent with all of the disclosure of Hirai and, unlike Dr. Chase's reading does not ignore or discount some of the permissions. *Id.* ¶ 98 (discussing Dr. Chase's cross-examination testimony regarding the "create" permission).

IPR2014-01209
Patent 7,051,147 B2

Petitioner raises two principal arguments in the Reply. Reply 16–19. First, Petitioner argues that Hirai does not teach that the access controls are at the network file system level. *Id.* at 16. Petitioner contends that the "create" and "delete" commands ignore the fact that an administrator could use the "create" and "delete" commands to control the formation and removal of partitions. *Id.* (citing Ex. 1008 ¶¶ 12–13). However, the portions of Hirai cited to support these statements merely establish that the disk is divided into partitions. Ex. 1008 ¶¶ 12–13. Petitioner cites to no evidence that would establish that the administrator in Hirai would create or delete partitions after they are established. Indeed, it is directly inconsistent with Dr. Chase's testimony under cross-examination that "since the partition already exists, create permission can't refer to a permission to create the partition. So it must mean something else." Ex. 2055, 322:22–323:4. Petitioner contends that "'execute' would be nonsensical in a remotely located storage NFS-level solution" and that "*Hirai's* sharing device 3 would have no way of enforcing an execute permission because the remote devices would of course execute the files locally, without the intervention or cooperation of the sharing device 3." Reply 16. Even if it were appropriate to ignore portions of the references, there is no evidence cited to support Petitioner's allegation that "execute" is nonsensical. *See In re Wesslau*, 353 F.2d 238, 241 (CCPA 1965) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."). Thus, we do not find it persuasive. Moreover, Petitioner fails to explain how this establishes that Hirai's access controls must,

24

IPR2014-01209
Patent 7,051,147 B2

therefore, be block level.  Thus, we do not find this argument overcomes Patent Owner's significant evidence to the contrary.

Second, Petitioner argues that Patent Owner's argument is irrelevant because it relies on the combination of Bergsten and Hirai to teach "access controls," and that Patent Owner's arguments are only an attack on the references individually, which is insufficient.  Pet. Reply 16–17 (citing *Keller*, 643 F.2d at 426; *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986)).  Petitioner argues that "[t]he petition explains that, to the extent *Bergsten* fails to describe the privileges associated with write-protecting data, *Hirai's* access controls may be incorporated into *Bergsten's* storage controller (which operates at the block level, not the file level)."  *Id.* (citing Pet. 47–48).  The Petition notes that Bergsten allows write-protection of certain blocks, but then vaguely asserts that "[t]o the extent that the Patent Owner attempts to argue that *Bergsten* may lack explicit and nuanced detail regarding the implementation of access controls and the ramifications of write-protecting data upon a single storage controller of a daisy-chained storage controller network, the access control map described in Hirai is detailed with a greater degree of particularity."  Pet. 47–48.  We are not persuaded that this presents the combination that Petitioner now argues, in which the access controls are obtained from Bergsten rather than Hirai, in sufficient detail.  Indeed, that is not how we recognized the combination at institution.  *See* Dec. 12.  Even assuming that this new variation on the combination was presented, we do not find this argument persuasive because, even assuming that Petitioner is relying on Bergsten and Hirai to teach this element, the question of whether Hirai discloses high level or low level protocols is not irrelevant—it is relevant to assessing the adequacy of

IPR2014-01209
Patent 7,051,147 B2

the rationale for combining and modifying Bergsten and Hirai in the manner
Petitioner proposed.

Dr. Chase testifies in his Declaration that "[i]n the combined system
[of Bergsten and Hirai], the partition control table of Hirai would be merged
with the map of Bergsten to implement access controls to particular data
sections. The access controls would be based upon logical addressing."
Ex. 1010 ¶ 250. Dr. Chase also testifies that "[t]he effort to merge the
access rights allocations of Hirai into the mapping tree (or table) of Bergsten
would be a straightforward exercise for one of skill in the art at the time."
*Id.* ¶ 251. However, on cross examination, when asked about the "create"
permissions that undeniably do not apply at the block level, Dr. Chase
testified that "this is immaterial to me because I understand them to be an
illustration of how this table might be used to represent various access rights
and certainly read and write access are applicable in the scenario that we're
concerned with and in the combination that we've used Hirai for." Ex.
2055, 325:23–326:13. Dr. Chase continued that "as I said, the interpretation
of create permission is immaterial to me because read and write permission
are clearly applicable in the combination." *Id.* at 327:4–7. Dr. Chase
testified similarly with respect to the "execute" permission. *Id.* at 327:24–
328:25.

This type of reasoning—where relevant parts of the reference are
disregarded for the proposed combination without sufficient explanation of
why a person of ordinary skill would do so—is precisely the type of
hindsight reasoning that must be rejected. "Care must be taken to avoid
hindsight reconstruction by using 'the patent in suit as a guide through the
maze of prior art references, combining the right references in the right way

26

so as to achieve the result of the claims in suit.'" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) (quoting *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983)). We have been asked without sufficient justification to carve out and perhaps modify the access controls disclosed in Hirai and combine them with Bergsten to hold that the addition of a certain type of access controls to Bergsten would have been obvious. But "[t]his type of piecemeal analysis is precisely the kind of hindsight that the Board must not engage in." *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011). Petitioner has not explained why a person of ordinary skill, without the claims in front of them, would have been motivated to take the access control table of Hirai and merge it with the alleged map of Bergsten in the manner that they have proposed. The only thing that Petitioner suggests is that a person of ordinary skill could have done it, but that is not the test of obviousness. *See Belden, Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("Obviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention.").

Petitioner's analysis of claims 1, 2, 4, 10, 11, and 13 all rely on the same principles. Accordingly, we find that Petitioner has failed to show by a preponderance of the evidence that claims 1, 2, 4, 10, 11, and 13 are obvious over the combination of Bergsten and Hirai.

### F. Asserted Ground Based on Bergsten, Hirai, and Smith

Petitioner challenges claim 5 as unpatentable over Bergsten, Hirai, and Smith. Pet. 57–58. Petitioner argues that "[o]ne of ordinary skill would understand that the emulation and physical drivers of *Bergsten* are designed

IPR2014-01209
Patent 7,051,147 B2

to incorporate the functionality of the Tachyon chip of *Smith*." Pet. 57.
Specifically, Petitioner argues that the combined system, and in particular,
Smith, describes a Fibre Channel protocol unit, a FIFO queue coupled to the
FC protocol unit, and inbound and outbound sequence managers that
perform DMA transfers of inbound data and outbound data. *Id.* at 57–58
(citing Ex. 1005, 5, 7, 9, and Fig. 4).

Petitioner's proposed combination of Bergsten, Hirai, and Smith relies
on the same reasoning we found insufficient above with respect to the
combination of Bergsten and Hirai. *See* Pet. 56–58. Petitioner does not
contend that Smith cures the deficiencies in the combination that we
identified above. *See id.* Accordingly, we determine that Petitioner has also
failed to show by a preponderance of the evidence that claim 5 is obvious
over Bergsten, Hirai, and Smith.

## G. *Objective Indicia of Non-Obviousness*

Factual inquiries for an obviousness determination include secondary
considerations based on evaluation and crediting of objective evidence of
nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).
Notwithstanding what the teachings of the prior art would have suggested to
one of ordinary skill in the art at the time of the invention, the totality of the
evidence submitted, including objective evidence of nonobviousness, may
lead to a conclusion that the challenged claims would not have been obvious
to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72
(Fed. Cir. 1984).

Secondary considerations may include any of the following: long-felt
but unsolved needs, failure of others, unexpected results, commercial
success, copying, licensing, and praise. *See Graham*, 383 U.S. at 17;

28

IPR2014-01209
Patent 7,051,147 B2

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971)); *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998). In that regard, in order to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). The burden of producing evidence showing that there is a nexus lies with the patent owner. *Id.*; *Prometheus Labs, Inc. v. Roxane Labs, Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015).

### 1. Long-Felt Need

Patent Owner presents arguments regarding long-felt need in its Response. PO Resp. 54. Patent Owner's evidence of long-felt need includes selected quotes from an article by an expert used by Petitioner in a co-pending lawsuit and citations to testimony by the same expert to the effect that "before Crossroads' invention, there was no such thing as a storage router and that the term 'storage router' did not exist." *Id.* at 55 (citing Ex. 2038, 14; Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14).

"Establishing long-felt need requires objective evidence that an art-recognized problem existed in the art for a long period of time without

29

IPR2014-01209
Patent 7,051,147 B2

solution." *Ex parte Jellá*, 90 USPQ2d 1009, 1019 (BPAI 2008)
(precedential).

We have reviewed the cited testimony (Ex. 2029, 103:18–24, 104:15–
105:1, 136:6–14), and we do not find it to demonstrate a long-felt need. The
testimony is directed to whether the term "storage router" was used in the art
in the late 1990s. *See, e.g.*, *id.* at 104:24–105:1. It does not address what the
needs or problems of the art were at that time. Thus, we do not find it
supports Patent Owner's contention.

The article cited by Patent Owner (Ex. 2038), which suggests that a
problem might have existed in file system performance generally,
nevertheless does not establish that there was long-felt need for the claimed
invention. Patent Owner has proffered no evidence as to how long this
problem had been recognized, the extent of the problem, whether it remained
unresolved at the time of the invention, and whether the invention resolved
this need. *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324,
1332–33 (Fed. Cir. 2009). As such, we find that Patent Owner has not
shown adequately that there was any long-felt need.

## 2. *Commercial Success*

Patent Owner submits evidence of the number of products it has sold,
revenue from those sales, and the relative sales of its various products as
demonstrating the commercial success of the claimed invention. PO Resp.
55–57 (citing Ex. 2043; Ex. 2044). Petitioner argues that Patent Owner's
attempt to establish a nexus between the alleged secondary considerations
and the claimed invention falls short. Reply 20–22.

Evidence of commercial success "is only significant if there is a nexus
between the claimed invention and the commercial success." *Ormco Corp.*

30

IPR2014-01209
Patent 7,051,147 B2

*v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). To establish a proper nexus between a claimed invention and the commercial success of a product, a patent owner must offer "proof that the sales [of the allegedly successful product] were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

As a threshold matter, Patent Owner has not established a nexus between its commercial product and the features of its claimed invention. Patent Owner's technology includes many features besides those identified as allegedly non-obvious in the '147 patent. Patent Owner has not shown that the items listed in its summary sheets embody the claimed invention, or that sales of the listed products resulted from the novel, non-obvious features of the claimed invention rather than other features. *See Ormco Corp.*, 463 F.3d at 1312–13 (evidence did not show that commercial success was due to claimed and novel features).

Even if Patent Owner had established a nexus between its marketed technology and the invention claimed in the patent, its commercial success argument would not be persuasive. Patent Owner's declarant's statements that certain products include "mapping" or "access controls" (Ex. 2043 ¶¶ 5–6) are insufficient to show commercial success of the claimed invention. An important component of the commercial success inquiry is determining market share associated with the alleged success, relative to all competing products. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012). Even sales volume, if provided without market share information, is only weak evidence, if any, of commercial success. *Id.* at 1299. Here, the

31

IPR2014-01209
Patent 7,051,147 B2

fact that Patent Owner sold a certain number of these devices and that they
made up a certain share of its sales is insufficient to establish commercial
success without some context about the larger market. *See In re Baxter
Travenol Labs.*, 952 F.2d 388, 391–392 (Fed. Cir. 1991).

### 3. Licensing

Patent Owner argues that "[a]s shown in Exhibit 2050, a large number
of licensees have taken a license directed specifically to Crossroads' '972
patent family." PO Resp. 57 (citing Ex. 2050). Patent Owner submits that
"[t]he total license payments through FY2014 are over $60 million" and that
"[p]rominent members of the industry have paid millions of dollars to
Crossroads in exchange for a license." *Id.* Patent Owner concludes that
because these companies were willing to pay millions of dollars to license
the invention claimed in the '972 patent family, the claims are not obvious.
*Id.*

"While licenses can sometimes tilt in favor of validity in close cases,
they cannot by themselves overcome a convincing case of invalidity without
showing a clear nexus to the claimed invention." *ABT Sys., LLC v. Emerson
Elec. Co.*, 797 F.3d 1350, 1361–62 (Fed. Cir. 2015); *see also Iron Grip
Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our
cases specifically require affirmative evidence of nexus where the evidence
of commercial success presented is a license, because it is often 'cheaper to
take licenses than to defend infringement suits.'"); *SIBIA Neurosciences,
Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) ("[T]he
mere existence of these licenses is insufficient to overcome the conclusion of
obviousness, as based on the express teachings in the prior art that would
have motivated one of ordinary skill to modify [other prior art].").

IPR2014-01209
Patent 7,051,147 B2

Indeed, the mere existence of several licenses, without more specific information about the circumstances surrounding the licensing, is not a good indicator of nonobviousness.  In *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907–08 (Fed. Cir. 1985), the Court of Appeals for the Federal Circuit stated that such licensing programs "are not infallible guides to patentability.  They sometimes succeed because they are mutually beneficial to the licensed group or because of business judgments that it is cheaper to take licenses than to defend infringement suits, or for other reasons unrelated to the unobviousness of the licensed subject matter."

Here, we lack sufficient information about the circumstances surrounding these licenses to be able to assess whether they truly weigh in favor of nonobviousness.  Patent Owner directs us to no testimony from any licensee regarding why the licensee took a license from Patent Owner.  It is unknown how much of the decision to take a license stems from a business cost-benefit analysis with regard to defending an infringement suit or from another business reason, rather than from acknowledged merits of the claimed invention.  Patent Owner does not provide any information about how many entities refused to take a license, or why they refused.

In addition, as Patent Owner admits, these licenses are directed to an entire family of patents.  Without more evidence, we are unable to determine whether the claimed subject matter of the '147 patent was the motivator for taking the license.  Given these circumstances, we determine that Patent Owner has failed to establish an adequate nexus between the claimed invention of the '147 patent and the licenses.  Thus, we do not find Patent Owner's evidence of licensing weighs in favor of nonobviousness.

IPR2014-01209
Patent 7,051,147 B2

## IV.    PETITIONER'S MOTION TO EXCLUDE

We have reviewed Petitioner's Motion to Exclude (Paper 58), Patent Owner's Opposition to the Motion (Paper 63), and Petitioner's Reply in support of the Motion (Paper 69).  Petitioner moves to exclude Exhibits 2300–2304, 2306–2323, 2035–36, 2043 ¶ 6, 2044, 2045, and 2050.  Exhibit 2311, which is a chronology of events leading up to the filing of the '972 patent application, is fairly termed a demonstrative.  It cites to Exhibits 2300–2304, 2306–2310, and 2312–2323.  Even when we consider Exhibits 2300–2304, 2306–2310, and 2312–2323, or any portions of Exhibit 2311 that reference Exhibits 2300–2304, 2306–2310, and 2312–2323, we determine that they do not provide sufficient corroboration of reduction to practice.  Similarly, even when we consider Exhibits 2035–36, 2043 ¶ 6, 2044, 2045, and 2050, we determine that they do not provide sufficient support for Patent Owner's objective indicia arguments.  Accordingly, because we are in agreement with Petitioner's position on these issues for the reasons set forth above, even when considering the evidence that Petitioner seeks to exclude, Petitioner's Motion to Exclude is dismissed as moot as to these exhibits.

## V.    PATENT OWNER'S MOTION TO EXCLUDE

We have reviewed Patent Owner's Motion to Exclude (Paper 61, "PO Mot. to Exclude"), Petitioner's Opposition to the Motion (Paper 65, "Pet. Opp. Mot. to Exclude"), and Patent Owner's Reply in Support of the Motion (Paper 70).  Patent Owner moves to exclude certain cross examination testimony of Dr. Levy and of Mr. Middleton, and Exhibits 1008, 1009, 1224, 1225, and 1226.  PO Mot. to Exclude.  We consider each in turn.

IPR2014-01209
Patent 7,051,147 B2

Patent Owner seeks to exclude certain cross examination testimony of Dr. Levy because "it was obtained pursuant to objectionable questioning and/or mischaracterizes his testimony." PO Mot. to Exclude 1. Patent Owner seeks to exclude testimony of Mr. Middleton because Petitioner mischaracterizes his testimony "via selective citation." PO Mot. to Exclude 7. Petitioner responds that these objections go to the weight that should be given the evidence, not its admissibility. Pet. Opp. Mot. to Exclude 2, 6. We agree with Petitioner. Regarding exhibits 1009, 1224, 1225, and 1226, we did not rely on either on the testimony to which Patent Owner objects or any of the exhibits identified in Patent Owner's motion. Patent Owner also seeks to exclude Exhibit 1008 as having an improper certificate of translation. However, even considering Exhibit 1008, we find for Patent Owner on the asserted ground of unpatentability based on Hirai. Accordingly, for these reasons, we deny-in-part and dismiss-in-part as moot Patent Owner's Motion to Exclude.

## VI.    PATENT OWNER'S MOTION TO SEAL

Patent Owner filed several exhibits (Exhibits 2044, 2045, 2050, and 2052) under seal, along with a motion to seal (Paper 27) and a protective order (Paper 28). We previously granted Patent Owner's motion for entry of the default protective order. Paper 52. Patent Owner's motion to seal is unopposed. Patent Owner's motion to seal is *granted*.

There is an expectation that information will be made public where the information is identified in a final written decision, and that confidential information that is subject to a protective order ordinarily would become public 45 days after final judgment in a trial, unless a motion to expunge is granted. 37 C.F.R. § 42.56; Office Patent Trial Practice Guide, 77 Fed.

IPR2014-01209
Patent 7,051,147 B2

Reg. 48,756, 48,761 (Aug. 14, 2012).  In rendering this Final Written

Decision, it was not necessary to identify, nor discuss in detail, any

confidential information.  However, a party who is dissatisfied with this

Final Written Decision may appeal the Decision pursuant to 35 U.S.C.

§ 141(c), and has 63 days after the date of this Decision to file a notice of

appeal.  37 C.F.R. § 90.3(a).  Thus, it remains necessary to maintain the

record, as is, until resolution of an appeal, if any.

In view of the foregoing, the confidential documents filed in the

instant proceeding will remain under seal, at least until the time period for

filing a notice of appeal has expired or, if an appeal is taken, the appeal

process has concluded.  The record for the instant proceeding will be

preserved in its entirety, and the confidential documents will not be

expunged or made public, pending appeal.  Notwithstanding 37 C.F.R.

§ 42.56 and the Office Patent Trial Practice Guide, neither a motion to

expunge confidential documents nor a motion to maintain these documents

under seal is necessary or authorized at this time.  *See* 37 C.F.R. § 42.5(b).

Petitioner filed a number of documents (Exhibits 1217–1223) under

seal without filing a corresponding motion to seal those documents.  *See*

37 C.F.R. § 42.14.  If a motion to seal is not filed within 20 days of this

decision, those documents will be made public.

## VII.   CONCLUSION

For the reasons expressed above, we determine that Petitioner has

shown by a preponderance of the evidence that claims 1, 2, 4, 10, 11, and 13

are unpatentable as obvious over Kikuchi and Bergsten, and that claim 5 is

unpatentable as obvious over Kikuchi, Bergsten, and Smith.  The relatively

weak secondary evidence of non-obviousness, diminished further by Patent

IPR2014-01209
Patent 7,051,147 B2

Owner's failure to show nexus to the claimed invention, is not sufficient to overcome the relatively strong evidence of obviousness presented by Petitioner. *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) (requisite nexus between secondary indicia and invention must be shown for evidence to be accorded substantial weight, and where a claimed invention represents no more than the predictable use of prior art elements according to established functions, evidence of secondary indicia is often inadequate to establish non-obviousness).  Petitioner has *not* shown by a preponderance of the evidence that claims 1, 2, 4, 10, 11, and 13 are unpatentable as obvious over Bergsten and Hirai, or that claim 5 is unpatentable as obvious over Bergsten Hirai, and Smith.

## VIII.  ORDER

For the reasons given, it is:

ORDERED that claims 1, 2, 4, 5, 10, 11, and 13 of the '147 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is *dismissed as moot*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied-in-part and dismissed-in-part as moot*;

FURTHER ORDERED that Patent Owner's Motion to Seal Exhibits 2044, 2045, 2050, and 2052 is *granted*;

FURTHER ORDERED that Exhibits 1217–1223 are to be unsealed within 20 days of this Final Written Decision, unless a motion to seal those exhibits is filed; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-01209
Patent 7,051,147 B2


FOR PETITIONER:

Greg H. Gardella
Oblon, McClelland, Maier & Neustadt, L.L.P
CPDocketGardella@oblon.com


Scott McKeown
Oblon, McClelland, Maier & Neustadt, L.L.P
cpdocketmckeown@oblon.com


FOR PATENT OWNER:

Steven Sprinkle
Sprinkle IP Law Group
ssprinkle@sprinklelaw.com

John Adair
Sprinkle IP Law Group
crossroadsipr@sprinklelaw.com

Russell Wong
Wong, Cabello, Lutsch, Rutherford & Brucculeri, LLP
CrossroadsIPR@counselip.com


James Hall
Wong, Cabello, Lutsch, Rutherford & Brucculeri, LLP
CrossroadsIPR@counselip.com


Keith Rutherford
Wong, Cabello, Lutsch, Rutherford & Brucculeri, LLP
CrossroadsIPR@blankrome.com

38



US007051147B2

(12) **United States Patent**
Hoese et al.

(10) Patent No.: **US 7,051,147 B2**
(45) Date of Patent: *May 23, 2006

(54) **STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE**

(75) Inventors: **Geoffrey B. Hoese**, Austin, TX (US); **Jeffry T. Russell**, Cibolo, TX (US)

(73) Assignee: **Crossroads Systems, Inc.**, Austin, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/658,163**

(22) Filed: **Sep. 9, 2003**

(65) **Prior Publication Data**
US 2004/0054838 A1    Mar. 18, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 10/081,110, filed on Feb. 22, 2002, now Pat. No. 6,789,152, which is a continuation of application No. 09/354,682, filed on Jul. 15, 1999, now Pat. No. 6,421,753, which is a continuation of application No. 09/001,799, filed on Dec. 31, 1997, now Pat. No. 5,941,972.

(51) **Int. Cl.**
*G06F 13/00* (2006.01)

(52) **U.S. Cl.** .......................... **710/305**; 710/11; 709/258

(58) **Field of Classification Search** ................ 710/1–5, 710/8–13, 22–28, 104–105, 305–306, 325, 710/250, 126–131, 36–38; 709/250, 258; 714/42; 711/112, 113, 110
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,082,406 A | 3/1963 | Stevens | |
| 4,092,732 A | 5/1978 | Ouchi | |
| 4,415,970 A | 11/1983 | Swenson et al. | |
| 4,455,605 A | 6/1984 | Cormier et al. | |
| 4,504,927 A | 3/1985 | Callan | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0810 530 A2    12/1997

(Continued)

OTHER PUBLICATIONS

DIGITAL StorageWorks, Using Your HSZ70 Array Controller in a SCSI Controller Shelf (DS-BA356-M Series), *User's Guide,* pp. 1-1 through A-5 with index, Jan. 1998.

(Continued)

*Primary Examiner*—Christopher Shin
(74) *Attorney, Agent, or Firm*—Sprinkle IP Law Group

(57) **ABSTRACT**

A storage router and storage network provide virtual local storage on remote storage devices to Fiber Channel devices. A plurality of Fiber Channel devices, such as workstations, are connected to a Fiber Channel transport medium, and a plurality of storage devices are connected to a second Fiber Channel transport medium. The storage router interfaces between the Fiber Channel transport media. The storage router maps between the workstations and the storage devices and implements access controls for storage space on the storage devices. The storage router then allows access from the workstations to the storage devices using native low level, block protocol in accordance with the mapping and the access controls.

**39 Claims, 2 Drawing Sheets**



## US 7,051,147 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,533,996 A | 8/1985 | Gartung et al. |
| 4,573,152 A | 2/1986 | Greene et al. |
| 4,603,380 A | 7/1986 | Easton et al. |
| 4,620,295 A | 10/1986 | Aiden, Jr. |
| 4,644,462 A | 2/1987 | Matsubara et al. |
| 4,695,948 A | 9/1987 | Blevins et al. |
| 4,697,232 A | 9/1987 | Brunelle et al. |
| 4,751,635 A | 6/1988 | Kret |
| 4,787,028 A | 11/1988 | Finforck et al. |
| 4,807,180 A | 2/1989 | Takeuchi et al. |
| 4,811,278 A | 3/1989 | Bean et al. |
| 4,821,179 A | 4/1989 | Jensen et al. |
| 4,825,406 A | 4/1989 | Bean et al. |
| 4,827,411 A | 5/1989 | Arrowood et al. |
| 4,835,674 A | 5/1989 | Collins et al. |
| 4,864,532 A | 9/1989 | Reeve et al. |
| 4,897,874 A | 1/1990 | Lidensky et al. |
| 4,947,367 A | 8/1990 | Chang et al. |
| 4,961,224 A | 10/1990 | Yung |
| 5,072,378 A | 12/1991 | Manka |
| 5,077,732 A | 12/1991 | Fischer et al. |
| 5,077,736 A | 12/1991 | Dunphy, Jr. et al. |
| 5,124,987 A | 6/1992 | Milligan et al. |
| 5,155,845 A | 10/1992 | Beal et al. |
| 5,163,131 A | 11/1992 | Row et al. |
| 5,185,876 A | 2/1993 | Nguyen et al. |
| 5,193,168 A | 3/1993 | Corrigan et al. |
| 5,193,184 A | 3/1993 | Belsan et al. |
| 5,202,856 A | 4/1993 | Glider et al. |
| 5,210,866 A | 5/1993 | Milligan et al. |
| 5,212,785 A | 5/1993 | Powers et al. |
| 5,214,778 A | 5/1993 | Glider et al. |
| 5,226,143 A | 7/1993 | Baird et al. |
| 5,239,632 A | 8/1993 | Larner |
| 5,239,643 A | 8/1993 | Blount et al. |
| 5,239,654 A | 8/1993 | Ing-Simmons |
| 5,247,638 A | 9/1993 | O'Brien et al. |
| 5,247,692 A | 9/1993 | Fujimura |
| 5,257,386 A | 10/1993 | Saito |
| 5,297,262 A | 3/1994 | Cox et al. |
| 5,301,290 A | 4/1994 | Tetzlaff et al. |
| 5,315,657 A | 5/1994 | Abadi et al. |
| 5,317,739 A | 5/1994 | Elko et al. |
| 5,331,673 A | 7/1994 | Elko et al. |
| 5,347,384 A | 9/1994 | McReynolds et al. |
| 5,361,347 A | 11/1994 | Glider et al. |
| 5,367,646 A | 11/1994 | Pardillos et al. |
| 5,379,385 A | 1/1995 | Shomler |
| 5,379,398 A | 1/1995 | Cohn et al. |
| 5,388,243 A | 2/1995 | Glider et al. |
| 5,388,246 A | 2/1995 | Kasai |
| 5,394,526 A | 2/1995 | Crouse et al. |
| 5,396,596 A | 3/1995 | Hashemi et al. |
| 5,403,639 A | 4/1995 | Belsan et al. |
| 5,410,667 A | 4/1995 | Belsan et al. |
| 5,410,697 A | 4/1995 | Baird et al. |
| 5,414,820 A | 5/1995 | McFarland et al. |
| 5,416,915 A | 5/1995 | Mattson et al. |
| 5,418,909 A | 5/1995 | Jachowski et al. |
| 5,420,988 A | 5/1995 | Elliott |
| 5,423,026 A | 6/1995 | Cook et al. |
| 5,423,044 A | 6/1995 | Sutton et al. |
| 5,426,637 A | 6/1995 | Derby et al. |
| 5,430,855 A | 7/1995 | Wash et al. |
| 5,450,570 A | 9/1995 | Richek et al. |
| 5,452,421 A | 9/1995 | Beardsley et al. |
| 5,459,857 A | 10/1995 | Ludlam et al. |
| 5,463,754 A | 10/1995 | Beausoleil et al. |
| 5,465,382 A | 11/1995 | Day, III et al. |
| 5,469,576 A | 11/1995 | Dauerer et al. |
| 5,471,609 A | 11/1995 | Yudenfriend |
| 5,487,077 A | 1/1996 | Hassner et al. |
| 5,491,812 A | 2/1996 | Pisello et al. |
| 5,495,474 A | 2/1996 | Olnowich et al. |
| 5,496,576 A | 3/1996 | Jeong |
| 5,504,857 A | 4/1996 | Baird et al. |
| 5,507,032 A | 4/1996 | Kimura |
| 5,511,169 A | 4/1996 | Suda |
| 5,519,695 A | 5/1996 | Purohit et al. |
| 5,530,845 A | 6/1996 | Hiatt et al. |
| 5,535,352 A | 7/1996 | Bridges et al. |
| 5,537,585 A | 7/1996 | Blickerstaff et al. |
| 5,544,313 A | 8/1996 | Shachnai et al. |
| 5,548,791 A | 8/1996 | Casper et al. |
| 5,564,019 A | 10/1996 | Beausoleil et al. |
| 5,568,648 A | 10/1996 | Coscarella et al. |
| 5,581,709 A | 12/1996 | Ito et al. |
| 5,581,714 A | 12/1996 | Amini et al. |
| 5,581,724 A | 12/1996 | Belsan et al. |
| 5,596,562 A | 1/1997 | Chen |
| 5,596,736 A | 1/1997 | Kerns |
| 5,598,541 A | 1/1997 | Malladi |
| 5,613,082 A | 3/1997 | Brewer et al. |
| 5,621,902 A | 4/1997 | Cases et al. |
| 5,632,012 A | 5/1997 | Belsan et al. |
| 5,634,111 A | 5/1997 | Oeda et al. |
| 5,638,518 A | 6/1997 | Malladi |
| 5,642,515 A | 6/1997 | Jones et al. |
| 5,659,756 A | 8/1997 | Hefferon et al. |
| 5,664,107 A | 9/1997 | Chatwani et al. |
| 5,680,556 A | 10/1997 | Begun et al. |
| 5,701,491 A | 12/1997 | Dunn et al. |
| 5,712,976 A | 1/1998 | Falcon, Jr. et al. |
| 5,727,218 A | 3/1998 | Hotchkin |
| 5,729,705 A | 3/1998 | Weber |
| 5,743,847 A | 4/1998 | Nakamura et al. |
| 5,748,924 A | 5/1998 | Llorens et al. |
| 5,751,975 A | 5/1998 | Gillespie et al. |
| 5,768,623 A | 6/1998 | Judd et al. |
| 5,774,683 A | 6/1998 | Gulick |
| 5,781,715 A | 7/1998 | Sheu |
| 5,802,278 A | 9/1998 | Isfeld et al. |
| 5,805,816 A | 9/1998 | Picazo, Jr. et al. |
| 5,809,328 A | 9/1998 | Nogales et al. |
| 5,812,754 A | 9/1998 | Lui et al. |
| 5,835,496 A | 11/1998 | Yeung et al. |
| 5,845,107 A | 12/1998 | Fisch et al. |
| 5,848,251 A | 12/1998 | Lomelino et al. |
| 5,857,080 A | 1/1999 | Jander et al. |
| 5,860,137 A | 1/1999 | Raz et al. |
| 5,864,653 A | 1/1999 | Tavallaei et al. |
| 5,867,648 A | 2/1999 | Foth et al. |
| 5,884,027 A | 3/1999 | Garbus et al. |
| 5,889,952 A | 3/1999 | Hunnicutt et al. |
| 5,913,045 A | 6/1999 | Gillespie et al. |
| 5,923,557 A | 7/1999 | Eidson |
| 5,933,824 A | 8/1999 | DeKoning et al. |
| 5,935,260 A | 8/1999 | Ofer |
| 5,941,969 A | 8/1999 | Ram et al. |
| 5,941,972 A * | 8/1999 | Hoese et al. ................ 710/315 |
| 5,953,511 A | 9/1999 | Sescilia et al. |
| 5,959,994 A | 9/1999 | Boggs et al. |
| 5,974,530 A | 10/1999 | Young |
| 5,978,379 A * | 11/1999 | Chan et al. ................. 370/403 |
| 5,991,797 A | 11/1999 | Futral et al. |
| 6,000,020 A * | 12/1999 | Chin et al. .................. 711/162 |
| 6,021,451 A | 2/2000 | Bell et al. |
| 6,041,381 A | 3/2000 | Hoese |
| 6,055,603 A | 4/2000 | Ofer et al. |
| 6,065,087 A | 5/2000 | Keaveny et al. |
| 6,070,253 A | 5/2000 | Tavallaei et al. |
| 6,073,209 A | 6/2000 | Bergsten |
| 6,073,218 A | 6/2000 | DeKoning et al. |
| 6,075,863 A | 6/2000 | Krishnan et al. |

Oracle-Huawei-NetApp Ex. 1001, pg. 2

Appx00165

# US 7,051,147 B2
Page 3

| 6,081,849 | A |  | 6/2000 | Born et al. |
| 6,098,149 | A |  | 8/2000 | Ofer et al. |
| 6,108,684 | A |  | 8/2000 | DeKoning et al. |
| 6,118,766 | A |  | 9/2000 | Akers |
| 6,131,119 | A |  | 10/2000 | Fukui |
| 6,134,617 | A |  | 10/2000 | Weber |
| 6,141,737 | A |  | 10/2000 | Krantz et al. |
| 6,145,006 | A |  | 11/2000 | Vishlitsky et al. |
| 6,148,004 | A |  | 11/2000 | Nelson et al. |
| 6,185,203 | B1 | * | 2/2001 | Berman ..................... 370/351 |
| 6,209,023 | B1 |  | 3/2001 | Dimitroff et al. |
| 6,219,771 | B1 |  | 4/2001 | Kikuchi et al. |
| 6,223,266 | B1 |  | 4/2001 | Sartore |
| 6,230,218 | B1 |  | 5/2001 | Casper et al. |
| 6,260,120 | B1 |  | 7/2001 | Blumenau et al. |
| 6,330,629 | B1 |  | 12/2001 | Kondo et al. |
| 6,341,315 | B1 |  | 1/2002 | Arroyo et al. |
| 6,343,324 | B1 |  | 1/2002 | Hubis et al. |
| 6,363,462 | B1 |  | 3/2002 | Bergsten |
| 6,421,753 | B1 | * | 7/2002 | Hoese et al. ................ 710/305 |
| 6,425,035 | B1 | * | 7/2002 | Hoese et al. ................ 710/305 |
| 6,425,036 | B1 |  | 7/2002 | Hoese et al. |
| 6,484,245 | B1 |  | 11/2002 | Sanada et al. |
| 6,529,996 | B1 |  | 3/2003 | Nguyen et al. |
| 6,738,854 | B1 | * | 5/2004 | Hoese et al. ................ 710/305 |
| 6,763,419 | B1 | * | 7/2004 | Hoese et al. ................ 709/250 |
| 6,789,152 | B1 | * | 9/2004 | Hoese et al. ................ 710/305 |

## FOREIGN PATENT DOCUMENTS

| EP | 0827059 A2 | 3/1998 |
| GB | 2296798 A | 7/1996 |
| GB | 2297636 A | 8/1996 |
| GB | 2341715 | 3/2000 |
| JP | 6301607 | 10/1994 |
| JP | 8-230895 | 9/1996 |
| WO | WO 98/36357 | 8/1998 |
| WO | WO 99/34297 A1 | 7/1999 |

## OTHER PUBLICATIONS

DIGITAL StorageWorks, HSZ70 Array Controller HSOF Version 7.0 (EK-HSZ70-CG.A01), *Configuration Manual,* pp. 1-2 through G15 with index, Jul. 1997.
DIGITAL StorageWorks, HSZ70 Array Controller HSOF Version 7.0, *CLI Reference Manual,* pp. 1-156, Jul. 1997.
Decision Returning Petition mailed Feb. 28, 2005.
Block-Based Distributed File Systems, Anthony J. McGregor, Jul. 1997.
Compaq StorageWorks HSG80 Array Controller ACS Version 8.3 (Maintenance and Service Guide) Nov. 1998.
Compaq StorageWorks HSG80 Array Controller ACS Version 8.3 (Configuration and CLI Reference Guide) Nov. 1998.
CRD-5500 SCSI RAID Controller User's Manual CMD Technology, Inc. pp. 1-1 to 6-25, revised Nov. 21, 1996.
DIGITAL Storage Works, HSZ70 Array Controller, HSOF Version 7.0 EK-HSZ70-CG. A01, Digital Equipment Corporation, Maynard, Massachusetts.
DIGITAL StorageWorks, HSZ70 Array Controller HSOF Version 7.0 EK-HSZ270-RM. A01 CLI Reference Manual.
DIGITAL StorageWorks HSZ70 Array Controller HSOF Version 7.0 EK-HSZ70-SV. A01, 1997.
DIGITAL StorageWorks HSG80 Array Controller ACS Version 8.0 (User's Guide Jan. 1998).
DP5380 Asynchronous SCSI Interface, National Semiconductor Corporation, Arlington, TX, May 1989, pp. 1-32.
Emerson, "Ancor Communications: Performance evaluation of switched fibre channel I/O system using—FCP for SCSI" Feb. 1, 1995, IEEE, pp. 479-484.

Fibre Channel and ATM: The Physical Layers, Jerry Quam WESCON/94, published Sep. 27-29, 1994. pp. 648-652.
Fiber Channel storage interface for video-on-demand servers by Anazaloni, et al, Jun. 15, 1905.
Gen5 S-Series XL System Guide Revision 1.01 by Chen, Jun. 18, 1905.
Graphical User Interface for MAXSTRAT Gen5/Gen-S Servers User's guide 1.1, Jun. 11, 1996.
High Performance Data transfers Using Network-Attached Peripherals at the national Storage Laboratory by Hyer, Feb. 26, 1993.
IFT-3000 SCSI to SCSI Disk array Controller Instruction Manual Revision 2.0 by Infotrend Technologies, Inc., 1995.
Implementing a Fibre Channel SCSI transport by Snively, 1994.
"InfoServer 150—Installation and Owner's Guide", EK-INFSV-OM-001, Digital Equipment Corporation, Maynard, Massachusettes 1991, Chapters 1 and 2.
InforServer 150VXT Photograph.
Infoserver 100 System Operations Guide, First Edition Digital Equipment Corporation, 1990.
Johnson, D.B., et al., "The Peregrine High Performance RPC System", Software-Practice and Experience, 23(2):201-221, Feb. 1993.
Local-Area networks for the IBM PC by Haugdahl.
Misc. Reference Manual Pages, SunOS 5.09.
New serial I/Os speed storage subsystems by Bursky, Feb. 6, 1995.
Petal: Distributed Virtual Disks, Edward K. Lee and Chandramohan A. Thekkath, ACM SIGPLAN Notices, vol. 31, Issue 9, Sep. 1996, pp. 84-92.
Pictures of internal components of the InfoServer 150, taken from http://bindarydinosaurs.couk/Museum/Digital/infoserver/infoserver.php in Nov. 2004.
Raidtec FibreArray and Raidtec FlexArray UltraRAID Systems, Windows IT PRO Article, Oct. 1997.
S.P. Joshi, "Ethernet controller chip interfaces with variety of 16-bit processors," electronic Design, Hayden Publishing Co., Inc., Rochelle Part, NJ, Oct. 14, 1982. pp. 193-200.
Simplest Migration to Fibre Channel Technology Article, Digital Equipment Corporation, Nov. 10, 1997, published on PR Newswire.
Systems Architectures Using Fibre Channel, Roger Cummings, Twelfth IEEE Symposium on Mass Storage Systems, Copyright 1993 IEEE. pp. 251-256.
Dot Hill's Request to Exceed Page Limit in Motion for Summary Judgment filed Jun. 29, 2005. Case No. A-03-CV-754 (SS).
Request for Ex Parte Reexamination for 6,425,035. Third Party Requester: William A. Blake.
Request for Ex Parte Reexamination for 6,425,035. Third Party Requester: Natu J. Patel.
Office Action dated Jan. 21, 2003 for 10/174,720 (CROSS1120-8).
Office Action dated Feb. 27, 2001 for 09/354,682 (CROSS1120-1).
Office Action dated Aug. 11, 2000 for 09/354,682 (CROSS1120-1).
Office Action dated Dec. 16, 1999 for 09/354,682 (CROSS1120-1).
Office Action dated Nov. 6, 2002 for 10/023,786 (CROSS1120-4).
Office Action dated Jan. 21, 2003 for 10/081,110 (CROSS1120-5).

Oracle-Huawei-NetApp Ex. 1001, pg. 3

Appx00166

US 7,051,147 B2
Page 4

Office Action in Ex Parte Reexamination 90/007,127, mailed Feb. 7, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,127 filed on Apr. 6, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,125 and 90/007,317 filed on Apr. 6, 2005.

Office Action in Ex Parte Reexamination 90/007,126, mailed Feb. 7, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,126 filed on Apr. 6, 2005.

Office Action in Ex Parte Reexamination 90/007,124, mailed Feb. 7, 2005.

Office Action in Ex Parte Reexamination 90/007,123, mailed Feb. 7, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,123 filed on Apr. 5, 2005.

European Office Action issued Apr. 1, 2004 in Application No. 98966104.6-2413.

Fiber Channel (FCS)/ATM Interworking: A Design Solution by Anzaloni, et al.

Copies of the following are on the attached CD-Rom.

Defendant's First Supplemental Trial Exhibit List, Crossroads Systems, Inc., v. Chaparral Network Storage, Inc., C.A. No. A-00CA-217-SS (W.D. Tex. 2001). (CD-Rom).

Defendant's Third Supplemental Trial Exhibit List, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A-00CA-248-SS (W.D. Tex. 2001) (CD-Rom).

Defendant Chaparral Network Storage, Inc.'s First Supplemental Trial Exhibit List (D1 through D271) (CD-ROM Chaparral Exhibits ExList_Def), Sep. 2, 2001.

Plaintiff's Fourth Amended Trial Exhibit List, Crossroads Systems, Inc. v. Chaparral Network Storage, Inc, C.A. No. A-00CA-217-SS (W.D. Tex. 2001) (CD-Rom), Sep. 11, 2001.

Trail Transcripts, Crossroads Systems, Inc. v. Chaparral Network Storage, Inc., C.A. No. A-00CA-217-SS (W.D. Tex. 2001). (CD-Rom).

Trail Transcripts, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A-00CA-248-SS (W.D. Tex. 2001). (CD-Rom).

Datasheet for CrossPoint 4100 Fibre Channel to SCSI Router (Dedek Ex 41 (ANCT 117-120)) (CD-ROM Chaparral Exhibits D012).

Symbios Logic- Software Interface Specification Series 3 SCSI RAID Controller Software Release 02.xx (Engelbrecht Ex 2 (LSI 1421-1658)) (CD-ROM Chaparral Exhibits D013), Dec. 3, 1997.

Press Release- Symbios Logic to Demonstrate Strong Support for Fibre Channel at Fall Comdex (Engelbrecht 12 (LSI 2785-86)) (CD-ROM Chaparral Exhibits D016), Nov. 13, 1996.

OEM Datasheet on the 3701 Controller (Engelbrecht 13 (LSI 01837-38)) (CD-ROM Chaparral Exhibits D017), Jun. 17, 1905.

Nondisclosure Agreement Between Adaptec and Crossroads Dated Oct. 17, 1996 (Quisenberry Ex 25 (CRDS 8196)) (CD-ROM Chaparral Exhibits D020).

Organizational Presentation on the External Storage Group (Lavan Ex 1 (CNS 182242-255)) (CD-ROM Chaparral Exhibits D021), Apr. 11, 1996.

Bridge. C, Bridge Between SCSI-2 and SCSI-3 FCP (Fibre Channel Protocol) (CD-ROM Chaparral Exhibits P214).

Bridge Phase II Architecture Presentation (Lavan Ex 2 (CNS 182287-295)) (CD-ROM Chaparral Exhibits D022), Apr. 12, 1996.

Attendees/Action Items from Apr. 12, 1996 Meeting at BTC (Lavan Ex 3 (CNS 182241)) (CD-ROM Chaparral Exhibits D023), Apr. 12, 1996.

Brooklyn Hardware Engineering Requirements Documents, Revision 1.4 (Lavan Ex 4 (CNS 178188-211)) (CD-ROM Chaparral Exhibits D024) by Pecone, May 26, 1996.

Brooklyn Single-Ended SCSI RAID Bridge Controller Hardware OEM Manual, Revision 2.1 (Lavan EX 5 (CNS 177169-191)) (CD-ROM Chaparral Exhibits D025), Mar. 21, 1996.

Coronado Hardware Engineering Requirements Document, Revision 0.0 (Lavan Ex 7 (CNS 176917-932)) (CD-ROM Chaparral Exhibits D027) by O'Dell, Sep. 30, 1996.

ESS/FPG Organization (Lavan Ex 8 (CNS 178639-652)) (CD-ROM Chaparral Exhibits D028), Dec. 6, 1996.

Adaptec MCS ESS Presents: Intelligent External I/O Raid Controllers "Bridge" Strategy (Lavan Ex 9 (CNS 178606-638)). (CD-ROM Chaparral Exhibits D029), Feb. 6, 1996.

AEC-7313 Fibre Channel Daughter Board (for Brooklyn) Engineering Specification, Revision 1.0 (Lavan Ex 10 (CNS 176830-850)) (CD-ROM Chaparral Exhibits D030), Feb. 27, 1997.

Bill of Material (Lavan Ex 14 (CNS 177211-214)) (CD-ROM Chaparral Exhibits D034), Jul. 24, 1997.

AEC-. 4412B, AEC-7412/B2 External RAID Controller Hardware OEM Manual, Revision 2.0 (Lavan Ex 15 (CNS 177082-123)) (CD-ROM Chaparral Exhibits D035), Jun. 27, 1997.

Coronado II, AEC-7312A Fibre Channel Daughter (for Brooklyn) Hardware Specification, Revision 1.2 (Lavan Ex 16 (CNS 177192-210)) (CD-ROM Chaparral Exhibits D036) by Tom Yang, Jul. 18, 1997.

AEC-4412B, AEC7412/3B External RAID Controller Hardware OEM Manual, Revision 3.0. (Lavan Ex 17 (CNS 177124-165)) (CD-ROM Chaparral Exhibits D037), Aug. 25, 1997.

Memo Dated Aug. 15, 1997 to AEC-7312A Evaluation Unit Customers re: B001 Release Notes (Lavan Ex 18 (CNS 182878-879)) (CD-ROM Chaparral Exhibits D038).

Brooklyn Main Board (AES-0302) MES Schedule (Lavan Ex 19 (CNS 177759-763)) (CD-ROM Chaparral Exhibits D039), Feb. 11, 1997.

News Release-Adaptec Adds Fibre Channel Option to its External RAID Controller Family (Lavan Ex 20 (CNS 182932-934)) (CD-ROM Chaparral Exhibits D040), May 6, 1997.

AEC-4412B/7412B User's Guide, Rev. A (Lavan Ex 21) (CD-ROM Chaparral Exhibits D041), Jun. 19, 1905.

Data Book- AIC-7895 PCI Bus Master Single Chip SCSI Host Adapter (Davies Ex 1 (CNS 182944-64)) (CD-ROM Chaparral Exhibits D046), May 21, 1996.

Data Book- AIC-1160 Fibre Channel Host Adapter ASIC (Davies Ex 2 (CNS 181800-825)) (CD-ROM Chaparral Exhibits D047), Jun. 18, 1905.

Viking RAID Software (Davies Ex 3 (CNS 180969-181026)) (CD-ROM Chaparral Exhibits D048), Jun. 18, 1905.

Header File with Structure Definitions (Davies Ex 4 (CNS 180009-018)) (CD-ROM Chaparral Exhibits D049), Aug. 8, 1996.

Oracle-Huawei-NetApp Ex. 1001, pg. 4

Appx00167

US 7,051,147 B2
Page 5

C++ SourceCode for the SCSI Command Handler (Davies Ex 5 (CNS 179136-168)) (CD-ROM Chaparral Exhibits D050), Aug. 8, 1996.

Header File Data Structure (Davies Ex 6 (CNS 179997-180008)) (CD-ROM Chaparral Exhibits D051), Jan. 2, 1997.

SCSI Command Handler (Davies Ex 7 (CNS 179676-719)) (CD-ROM Chaparral Exhibits D052), Jan. 2, 1997.

Coronado: Fibre Channel to SCSI Intelligent RAID Controller Product Brief (Kalwitz Ex 1 (CNS 182804-805)) (CD-ROM Chaparral Exhibits D053).

Bill of Material (Kalwitz Ex 2 (CNS 181632-633)) (CD-ROM Chaparral Exhibits D054), Mar. 17, 1997.

Emails Dated Jan. 13-Mar. 31, 1997 from P. Collins to Mo re: Status Reports (Kalwitz Ex 3 (CNS 182501-511)) (CD-ROM Chaparral Exhibits D055).

Hardware Schematics for the Fibre Channel Daughtercard Coronado (Kalwitz Ex 4 (CNS 181639-648)) (CD-ROM Chaparral Exhibits D056).

Adaptec Schematics re AAC-340 (Kalwitz Ex 14 (CNS 177215-251)) (CD-ROM Chaparral Exhibits D057).

Bridge Product Line Review (Manzanares Ex 3 (CNS 177307-336)) (CD-ROM Chaparral Exhibits D058).

AEC Bridge Series Products-Adaptec External Controller RAID Products Pre-Release Draft, v.6 (Manzanares Ex 4 (CNS 174632-653)). (CD-ROM Chaparral Exhibits D059), Oct. 28, 1997.

Hewlett-Packard Roseville Site Property Pass for Brian Smith (Dunning Ex 14 (HP 489) (CD-ROM Chaparral Exhibits D078), Nov. 7, 1996.

Distribution Agreement Between Hewlett-Packard and Crossroads (Dunning Ex 15 (HP 326-33) (CD-ROM Chaparral Exhibits D079).

HPFC-5000 Tachyon User's Manuel, First Edition (PTI 172419-839) (CD-ROM Chaparral Exhibits D084), May 1, 1996.

X3T10 994D—(Draft) Information Technology: SCSI-3 Architecture Model, Rev. 1.8 (PTI 165977) (CD-ROM Chaparral Exhibits D087).

X3T10 Project 1047D: Information Technology- SCSI-3 Controller Commands (SCC), Rev, 6c (PTI 166400-546) (CD-ROM Chaparral Exhibits D088), Sep. 3, 1996.

X3T10 995D- (Draft) SCSI-3 Primary Commands, Rev. 11 (Wanamaker Ex 5 (PTI 166050-229)) (CD-ROM Chaparral Exhibits D089), Nov. 13, 1996.

VBAR Volume Backup and Restore (CRDS 12200-202) (CD-ROM Chaparral Exhibits D099).

Preliminary Product Literature for Infinity Commstor's Fibre Channel to SCSI Protocol Bridge (Smith Ex 11; Quisenberry Ex 31 (SPLO 428-30) (CD-ROM Chaparral Exhibits D143), Aug. 19, 1996.

Letter dated Jul. 12, 1996 from J. Boykin to B. Smith re: Purchase Order for Evaluation Units from Crossroads (Smith Ex 24) CRDS 8556-57) (CD-ROM Chaparral Exhibits D144), Jul. 12, 1996.

CrossPoint 4100 Fibre Channel to SCSI Router Preliminary Datasheet (Hulsey Ex 9 (CRDS 16129-130)) (CD-ROM Chaparral Exhibits D145), Nov. 1, 1996.

CrossPoint 4400 Fibre Channel to SCSI Router Preliminary Datasheet (Bardach Ex. 9 Quisenberry Ex 33 (CRDS 25606-607)) (CD-ROM Chaparral Exhibits D153), Nov. 1, 1996.

Fax Dated Jul. 22, 1996 from L. Petti to B. Smith re: Purchase Order from Data General for FC2S Fibre to Channel SCSI Protocol Bridge Model 11 (Smith Ex 25; Quisenberry Ex 23; Bardach Ex 11 (CRDS 8552-55;8558) (CD-ROM Chaparral Exhibits D155).

Email Dated Dec. 20, 1996 from J. Boykin to B. Smith re: Purchase Order for Betas in Feb. and Mar. (Hoese Ex 16, Quisenberry Ex 25; Bardach Ex 12 (CRDS 13644-650) (CD-ROM Chaparral Exhibits D156).

Infinitiy Commstor Fibre Channel Demo for Fall Comdex, 1996 (Hoese Ex 15, Bardach Ex 13 (CRDS 27415) (CD-ROM Chaparral Exhibits D157).

Fax Dated Dec. 19, 1996 from B. Bardach to T. Rarich re: Purchase Order Information (Bardach Ex. 14; Smith Ex 16 (CRDS 4460)) (CD-ROM Chaparral Exhibits D158).

Miscellaneous Documents Regarding Comdex (Quisenberry Ex 2 (CRDS 27415-465)) (CD-ROM Chaparral Exhibits D165).

CrossPoint 4100 Fibre Channel to SCSI Router Preliminary Datasheet (Quisenberry) Ex 3 (CRDS 4933-34) (CD-ROM Chaparral Exhibits D166) (CD-ROM Chaparral Exhibits D166).

CrossPoint 4400 Fibre to Channel to SCSI Router Preliminary Datasheet; Crossroads Company and Product Overview (Quisenberry Ex 4 (CRDS 25606; 16136)) (CD-ROM Chaparral Exhibits D167).

Crossroads Purchase Order Log (Quisenberry Ex 9 (CRDS 14061-062)) (CD-ROM Chaparral Exhibits D172).

RAID Manager 5 with RDAC 5 for UNIX V.4 User's Guide (LSI-01854) (CD-ROM Chaparral Exhibits P062), Sep. 1, 1996.

Letter dated May 12, 1997 from Alan G. Leal to Barbara Bardach enclosing the original OEM License and Purchase Agreement between Hewlett-Package Company and Crossroads Systems, Inc. (CRDS 02057) (CD-ROM Chaparral Exhibits P130).

CR4x00 Product Specification (CRDS 43929) (CD-ROM Chaparral Exhibits P267), Jun. 1, 1998.

Symbios Logic—Hardware Function Specification for the Symbios Logic Series 3 Fibre Channel Disk Array Controller Model 3701 (Engelbrecht Ex 3 (LSI-1659-1733) (CD-ROM Pathlight Exhibits D074).

Report of the Working Group on Storage I/O for Large Scale Computing; Department of Computer Science Duke University: CS-1996-21 (PTI 173330-347). (CD-ROM Pathlight Exhibits D098).

Brian Allison's 1999 Third Quarter Sales Plan (PDX 38 ) CNS 022120-132)) (CD-ROM Pathlight Exhibits D201), Jun. 5, 2001.

Brooklyn SCSI-SCSI Intellegent External RAID Bridge Definition Phase External Documentation (CD-ROM Pathlight Exhibits D129).

* cited by examiner

Oracle-Huawei-NetApp Ex. 1001, pg. 5



FIG. 1

FIG. 2

FIG. 3

Oracle-Huawei-NetApp Ex. 1001, pg. 6



*FIG. 4*

*FIG. 5*

Oracle-Huawei-NetApp Ex. 1001, pg. 7

US 7,051,147 B2

# 1

## STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE

### RELATED APPLICATIONS

This application is a continuation of and claims the benefit of the filing dates of U.S. patent application Ser. No. 10/081,110 by inventors Geoffrey B. Hoese and Jeffry T. Russell, entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Feb. 22, 2002, now U.S. Pat. No. 6,789,152 which in turn is a continuation of U.S. application Ser. No. 09/354,682 by inventors Geoffrey B. Hoese and Jeffry T. Russell, entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Jul. 15, 1999, now U.S. Pat. No. 6,421,753, which in turn is a continuation of U.S. patent application Ser. No. 09/001,799, filed on Dec. 31, 1997, now U.S. Pat. No. 5,941,972, and hereby incorporates these applications by reference in their entireties as if they had been fully set forth herein.

### TECHNICAL FIELD OF THE INVENTION

This invention relates in general to network storage devices, and more particularly to a storage router and method for providing virtual local storage on remote SCSI storage devices to Fibre Channel devices.

### BACKGROUND OF THE INVENTION

Typical storage transport mediums provide for a relatively small number of devices to be attached over relatively short distances. One such transport medium is a Small Computer System Interface (SCSI) protocol, the structure and operation of which is generally well known as is described, for example, in the SCSI-1, SCSI-2 and SCSI-3 specifications. High speed serial interconnects provide enhanced capability to attach a large number of high speed devices to a common storage transport medium over large distances. One such serial interconnect is Fibre Channel, the structure and operation of which is described, for example, in *Fibre Channel Physical and signaling Interface (FC-PH)*, ANSI X3.230 *Fibre Channel Arbitrated Loop (FC-AL)*, and ANSI X3.272 *Fibre Channel Private Loop Direct Attach (FC-PLDA)*.

Conventional computing devices, such as computer workstations, generally access storage locally or through network interconnects. Local storage typically consists of a disk drive, tape drive, CD-ROM drive or other storage device contained within, or locally connected to the workstation. The workstation provides a file system structure, that includes security controls, with access to the local storage device through native low level, block protocols. These protocols map directly to the mechanisms used by the storage device and consist of data requests without security controls. Network interconnects typically provide access for a large number of computing devices to data storage on a remote network server. The remote network server provides file system structure, access control, and other miscellaneous capabilities that include the network interface. Access to data through the network server is through network protocols that the server must translate into low level requests to the storage device. A workstation with access to the server storage must translate its file system protocols into network protocols that are used to communicate with the server. Consequently, from the perspective of a workstation, or other computing device, seeking to access such server data, the access is much slower than access to data on a local storage device.

# 2

## SUMMARY OF THE INVENTION

In accordance with the present invention, a storage router and method for providing virtual local storage on remote SCSI storage devices to Fibre Channel devices are disclosed that provide advantages over conventional network storage devices and methods.

According to one aspect of the present invention, a storage router and storage network provide virtual local storage on remote SCSI storage devices to Fibre Channel devices. A plurality of Fibre Channel devices, such as workstations, are connected to a Fibre Channel transport medium, and a plurality of SCSI storage devices are connected to a SCSI bus transport medium. The storage router interfaces between the Fibre Channel transport medium and the SCSI bus transport medium. The storage router maps between the workstations and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. The storage router then allows access from the workstations to the SCSI storage devices using native low level, block protocol in accordance with the mapping and the access controls.

According to another aspect of the present invention, virtual local storage on remote SCSI storage devices is provided to Fibre Channel devices. A Fibre Channel transport medium and a SCSI bus transport medium are interfaced with. A configuration is maintained for SCSI storage devices connected to the SCSI bus transport medium. The configuration maps between Fibre Channel devices and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. Access is then allowed from Fibre Channel initiator devices to SCSI storage devices using native low level, block protocol in accordance with the configuration.

A technical advantage of the present invention is the ability to centralize local storage for networked workstations without any cost of speed or overhead. Each workstation access its virtual local storage as if it work locally connected. Further, the centralized storage devices can be located in a significantly remote position even in excess of ten kilometers as defined by Fibre Channel standards.

Another technical advantage of the present invention is the ability to centrally control and administer storage space for connected users without limiting the speed with which the users can access local data. In addition, global access to data, backups, virus scanning and redundancy can be more easily accomplished by centrally located storage devices.

A further technical advantage of the present invention is providing support for SCSI storage devices as local storage for Fibre Channel hosts. In addition, the present invention helps to provide extended capabilities for Fibre Channel and for management of storage subsystems.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features, and wherein:

FIG. **1** is a block diagram of a conventional network that provides storage through a network server;

FIG. **2** is a block diagram of one embodiment of a storage network with a storage router that provides global access and routing;

Oracle-Huawei-NetApp Ex. 1001, pg. 8

US 7,051,147 B2

**3**

FIG. **3** is a block diagram of one embodiment of a storage network with a storage router that provides virtual local storage;

FIG. **4** is a block diagram of one embodiment of the storage router of FIG. **3**; and

FIG. **5** is a block diagram of one embodiment of data flow within the storage router of FIG. **4**.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** is a block diagram of a conventional network, indicated generally at **10**, that provides access to storage through a network server. As shown, network **10** includes a plurality of workstations **12** interconnected with a network server **14** via a network transport medium **16**. Each workstation **12** can generally comprise a processor, memory, input/output devices, storage devices and a network adapter as well as other common computer components. Network server **14** uses a SCSI bus **18** as a storage transport medium to interconnect with a plurality of storage devices **20** (tape drives, disk drives, etc.). In the embodiment of FIG. **1**, network transport medium **16** is an network connection and storage devices **20** comprise hard disk drives, although there are numerous alternate transport mediums and storage devices.

In network **10**, each workstation **12** has access to its local storage device as well as network access to data on storage devices **20**. The access to a local storage device is typically through native low level, block protocols. On the other hand, access by a workstation **12** to storage devices **20** requires the participation of network server **14** which implements a file system and transfers data to workstations **12** only through high level file system protocols. Only network server **14** communicates with storage devices **20** via native low level, block protocols. Consequently, the network access by workstations **12** through network server **14** is slow with respect to their access to local storage. In network **10**, it can Also be a logistical problem to centrally manage and administer local data distributed across an organization, including accomplishing tasks such as backups, virus scanning and redundancy.

FIG. **2** is a block diagram of one embodiment of a storage network, indicated generally at **30**, with a storage router that provides global access and routing. This environment is significantly different than that of FIG. **1** in that there is no network server involved. In FIG. **2**, a Fibre Channel high speed serial transport **32** interconnects a plurality of workstations **36** and storage devices **38**. A SCSI bus storage transport medium interconnects workstations **40** and storage devices **42**. A storage router **44** then serves to interconnect these mediums and provide devices on either medium global, transparent access to devices on the other medium. Storage router **44** routes requests from initiator devices on one medium to target devices on the other medium and routes data between the target and the initiator. Storage router **44** can allow initiators and targets to be on either side. In this manner, storage router **44** enhances the functionality of Fibre Channel **32** by providing access, for example, to legacy SCSI storage devices on SCSI bus **34**. In the embodiment of FIG. **2**, the operation of storage router **44** can be managed by a management station **46** connected to the storage router via a direct serial connection.

In storage network **30**, any workstation **36** or workstation **40** can access any storage device **38** or storage device **42** through native low level, block protocols, and vice versa. This functionality is enabled by storage router **44** which

**4**

routes requests and data as a generic transport between Fibre Channel **32** and SCSI bus **34**. Storage router **44** uses tables to map devices from one medium to the other and distributes requests and data across Fibre Channel **32** and SCSI bus **34** without any security access controls. Although this extension of the high speed serial interconnect provided by Fibre Channel **32** is beneficial, it is desirable to provide security controls in addition to extended access to storage devices through a native low level, block protocol.

FIG. **3** is a block diagram of one embodiment of a storage network, indicated generally at **50**, with a storage router that provides virtual local storage. Similar to that of FIG. **2**, storage network **50** includes a Fibre Channel high speed serial interconnect **52** and a SCSI bus **54** bridged by a storage router **56**. Storage router **56** of FIG. **3** provides for a large number of workstations **58** to be interconnected on a common storage transport and to access common storage devices **60**, **62** and **64** through native low level, block protocols.

According to the present invention, storage router **56** has enhanced functionality to implement security controls and routing such that each workstation **58** can have access to a specific subset of the overall data stored in storage devices **60**, **62** and **64**. This specific subset of data has the appearance and characteristics of local storage and is referred to herein as virtual local storage. Storage router **56** allows the configuration and modification of the storage allocated to each attached workstation **58** through the use of mapping tables or other mapping techniques.

As shown in FIG. **3**, for example, storage device **60** can be configured to provide global data **65** which can be accessed by all workstations **58**. Storage device **62** can be configured to provide partitioned subsets **66**, **68**, **70** and **72**, where each partition is allocated to one of the workstations **58** (workstations A, B, C and D). These subsets **66**, **68**, **70** and **72** can only be accessed by the associated workstation **58** and appear to the associated workstation **58** as local storage accessed using native low level, block protocols. Similarly, storage device **64** can be allocated as storage for the remaining workstation **58** (workstation E).

Storage router **56** combines access control with routing such that each workstation **58** has controlled access to only the specified partition of storage device **62** which forms virtual local storage for the workstation **58**. This access control allows security control for the specified data partitions. Storage router **56** allows this allocation of storage devices **60**, **62** and **64** to be managed by a management station **76**. Management station **76** can connect directly to storage router **56** via a direct connection or, alternately, can interface with storage router **56** through either Fibre Channel **52** or SCSI bus **54**. In the latter case, management station **76** can be a workstation or other computing device with special rights such that storage router **56** allows access to mapping tables and shows storage devices **60**, **62** and **64** as they exist physically rather than as they have been allocated.

The environment of FIG. **3** extends the concept of a single workstation having locally connected storage devices to a storage network **50** in which workstations **58** are provided virtual local storage in a manner transparent to workstations **58**. Storage router **56** provides centralized control of what each workstation **58** sees as its local drive, as well as what data it sees as global data accessible by other workstations **58**. Consequently, the storage space considered by the workstation **58** to be its local storage is actually a partition (i.e., logical storage definition) of a physically remote storage device **60**, **62** or **64** connected through storage router **56**. This means that similar requests from workstations **58** for

Oracle-Huawei-NetApp Ex. 1001, pg. 9

US 7,051,147 B2

**5**

access to their local storage devices produce different accesses to the storage space on storage devices 60, 62 and 64. Further, no access from a workstation 58 is allowed to the virtual local storage of another workstation 58.

The collective storage provided by storage devices 60, 62 and 64 can have blocks allocated by programming means within storage router 56. To accomplish this function, storage router 56 can include routing tables and security controls that define storage allocation for each workstation 58. The advantages provided by implementing virtual local storage in centralized storage devices include the ability to do collective backups and other collective administrative functions more easily. This is accomplished without limiting the performance of workstations 58 because storage access involves native low level, block protocols and does not involve the overhead of high level protocols and file systems required by network servers.

FIG. 4 is a block diagram of one embodiment of storage router 56 of FIG. 3. Storage router 56 can comprise a Fibre Channel controller 80 that interfaces with Fibre Channel 52 and a SCSI controller 82 that interfaces with SCSI bus 54. A buffer 84 provides memory work space and is connected to both Fibre Channel controller 80 and to SCSI controller 82. A supervisor unit 86 is connected to Fibre Channel controller 80, SCSI controller 82 and buffer 84. Supervisor unit 86 comprises a microprocessor for controlling operation of storage router 56 and to handle mapping and security access for requests between Fibre Channel 52 and SCSI bus 54.

FIG. 5 is a block diagram of one embodiment of data flow within storage router 56 of FIG. 4. As shown, data from Fibre Channel 52 is processed by a Fibre Channel (FC) protocol unit 88 and placed in a FIFO queue 90. A direct memory access (DMA) interface 92 then takes data out of FIFO queue 90 and places it in buffer 84. Supervisor unit 86 processes the data in buffer 84 as represented by supervisor processing 93. This processing involves mapping between Fibre Channel 52 and SCSI bus 54 and applying access controls and routing functions. A DMA interface 94 then pulls data from buffer 84 and places it into a buffer 96. A SCSI protocol unit 98 pulls data from buffer 96 and communicates the data on SCSI bus 54. Data flow in the reverse direction, from SCSI bus 54 to Fibre Channel 52, is accomplished in a reverse manner.

The storage router of the present invention is a bridge device that connects a Fibre Channel link directly to a SCSI bus and enables the exchange of SCSI command set information between application clients on SCSI bus devices and the Fibre Channel links. Further, the storage router applies access controls such that virtual local storage can be established in remote SCSI storage devices for workstations on the Fibre Channel link. In one embodiment, the storage router provides a connection for Fibre Channel links running the SCSI Fibre Channel Protocol (FCP) to legacy SCSI devices attached to a SCSI bus. The Fibre Channel topology is typically an Arbitrated Loop (FC_AL).

In part, the storage router enables a migration path to Fibre Channel based, serial SCSI networks by providing connectivity for legacy SCSI bus devices. The storage router can be attached to a Fibre Channel Arbitrated Loop and a SCSI bus to support a number of SCSI devices. Using configuration settings, the storage router can make the SCSI bus devices available on the Fibre Channel network as FCP logical units. Once the configuration is defined, operation of the storage router is transparent to application clients. In this manner, the storage router can form an integral part of the

**6**

migration to new Fibre Channel based networks while providing a means to continue using legacy SCSI devices.

In one implementation (not shown), the storage router can be a rack mount or free standing device with an internal power supply. The storage router can have a Fibre Channel and SCSI port, and a standard, detachable power cord can be used, the FC connector can be a copper DB9 connector, and the SCSI connector can be a 68-pin type. Additional modular jacks can be provided for a serial port and a 802.3 10BaseT port, i.e. twisted pair Ethernet, for management access. The SCSI port of the storage router can support SCSI direct and sequential access target devices and can support SCSI initiators, as well. The Fibre Channel port can interface to SCSI-3 FCP enabled devices and initiators.

To accomplish its functionality, one implementation of the storage router uses: a Fibre Channel interface based on the HEWLETT-PACKARD TACHYON HPFC-5000 controller and a GLM media interface; an Intel 80960RP processor, incorporating independent data and program memory spaces, and associated logic required to implement a stand alone processing system; and a serial port for debug and system configuration. Further, this implementation includes a SCSI interface supporting Fast-20 based on the SYMBIOS 53C8xx series SCSI controllers, and an operating system based upon the WIND RIVERS SYSTEMS VXWORKS or IXWORKS kernel, as determined by design. In addition, the storage router includes software as required to control basic functions of the various elements, and to provide appropriate translations between the FC and SCSI protocols.

The storage router has various modes of operation that are possible between FC and SCSI target and initiator combinations. These modes are: FC Initiator to SCSI Target; SCSI Initiator to FC Target; SCSI Initiator to SCSI Target; and FC Initiator to FC Target. The first two modes can be supported concurrently in a single storage router device are discussed briefly below. The third mode can involve two storage router devices back to back and can serve primarily as a device to extend the physical distance beyond that possible via a direct SCSI connection. The last mode can be used to carry FC protocols encapsulated on other transmission technologies (e.g. ATM, SONET), or to act as a bridge between two FC loops (e.g. as a two port fabric).

The FC Initiator to SCSI Target mode provides for the basic configuration of a server using Fibre Channel to communicate with SCSI targets. This mode requires that a host system have an FC attached device and associated device drivers and software to generate SCSI-3 FCP requests. This mode acts as an initiator using the storage router to communicate with SCSI target devices. The SCSI devices supported can include SCSI-2 compliant direct or sequential access (disk or tape) devices. The storage router serves to translate command and status information and transfer data between SCSI-3 FCP and SCSI-2, allowing the use of standard SCSI-2 devices in a Fibre Channel environment.

The SCSI Initiator to FC Target mode provides for the configuration of a server using SCSI-2 to communicate with Fibre Channel targets. This mode requires that a host system has a SCSI-2 interface and driver software to control SCSI-2 target devices. The storage router will connect to the SCSI-2 bus and respond as a target to multiple target IDs. Configuration information is required to identify the target IDs to which the bridge will respond on the SCSI-2 bus. The storage router then translates the SCSI-2 requests to SCSI-3 FCP requests, allowing the use of FC devices with a SCSI host system. This will also allow features such as a tape

Oracle-Huawei-NetApp Ex. 1001, pg. 10

7

device acting as an initiator on the SCSI bus to provide full support for this type of SCSI device.

In general, user configuration of the storage router will be needed to support various functional modes of operation. Configuration can be modified, for example, through a serial port or through an Ethernet port via SNMP (simple network management protocol) or a Telnet session. Specifically, SNMP manageability can be provided via an 802.3 Ethernet interface. This can provide for configuration changes as well as providing statistics and error information. Configuration can also be performed via TELNET or RS-232 interfaces with menu driven command interfaces. Configuration information can be stored in a segment of flash memory and can be retained across resets and power off cycles. Password protection can also be provided.

In the first two modes of operation, addressing information is needed to map from FC addressing to SCSI addressing and vice versa. This can be 'hard' configuration data, due to the need for address information to be maintained across initialization and partial reconfigurations of the Fibre Channel address space. In an arbitrated loop configuration, user configured addresses will be needed for AL_PAs in order to insure that known addresses are provided between loop reconfigurations.

With respect to addressing, FCP and SCSI 2 systems employ different methods of addressing target devices. Additionally, the inclusion of a storage router means that a method of translating device IDs needs to be implemented. In addition, the storage router can respond to commands without passing the commands through to the opposite interface. This can be implemented to allow all generic FCP and SCSI commands to pass through the storage router to address attached devices, but allow for configuration and diagnostics to be performed directly on the storage router through the FC and SCSI interfaces.

Management commands are those intended to be processed by the storage router controller directly. This may include diagnostic, mode, and log commands as well as other vendor-specific commands. These commands can be received and processed by both the FCP and SCSI interfaces, but are not typically bridged to the opposite interface. These commands may also have side effects on the operation of the storage router, and cause other storage router operations to change or terminate.

A primary method of addressing management commands though the FCP and SCSI interfaces can be through peripheral device type addressing. For example, the storage router can respond to all operations addressed to logical unit (LUN) zero as a controller device. Commands that the storage router will support can include INQUIRY as well as vendor-specific management commands. These are to be generally consistent with SCC standard commands.

The SCSI bus is capable of establishing bus connections between targets. These targets may internally address logical units. Thus, the prioritized addressing scheme used by SCSI subsystems can be represented as follows: BUS:TARGET: LOGICAL UNIT. The BUS identification is intrinsic in the configuration, as a SCSI initiator is attached to only one bus. Target addressing is handled by bus arbitration from information provided to the arbitrating device. Target addresses are assigned to SCSI devices directly, though some means of configuration, such as a hardware jumper, switch setting, or device specific software configuration. As such, the SCSI protocol provides only logical unit addressing within the Identify message. Bus and target information is implied by the established connection.

8

Fibre Channel devices within a fabric are addressed by a unique port identifier. This identifier is assigned to a port during certain well-defined states of the FC protocol. Individual ports are allowed to arbitrate for a known, user defined address. If such an address is not provided, or if arbitration for a particular user address fails, the port is assigned a unique address by the FC protocol. This address is generally not guaranteed to be unique between instances. Various scenarios exist where the AL-PA of a device will change, either after power cycle or loop reconfiguration.

The FC protocol also provides a logical unit address field within command structures to provide addressing to devices internal to a port. The FCP_CMD payload specifies an eight byte LUN field. Subsequent identification of the exchange between devices is provided by the FQXID (Fully Qualified Exchange ID).

FC ports can be required to have specific addresses assigned. Although basic functionality is not dependent on this, changes in the loop configuration could result in disk targets changing identifiers with the potential risk of data corruption or loss. This configuration can be straightforward, and can consist of providing the device a loop-unique ID (AL_PA) in the range of "01h" to "EFh." Storage routers could be shipped with a default value with the assumption that most configurations will be using single storage routers and no other devices requesting the present ID. This would provide a minimum amount of initial configuration to the system administrator. Alternately, storage routers could be defaulted to assume any address so that configurations requiring multiple storage routers on a loop would not require that the administrator assign a unique ID to the additional storage routers.

Address translation is needed where commands are issued in the cases FC Initiator to SCSI Target and SCSI Initiator to FC Target. Target responses are qualified by the FQXID and will retain the translation acquired at the beginning of the exchange. This prevents configuration changes occurring during the course of execution of a command from causing data or state information to be inadvertently misdirected. Configuration can be required in cases of SCSI Initiator to FC Target, as discovery may not effectively allow for FC targets to consistently be found. This is due to an FC arbitrated loop supporting addressing of a larger number of devices than a SCSI bus and the possibility of FC devices changing their AL-PA due to device insertion or other loop initialization.

In the direct method, the translation to BUS:TARGET: LUN of the SCSI address information will be direct. That is, the values represented in the FCP LUN field will directly map to the values in effect on the SCSI bus. This provides a clean translation and does not require SCSI bus discovery. It also allows devices to be dynamically added to the SCSI bus without modifying the address map. It may not allow for complete discovery by FCP initiator devices, as gaps between device addresses may halt the discovery process. Legacy SCSI device drivers typically halt discovery on a target device at the first unoccupied LUN, and proceed to the next target. This would lead to some devices not being discovered. However, this allows for hot plugged devices and other changes to the loop addressing.

In the ordered method, ordered translation requires that the storage router perform discovery on reset, and collapses the addresses on the SCSI bus to sequential FCP LUN values. Thus, the FCP LUN values 0-N can represent N+1 SCSI devices, regardless of SCSI address values, in the order in which they are isolated during the SCSI discovery process. This would allow the FCP initiator discovery pro-

Oracle-Huawei-NetApp Ex. 1001, pg. 11

US 7,051,147 B2

| 9 | 10 |

cess to identify all mapped SCSI devices without further configuration. This has the limitation that hot-plugged devices will not be identified until the next reset cycle. In this case, the address may also be altered as well.

In addition to addressing, according to the present invention, the storage router provides configuration and access controls that cause certain requests from FC Initiators to be directed to assigned virtual local storage partitioned on SCSI storage devices. For example, the same request for LUN 0 (local storage) by two different FC Initiators can be directed to two separate subsets of storage. The storage router can use tables to map, for each initiator, what storage access is available and what partition is being addressed by a particular request. In this manner, the storage space provided by SCSI storage devices can be allocated to FC initiators to provide virtual local storage as well as to create any other desired configuration for secured access.

Although the present invention has been described in detail, it should be understood that various changes, substitutions, and alterations can be made hereto without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

**1**. A storage router for providing virtual local storage on remote storage devices to a device, comprising:

a buffer providing memory work space for the storage router;

a first Fibre Channel controller operable to connect to and interface with a first Fibre Channel transport medium;

a second Fibre Channel controller operable to connect to and interface with a second Fibre Channel transport medium; and

a supervisor unit coupled to the first and second Fibre Channel controllers and the buffer, the supervisor unit operable:

to maintain a configuration for remote storage devices connected to the second Fibre Channel transport medium that maps between the device and the remote storage devices and that implements access controls for storage space on the remote storage devices; and

to process data in the buffer to interface between the first Fibre Channel controller and the second Fibre Channel controller to allow access from Fibre Channel initiator devices to the remote storage devices using native low level, block protocol in accordance with the configuration.

**2**. The storage router of claim **1**, wherein the configuration maintained by the supervisor unit includes an allocation of subsets of storage space to associated Fibre Channel devices, wherein each subset is only accessible by the associated Fibre Channel device.

**3**. The storage router of claim **2**, wherein the Fibre Channel devices comprise workstations.

**4**. The storage router of claim **2**, wherein the remote storage devices comprise hard disk drives.

**5**. The storage router of claim **1**, wherein each of the first Fibre Channel controller comprises:

a Fibre Channel (FC) protocol unit operable to connect to the Fibre Channel transport medium;

a first-in-first-out queue coupled to the Fibre Channel protocol unit; and

a direct memory access (DMA) interface coupled to the first-in-first-out queue and to the buffer.

**6**. A storage network, comprising:

a first Fibre Channel transport medium;

a second Fibre Channel transport medium;

a plurality of workstations connected to the first Fibre Channel transport medium;

a plurality of storage devices connected to the second Fibre Channel transport medium; and

a storage router interfacing between the first Fibre Channel transport medium and the second Fibre Channel transport medium, the storage router providing virtual local storage on the storage devices to the workstations and operable:

to map between the workstations and the storage devices;

to implement access controls for storage space on the storage devices; and

to allow access from the workstations to the storage devices using native low level, block protocol in accordance with the mapping and access controls.

**7**. The storage network of claim **6**, wherein the access controls include an allocation of subsets of storage space to associated workstations, wherein each subset is only accessible by the associated workstation.

**8**. The storage network of claim **6**, wherein the storage devices comprise hard disk drives.

**9**. The storage network of claim **6**, wherein the storage router comprises:

a buffer providing memory work space for the storage router;

a first Fibre Channel controller operable to connect to and interface with the first Fibre Channel transport medium, the first Fibre Channel controller further operable to pull outgoing data from the buffer and to place incoming data into the buffer;

a second Fibre Channel controller operable to connect to and interface with the second Fibre Channel transport medium, the second Fibre Channel controller further operable to pull outgoing data from the buffer and to place incoming data into the buffer; and

a supervisor unit coupled to the first and second Fibre Channel controllers and the buffer, the supervisor unit operable:

to maintain a configuration for the storage devices that maps between workstations and storage devices and that implements the access controls for storage space on the storage devices; and

to process data in the buffer to interface between the first Fibre Channel controller and the second Fibre Channel controller to allow access from workstations to storage devices in accordance with the configuration.

**10**. A method for providing virtual local storage on remote storage devices to Fibre Channel devices, comprising:

interfacing with a first Fibre Channel transport medium;

interfacing with a second Fibre Channel transport medium;

maintaining a configuration for remote storage devices connected to the second Fibre Channel transport medium that maps between Fibre Channel devices and the remote storage devices and that implements access controls for storage space on the remote storage devices; and

allowing access from Fibre Channel initiator devices to the remote storage devices using native low level, block protocol in accordance with the configuration.

**11**. The method of claim **10**, wherein maintaining the configuration includes allocating subsets of storage space to associated Fibre Channel devices, wherein each subset is only accessible by the associated Fibre Channel device.

Oracle-Huawei-NetApp Ex. 1001, pg. 12

**11**

**12**. The method of claim **11**, wherein the Fibre Channel devices comprise workstations.

**13**. The method of claim **11**, wherein the remote storage devices comprise hard disk drives.

**14**. An apparatus for providing virtual local storage on a remote storage device to a device operating according to a Fibre Channel protocol, comprising:

  a first controller operable to connect to and interface with a first transport medium, wherein the first transport medium is operable according to the Fibre Channel protocol;

  a second controller operable to connect to and interface with a second transport medium, wherein the second transport medium is operable according to the Fibre Channel protocol; and

  a supervisor unit coupled to the first controller and the second controller, the supervisor unit operable to control access from the device connected to the first transport medium to the remote storage device connected to the second transport medium using native low level, block protocols according to a map between the device and the remote storage device.

**15**. The apparatus of claim **14**, wherein the supervisor unit is further operable to maintain a configuration wherein the configuration includes the map between the device and the remote storage device, and further wherein the map includes virtual LUNs that provide a representation of the storage device.

**16**. The apparatus of claim **15**, wherein the map only exposes the device to LUNs that the device may access.

**17**. The apparatus of claim **14**, wherein the supervisor unit is further operable to maintain a configuration including the map, wherein the map provides a mapping from a host device ID to a virtual LUN representation of the remote storage device to a physical LUN of the remote storage device.

**18**. The apparatus of claim **14**, wherein the remote storage device further comprises storage space partitioned into virtual local storage for the device connected to the first transport medium.

**19**. The apparatus of claim **18**, wherein the supervisor unit is further operable to prevent the device from accessing any storage on the remote storage device that is not part of a virtual local storage partition assigned to the device.

**20**. The apparatus of claim **14**, wherein the first controller and the second controller further comprise a single controller.

**21**. A system for providing virtual local storage on remote storage devices, comprising:

  a first controller operable to connect to and interface with a first transport medium operable according to a Fibre Channel protocol;

  a second controller operable to connect to and interface with a second transport medium operable according to the Fibre Channel protocol;

  at least one device connected to the first transport medium;

  at least one storage device connected to the second transport medium; and

  an access control device coupled to the first controller and the second controller, the access control device operable to:

    map between the at least one device and a storage space on the at least one storage device; and

    control access from the at least one device to the at least one storage device using native low level, block protocol in accordance with the map.

**22**. The system of claim **21**, wherein the access control device is further operable to maintain a configuration wherein the configuration includes the map between the at least one device and the at least one storage device, and further wherein the map includes virtual LUNs that provide a representation of the at least one storage device.

**23**. The system of claim **22**, wherein the map only exposes the at least one device to LUNs that the at least one device may access.

**24**. The system of claim **21**, wherein the access control device is further operable to maintain a configuration including the map, wherein the map provides a mapping from a host device ID to a virtual LUN representation of the at least one storage device to a physical LUN of the at least one storage device.

**25**. The system of claim **21**, wherein the at least one storage device further comprises storage space partitioned into virtual local storage for the at least one device.

**26**. The system of claim **25**, wherein the access control unit is further operable to prevent at least one device from accessing any storage on the at least one storage device that is not part of a virtual local storage partition assigned to the at least one device.

**27**. The system of claim **21**, wherein the first controller and the second controller further comprise a single controller.

**28**. A method for providing virtual local storage on remote storage devices, comprising:

  mapping between a device connected to a first transport medium and a storage device connected to a second transport medium, wherein the first transport medium and the second transport medium operate according to a Fibre Channel protocol;

  implementing access controls for storage space on the storage device; and

  allowing access from the device connected to the first transport medium to the storage device using native low level, block protocols.

**29**. The method of claim **28**, further comprising maintaining a configuration wherein the configuration includes a map between the device and the one storage device, and further wherein the map includes virtual LUNs that provide a representation of the storage device.

**30**. The method of claim **29**, wherein the map only exposes the device to LUNs that the device may access.

**31**. The method of claim **28**, further comprising maintaining a configuration including a map from a host device ID to a virtual LUN representation of the storage device to a physical LUN of the storage device.

**32**. The method of claim **28**, further comprising partitioning storage space on the storage device into virtual local storage for the device.

**33**. The method of claim **32**, further comprising preventing the device from accessing any storage on the storage device that is not part of a virtual local storage partition assigned to the device.

**34**. A system for providing virtual local storage, comprising:

  a host device;

  a storage device remote from the host device, wherein the storage device has a storage space;

  a first controller;

  a second controller

  a first transport medium operable according to a Fibre Channel protocol, wherein the first transport medium connects the host device to the first controller;

Oracle-Huawei-NetApp Ex. 1001, pg. 13

US 7,051,147 B2

13

a second transport medium operable according to the Fibre Channel protocol, wherein the second transport medium connects the second controller to the storage device;

a supervisor unit coupled to the first controller and the second controller, the supervisor unit operable to:

maintain a configuration that maps between the host device and at least a portion of the storage space on the storage device; and

implement access controls according to the configuration for the storage space on the storage device using native low level, block protocol.

**35**. The system of claim **34**, wherein the supervisor unit is further operable to:

maintain a configuration that maps from the host device to a virtual representation of at least a portion of the storage space on the storage device to the storage device; and

14

allow the host device to access only that portion of the storage space that is contained in the map.

**36**. The system of claim **35**, wherein the configuration comprises a map from a host device ID to a virtual LUN representation of the storage device to a physical LUN of the storage device.

**37**. The system of claim **34**, wherein the storage device further comprises storage space partitioned into virtual local storage for the host device.

**38**. The system of claim **37**, wherein the supervisor unit is further operable to prevent the host device from accessing any storage on the storage device that is not part of a virtual local storage partition assigned to the host device.

**39**. The apparatus of claim **34**, wherein the first controller and the second controller further comprise a single controller.

* * * * *

Oracle-Huawei-NetApp Ex. 1001, pg. 14